[No. S036105. Apr. 30, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
CLEOPHUS PRINCE, JR., Defendant and Appellant.

1186

1188

## COUNSEL

Mark E. Cutler, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson and Gary W. Schons, Assistant Attorneys General, William M. Wood, John T. Swan and Quisteen S. Shum, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**GEORGE, C. J.**—Defendant Cleophus Prince, Jr., appeals from a judgment of the San Diego County Superior Court imposing a sentence of death following his conviction of six counts of first degree murder (Pen. Code, § 187, subd. (a)),[1] five counts of burglary (§ 459), and one count of rape. (§ 261.) The jury found true one rape-murder special-circumstance allegation and one multiple-murder special-circumstance allegation. (§ 190.2, subd. (a)(3) & (17)(C).) The jury also found true the allegations that defendant used a knife in committing each of the murders. (§ 12022, subd. (b).) Defendant also was convicted of six attempted burglaries (§§ 459, 664) and nine completed burglaries of homes belonging to persons other than the murder victims (§ 459), and perjury. (§ 119.) The jury fixed the punishment at death. The court imposed a judgment of death and also sentenced defendant for the noncapital convictions. Defendant's appeal is automatic. (§ 1239, subd. (b).)

We affirm the judgment in its entirety.

## I. FACTS

### A. *Guilt Phase Evidence*

#### 1. *The prosecution's case*

We first provide an overview of the evidence. Defendant and his girlfriend Charla Lewis moved into an apartment in the Buena Vista Gardens apartment

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

complex in the Clairemont area of San Diego in December 1989. Defendant was employed by Expo Builders Supplies beginning on January 10, 1990, usually working from 3:00 p.m. until midnight. Later in the year he was employed at Nacomm Communications.

Tiffany Schultz was murdered on January 12, 1990; Janene Weinhold was murdered on February 16, 1990, and Holly Tarr was murdered on April 3, 1990. All three victims were young, attractive White women who resided in or near the Buena Vista Gardens apartment complex. A resident of that apartment complex testified that in the interval between the Weinhold and Tarr murders, a man she identified as defendant followed her home and stared at her.

The murders were similar to each other in many respects; circumstantial evidence tied defendant to the crimes; DNA (deoxyribonucleic acid) and other evidence connected defendant to the Weinhold murder, and Tarr's opal ring was found in Charla Lewis's possession.

In late April 1990, defendant twice attempted to enter apartments belonging to two young women at the Torrey Pines Village apartment complex. In early May 1990 he followed a woman from the beach to the La Jolla Shores beach house she was visiting and tried to force his way into the house, but was foiled when the woman pushed him over and fled.

On May 20, 1990, Elissa Keller was murdered in her apartment on Trojan Avenue in San Diego. The apartment was close to defendant's new residence at the Top of the Hill apartment complex. The murder was similar to the earlier murders; certain circumstantial evidence implicated defendant; he was seen wearing Keller's ring; and various incriminating statements also tied him to the crime.

There was evidence that on August 2, 1990, defendant committed another burglary of an apartment located in the Top of the Hill apartment complex. The apartment was occupied by three young women. There was evidence establishing that defendant, at a local Thomas Cook Foreign Exchange office, exchanged the Italian lire that were stolen in this burglary.

On September 13, 1990, Pamela Clark and her daughter Amber Clark were murdered in their home in the University City area of San Diego. The murder was similar to the other murders; defendant made incriminating statements; and he was seen wearing Pamela's wedding ring.

A series of burglaries and attempted burglaries in various areas of San Diego was committed between October 1990 and February 1991. Incriminating statements, possession of proceeds of the burglaries, positive identifications of defendant and his automobile, and other evidence tied defendant to

the crimes, many of which involved his following young women from a Family Fitness Center on Miramar Drive in San Diego to the women's homes and attempting to enter the women's residences while the occupants showered or prepared to shower.

The defense was mistaken identification and alibi.

A more detailed account of the evidence adduced at trial follows.

*Count 1—the murder of Tiffany Schultz*

On January 12, 1990, Tiffany Schultz, a White woman who was 21 years of age, was seen sunbathing in the doorway of her second-floor Canyon Ridge apartment about 10:00 a.m. The Canyon Ridge complex was located across the street from the Buena Vista Gardens apartment complex and shared a recreation center, which Schultz's apartment overlooked. Schultz spoke to a friend on the telephone from 10:00 to 10:30 a.m., but telephone calls placed to her near noon or 12:30 p.m. went unanswered.

Dorothy Curtiss, the manager of the Canyon Ridge apartment complex, was relatively certain that a stranger who approached her in front of her office at approximately 10:30 a.m. on January 12, 1990, was defendant. The stranger requested a hanger so he could unlock his automobile, indicating that the vehicle was parked on the street. When the manager supplied the hanger, the stranger, to her surprise and concern, walked toward the apartments rather than the street. Curtiss testified her office abutted the stairs that led to Schultz's apartment, and she had seen Schultz sunbathing, clad only in her bikini, within approximately half an hour of encountering defendant.

Persons occupying the apartment located below Schultz's reported to the police that when they arrived at the apartment between 11:00 a.m. and 1:00 p.m. on January 12, 1990, they heard loud sounds coming from Schultz's apartment. The noise sounded as if someone was being beaten. They also heard running water.

Schultz's roommate discovered her body in one of the bedrooms in the apartment. It appeared there had been a struggle. Schultz was clad only in bikini briefs. She lay on her back, her left leg extended under the bed, while her right leg lay at a 60- to 70-degree angle. One leg was smeared with blood, and there was blood on her crotch. There were at least 47 stab wounds, with a cluster of 20 stab wounds in the right breast and chest area. The wounds were deep, some extending through to the back. There was another cluster of stab wounds in the left area of the chest, also deep, some passing all the way through the body. There were wounds on the neck and upper-right

thigh as well as defensive wounds. Her mouth was bruised, and her face had suffered blunt trauma. She would have been motionless when the fatal knife wounds were inflicted. The bathtub was wet, and there was a damp towel nearby. There was no evidence of a sexual assault.

There also was no sign of forced entry. The interior and exterior doorknobs of the door leading to the room where Schultz's body was discovered bore bloody marks in a honeycomb or crosshatch pattern. It appeared that the assailant had departed by way of the patio, dropping from the second floor balcony to the ground.

Schultz's live-in boyfriend was arrested for the murder but was released after a few days.

> *Counts 2, 3, and 4—the murder and rape of Janene Weinhold and the burglary of her residence*

Janene Weinhold, a White woman who was 21 years of age, shared a second-story apartment in the Buena Vista Gardens apartment complex with a roommate. Both were students at the University of California, San Diego. Weinhold drove her roommate to work at 9:00 a.m. on February 16, 1990, telling her she planned to return home to do laundry and homework. Weinhold was to return to pick up her roommate at 2:00 p.m., but failed to do so, an uncharacteristic omission.

Marsha Nelson occupied an apartment below Weinhold's. Nelson testified that between 11:30 a.m. and noon on February 16, 1990, she observed defendant sitting on the stairs leading to Weinhold's second-story apartment. He appeared sad. She observed him over a period of 15 minutes. Subsequently she heard her dog barking, then heard loud sounds coming from Weinhold's apartment. When Nelson was summoned to a live lineup in June 1991, she identified defendant on a card but then crossed out this identification, explaining to the police that the incident had occurred too long ago for her to make an identification. At trial, she testified that she crossed out her identification because she did not want to become involved.

On February 16, 1990, telephone calls made to Weinhold's apartment from 2:30 p.m. on went unanswered. Weinhold's body was discovered when her roommate returned home that evening at approximately 8:00 p.m. The front door was locked, and there was no sign of a forced entry.

A knife belonging to the occupants of the apartment was found in the sink, displaying a bent tip and blood. Weinhold's body was discovered in her bedroom, one leg up against the bedroom door and the other leg spread. A

blouse, trousers, and underpants were nearby, the trousers and underwear inside out as if just taken off. The body was clad only in a bra. There were at least 22 stab wounds, all in the upper chest area, with eight clustered in a pattern in the upper-right breast. Most were deep, and some had penetrated the breastbone and ribs, a circumstance that might cause a knife to bend. The wounds had been administered with great force. Some of the wounds were defensive in nature. There was a bloodstain in a honeycomb or crosshatch pattern on a doorjamb.

Seminal fluid in Weinhold's vagina was tested, and a genotype match with defendant's blood sample was established to the degree that an expert testified that the match would occur in approximately 7 to 8 percent of the general population (and a lower percentage of the White population). Seminal fluid also was discovered on a jogging suit, a bedspread, and the carpet next to the body. Enzyme testing of the seminal fluid found on the carpet established that defendant, who is African-American, was within the 19 to 21 percent of that population that could have deposited the fluid. Further DNA testing of the jogging suit and bedspread disclosed a match with defendant's blood sample, a match that would occur in approximately one in 120,000 persons.

A number of statements also linked defendant to the murder of Weinhold.

In April 1990, defendant told his friends Robin and Robert Romo that he had gone on a date with a woman, and that when they arrived home he forced himself on her. Defendant related that when he was finished, the victim was weeping, and that he went back and "did her" again.

David Holden was a coworker of defendant's at Nacomm Communications, a cable company, beginning in the autumn of 1990. Early in 1991, defendant mentioned a girl named Janene. Defendant said he worked out with her at an athletic club and went to her home for sexual encounters on one or two occasions. Holden also testified defendant commented that the police never would capture the Clairemont murderer. (This was the description commonly used for the perpetrator of the charged murders.)

Raymond Huntley, a jailhouse informant with many prior convictions for serious crimes (and an escape charge pending), reported several conversations with defendant. On one occasion defendant allegedly said he "didn't have nothing for no White bitches." In another, defendant noted that in his job with the cable company, if he found a woman he wanted to "hit," he could check the name on the mailbox to determine whether she lived alone. The witness assumed that "hit" meant burglarize. The two men discussed assaulting women (Huntley had been convicted of such crimes). Defendant reported that

he enjoyed stalking women and once he selected one, he enjoyed playing with his victims, letting them believe they would escape, and then he would "do them." Defendant also reported that he enjoyed watching blood drip from a knife onto the victim's pubic area.

### The Cotalessa-Ritchie incident

Anna Cotalessa-Ritchie, a young White woman, testified that on March 25, 1990, during the noon hour, she walked from her second-story apartment in the Buena Vista Gardens apartment complex to a local store. She observed defendant at a bus stop on her way to the store, but he was not there when she returned. As she neared her apartment building, she saw defendant coming toward her. He stared at her as they crossed paths. She was at the door of her apartment, trying to insert the key into the lock, when she observed defendant at the bottom of the stairs. Again, he was staring at her. He bent as if to tie his shoes, although they were tied already. She entered her apartment and locked the door. After defendant's arrest, Cotalessa-Ritchie positively identified defendant at a video lineup as the person who had followed her. She also identified him at trial. Prior to her participation in the lineup, she once had seen defendant's image briefly on television.

### Counts 5 and 6—the murder of Holly Tarr and the burglary of her residence

Holly Tarr, who was 18 years of age and White, was a resident of Michigan. In April 1990, she visited her brother Richard at the Buena Vista Gardens apartment complex during her high school spring break. Her friend, Tammy Ho, accompanied her. On April 3, 1990, the two girls played tennis and then entered the pool area of the complex at 11:00 a.m. Ho observed a well-built African-American man working out in the adjacent athletic area. Approximately five or 10 minutes before noon, Tarr returned to the apartment alone, intending to shower. Ten minutes later, Ho approached the apartment and thought she heard a scream. To Ho's surprise, the door of the apartment was locked. Ho heard the telephone ring, but no one answered it. She knocked repeatedly and called out Tarr's name. A neighbor had called the apartment complex maintenance crew, and approximately 10 minutes later a maintenance worker, Richard Williams, arrived. The door was chained shut, and he had to break the chain to enter. Ho ran into the apartment and saw a man emerge from a bedroom and run toward her, his face covered with a white cloth. He held a long knife up to his ear. The man wore a red T-shirt and had dark skin. Ho fell onto a couch as he ran past her through the front door. Ho then discovered Tarr gasping for breath. Tarr's opal ring was gone.

The log for the day at the apartment complex weight room showed, in order of arrival, Richard Tarr, Holly Tarr, Tammy Ho, and C. Prince.

Between noon and 1:00 p.m. on April 3, 1990, a bystander heard screaming coming from the direction of the Tarr apartment. When the witness looked in the direction of the scream, he saw an African-American man wearing a red shirt and black pants and running full speed across the alley, not far from the Tarr apartment. The witness observed the man disappear among the buildings. While in pursuit, the witness encountered another maintenance worker, Juan Rivera Rojas, who described the direction of the man's flight. Rojas testified at trial that he saw an African-American man run by who was approximately 28 to 30 years of age, about five feet six inches tall, and wearing a red shirt and black pants. Rojas picked out defendant in a video lineup conducted in July 1991, but testified at trial that he had not seen the man's face and could not identify him.

Tarr's body lay on the floor of one of the bedrooms in the apartment, her legs spread approximately 45 degrees. She wore a bra and underpants, and a towel was on her chest. There was no sign of forced entry (other than the chain broken by the maintenance worker). Blood was on the stairwell leading to the apartment and in numerous places in the apartment. A shoe print at the threshold matched the size and design of defendant's Nike Air Jordan athletic shoes. An impression of a knife, in blood, was observed on the apartment doorjamb. A bloody knife and a T-shirt were found near the sidewalk and the parking area; the blood was identified as Tarr's, and the knife was from the Tarr apartment. Tarr died of a single stab wound, seven inches deep, that penetrated her heart. There was blood on her bra and on her underwear in the pubic area.

On the day of the Tarr murder, defendant's acquaintances, Robert Romo and Timothy Buckingham, observed defendant, wearing a red T-shirt, driving his automobile in an alley within the Buena Vista Gardens apartment complex between noon and 1:00 p.m. Defendant wore something white on his head. When Romo entered his own apartment in the Buena Vista Gardens complex, he learned from his wife, Robin Romo, that another murder had occurred. Robert shortly thereafter observed defendant drive by again. Robert had seen defendant wear a red T-shirt prior to, but never subsequent to, the Tarr murder.

When interviewed the day after the murder, defendant informed the police that he had been at the pool the prior day until noon, when he returned to his apartment and remained there until his departure for work at 1:50 p.m. He declined the police's request to go to the station for fingerprinting.

A few days after the Tarr murder, Robin Romo mentioned to defendant that there had been another murder. Defendant responded: "Yes I remember. I was at the pool. I saw her leaving."

When the police searched the home of defendant's girlfriend, Charla Lewis, they discovered Tarr's opal ring. The ring was one of 63 that had been manufactured, none of them having been distributed for sale further west than Michigan or Wisconsin. Lewis testified that defendant gave her the ring in December 1990.

### Counts 7 and 8—the attempted burglary of the residence shared by Stephanie Squires and Sarah Canfield

On April 25, 1990, Stephanie Squires observed defendant follow her to the pool in her apartment complex, the Torrey Pines Village apartments. She recognized him, perhaps from her recent prior residence at the Buena Vista Gardens apartment complex. Squires left the pool area around noon and returned to her apartment to shower. A neighbor witnessed an African-American man walk up the stairs toward Squires's apartment. The neighbor telephoned the apartment manager, Jean Smith. Smith testified that the neighbor told her that she saw the man climb the stairs and try the door handle. At trial, the neighbor testified that she merely had seen the man ascend the stairs and then sit down. She testified she did not wish to be involved.

On April 28, 1990, Squires's roommate, Sarah Canfield, attired in her bathing suit, was in the apartment they shared. Between 3:00 and 3:30 in the afternoon, she heard a knock at the door and could see the door handle moving. She looked out, saw defendant standing at the door, and telephoned the apartment manager and the police. At the time of the video lineup in July 1991, she was almost positive the man was defendant, and at trial she was certain of her identification.

At approximately 3:30 p.m. on the same day, April 28, 1990, Jean Smith saw an unfamiliar African-American man walk past her office. She asked her husband Glen to follow the man. Glen Smith testified he observed an African-American man driving an old, dirty or gray, two-door Chevrolet or Oldsmobile exit from the apartment complex parking lot. The vehicle was noisy, as if it had a defective muffler. A few days later, Glen saw the same vehicle driven by the same man in the same parking lot. Glen relayed the license number to the police, who found that the vehicle was registered to defendant. Glen identified a photograph of defendant's automobile as the vehicle he had seen on both occasions.

### Count 9—the burglary of Leslie Hughes-Webb's temporary residence

On May 2, 1990, between 1:30 p.m. and approximately 2:50 p.m., Leslie Hughes-Webb, a young White woman, was sunbathing on the beach near the

La Jolla Shores beach house she was visiting. After she walked back to the house, she climbed the stairs to the back door and found defendant standing in front of the door. She asked his business, and replying that he had rented the home in the past, he walked away. Hughes-Webb entered the house and saw through the glass door that defendant was returning. She attempted to secure the door, but defendant forced it open. He attacked Hughes-Webb, covering her mouth and subsequently grabbing her face and shoulders, and they struggled until she was able to push him over into a nightstand. She fled screaming, and he followed her outside and down two steps, then turned, and ran out the gate. He was due at work at 3:00 p.m., but arrived 15 minutes late that day. At a lineup and at trial, Hughes-Webb identified defendant as her attacker.

*Counts 10 and 11—the murder of Elissa Keller and the burglary of her residence*

Elissa Keller, 38 years of age and White, lived with her 18-year-old daughter. Her home was close to defendant's new residence at the Top of the Hill apartment complex, where he had moved in early May 1990. Late in the evening of May 20, 1990, Keller spoke on the telephone to her daughter, who was away for the weekend. On May 21, 1990, Keller failed to appear at her place of employment at 9:00 a.m., which was unusual. She did not appear at work later that day or answer the telephone. Keller's daughter arrived at their home at approximately 11:30 p.m. on May 21, 1990. The deadbolt on the front door was not locked, which was unusual, and the chain was off the hook. She went to her bedroom, where she discovered her mother's body lying on the floor with a blanket covering her torso.

Keller lay on the carpet with her legs out and slightly separated. She wore only a tank top, and her bloody underwear lay inside out and close to the body. There were nine tightly clustered, deep stab wounds in her chest, along with some defensive wounds. There was blood smeared on her arms and legs. It appeared that she may have been punched in the face and choked. According to the physician who examined her body at approximately 3:00 a.m. on May 22, 1990, Keller had been dead between six and 12 hours, and possibly longer.

The perpetrator's point of entry apparently was a partially open window. Shoe prints on the sill and on a nearby stereo could have been made by defendant's Nike Air Jordan athletic shoes, and were similar to those found at the scene of Tarr's murder. A criminalist testified that gloves such as the ones used by defendant at his place of employment between January and August 1990, and found in the trunk of his vehicle, left the bloody marks found on

the bathroom counter. The gloves bore a distinctive honeycomb or crosshatch pattern. A pair of such gloves also was discovered in the closet of defendant's girlfriend, Charla Lewis.

Keller's gold nugget ring was missing, and defendant subsequently was seen wearing it. The ring later was stolen from defendant but ultimately was traced to him during the murder investigation.

Michael Bari was acquainted with defendant when both men resided at the Top of the Hill apartments. Defendant possessed a large quantity of jewelry and told Bari he had obtained it "off the girls he had slept with. They would not be needing them anymore." Defendant demonstrated for Bari how to break into an apartment by using a Blockbuster video store card, remarking that "as long as it doesn't have a deadbolt, I can get into the apartment." Another occupant of the Top of the Hill apartments during the period defendant resided there, John Rollins, also was acquainted with defendant. Rollins brought up the subject of Keller's murder and heard defendant claim responsibility for that murder, but the remark was made in the course of preparing for a party, and everyone present interpreted it as a joke.

*Count 12—the burglary of the residence occupied by Anna McComber, Maria Saatin, and Nadia Gatti*

Anna McComber resided in the Top of the Hill apartment complex, as did defendant. Two friends from Italy, Maria Saatin and Nadia Gatti, were visiting her. On August 2, 1990, the three young women sunbathed by the apartment complex pool, went shopping, and sunbathed again. When they returned to the apartment, they discovered that a large amount of cash in $50 and $100 bills had been stolen, along with some Italian lire belonging to the Italian visitors.

On August 3, 1990, a person who identified himself as Cleophus Prince exchanged 94,000 Italian lire for $74.73 at the San Diego Thomas Cook Foreign Exchange office. Defendant also deposited $1,100 in two $50 and ten $100 bills into his bank account. The cash deposit was far greater than any he previously had made in the five months he had had the account.

*Counts 13, 14, and 15—the murders of Amber and Pamela Clark and the burglary of their residence*

On July 17, 1990, defendant's girlfriend Charla Lewis joined the Family Fitness Center on Miramar Road. She listed defendant as a member. The membership was cancelled 10 days later.

At approximately 8:00 a.m. on September 13, 1990, Pamela Clark left her home in the University City area of San Diego en route to the Family Fitness Center on Miramar Road. She was wearing a "full body glove" and a bathing suit. She was White, 42 years of age, and very fit. Her husband left their home at approximately 8:30 a.m. Their 18-year-old daughter Amber, who was still asleep, was a member of the same fitness center. At approximately 10:00 a.m., neighbors heard Amber speaking or arguing with someone inside the house. One neighbor heard Amber call out as if afraid and also heard a male voice, but the neighbor believed nothing serious was occurring. This witness believed Pamela Clark's automobile had left the residence earlier in the morning but had returned by 11:00 a.m. Pamela, who was a massage therapist, did not appear at work for her 11:00 a.m. appointment, an unusual occurrence. No one answered the telephone at the Clarks' home.

A colleague of Pamela Clark's discovered her body in the entryway of the home. Pamela was nude, lying on her back with her arms spread at 90 degrees to her body with her legs together. She had suffered 11 deep, clustered stab wounds to the upper left chest in an area measuring four and one-half by three and one-half inches. There was evidence indicating she had been dragged to that location. A knife that could have inflicted the wounds lay near her head.

Amber Clark's body lay on the floor, partly in a hallway and partly in a bedroom. She was clothed, but her garments had been pulled down to expose her breasts. Her legs were spread somewhat apart. Like her mother, she had suffered 11 deep, closely clustered stab wounds to her upper chest in an area measuring three by three and one-quarter inches. Blood was smeared on her body. A knife blade lay on the floor in the bathroom.

Pamela Clark's purse was found on her bed but, uncharacteristically, contained no money. Her wedding ring was missing.

Possible points of entry included a partially open dining room window from which a screen had been removed, and a living room sliding glass door. The door handle bore marks of silica and other material consistent with the gypsum that defendant used in his employment. Shoe prints outside led back and forth under the dining room window. Defendant's Eastland-brand shoes matched shoe prints found under the window and in the dining room. Defendant had called in sick to his employer on the day of the Clark murders.

Two persons who resided with defendant subsequent to these murders testified that he had been in possession of Pamela Clark's wedding ring.

Ernest Tu'ua, a coworker of defendant's, testified that defendant told him during the summer of 1990 that he was dating a massage therapist and that he

was "doing the massage therapist and her daughter," a comment that Tu'ua took to refer to sexual relations. Defendant commented that the massage therapist was an older White woman with a good body. In September 1990, having changed jobs, defendant was working at Nacomm Communications. He installed underground cable. He commented to his foreman that he was "going to do a mother and a daughter," a comment the foreman took to refer to sexual relations. Defendant offered to sell jewelry to the foreman. Another coworker reported that in September 1990, defendant said he was dating a woman and her daughter, adding that the mother, aged 40, had a youthful appearance and the daughter, aged 17 or 18, was attractive. Defendant offered to sell the witness jewelry.

### September 1990—defendant and his cohorts

In the autumn of 1990, defendant resided at the Top of the Hill apartment complex with Shirley Beasley (a male) and Shirley's younger brother Moheshea (Charla Lewis having moved out). According to Moheshea, Shirley told him that defendant and Shirley, in the course of burglarizing the apartment of an older couple who resided at the Top of the Hill complex, had stolen some beer. Defendant told Moheshea he could break into apartments at the nearby Trojan apartment building, because the doors lacked deadbolts. Defendant committed three burglaries with Moheshea, who was 16 years of age at the time. In committing these burglaries, defendant put socks on his hands as he approached the front door of the targeted home and then opened the door using a plastic card. Defendant told Moheshea that he knew of a residence containing jewelry and a safe, and proposed to burglarize it. Defendant stated that he had been inside the home while the female occupant slept, and that if she had awakened, he would have cut her throat. Defendant proposed to return to burglarize this residence. Moheshea testified that he and defendant thereafter broke into a Top of the Hill apartment and stole foreign currency. Defendant also told Moheshea that he surveilled the homes of women he had met at gyms.

### Count 16—the burglary of Michelle Tait's residence

Michelle Tait resided at the Collwood Pines apartments. On October 6, 1990, she sunbathed at the apartment pool beginning in the late morning. She returned to her apartment briefly around 2:00 p.m., finding nothing amiss. When she returned at 3:00 p.m., however, she found that her television and videocassette recorder (VCR) had been stolen.

Tait had had an encounter with defendant during the month preceding the burglary. She was walking up the stairs to her apartment when defendant asked repeatedly whether he could help her carry her groceries. He was pushy

and aggressive. They made eye contact for almost a minute. He stared her down on that occasion, and also at the preliminary examination.

Shirley Beasley testified that while he resided with defendant at the Top of the Hill apartment complex, they burglarized an apartment at the Collwood Pines apartment complex. Defendant asked Beasley whether he wanted a television and a VCR. Pointing to a woman lying by the Collwood Pines apartment complex's pool, defendant stated it was her apartment they would burglarize. Defendant put socks on his hands and entered the apartment door using a credit card. Defendant went to the kitchen and took a knife, stating that if the occupant returned, Beasley should move out of the way and defendant would "handle it." They took the television and the VCR. Both were sold or given away but were traced to defendant. Defendant told Beasley he had been watching a home he knew contained a safe, intending to burglarize it. Defendant also told Beasley he had stolen foreign currency during a burglary and knew where to exchange it. Beasley testified that defendant kept a large quantity of women's jewelry in the apartment they shared.

### Count 17—the burglary of Michael Gromme's residence

Michael Gromme resided in the Top of the Hill apartment complex and was acquainted with defendant. Gromme complained about the noisy muffler on defendant's automobile. On October 15, 1990, when Gromme returned from work at approximately 5:00 p.m., he found that all of his liquor and $100 in cash had been stolen from his apartment. He discussed the burglary with defendant and defendant's roommate shortly after discovering the loss. Defendant's roommate commiserated, claiming that he and defendant had suffered a recent burglary. Gromme's apartment was located one floor above defendant's.

Shirley Beasley testified that he and defendant burglarized the home of an older couple who lived in the Top of the Hill apartment complex and stole all of their liquor to have it for a party. Defendant suggested committing the burglary, noting that the apartment was "right upstairs" from his apartment. During the burglary, defendant took a knife from the kitchen and walked around the apartment. Beasley testified that shortly after the burglary he and defendant commiserated with the occupants of the burglarized apartment, falsely claiming to have suffered a recent burglary themselves.

### Count 18—the burglary of Bruno Gherardi's residence

On November 18, 1990, Bruno Gherardi's home in Encinitas was burglarized. The screen of his open bedroom window had been cut, and the sliding

door to his bedroom was open. His camcorder and its accessory bag were missing, along with a knife from a butcher block in the kitchen. The camcorder was traced to defendant.

### Count 19—the attempted burglary of Patricia Van's residence

On December 19, 1990, Patricia Van returned to her home from the Miramar Road Family Fitness Center about 9:30 a.m. Approximately 20 minutes later, she heard a soft knocking at the door and saw a man she identified at trial as defendant standing there. She opened the door, and defendant asked for a person named Terry, but no one by that name resided there. Her neighbor, Earline Schooner, stood behind defendant, and when she challenged him brusquely, he walked away.

Schooner earlier had seen defendant examining nearby backyards. After 10 minutes, she saw him enter a side yard and approach Van's front door. Schooner, having seen defendant exit from a vehicle, provided the police with the vehicle license number. The automobile was registered to defendant, and he was stopped by the police at 2:30 p.m. on the same day while driving away from the Family Fitness Center on Miramar Road. The vehicle was a gray Chevrolet Cavalier. The police cited defendant for his loud muffler.

### Count 20—the burglary of Melinda Pinkerton's residence

At approximately 11:00 a.m. on January 8, 1991, Lynn Shudarek returned home from her workout at the Family Fitness Center on Miramar Road. She heard someone knocking at the front door and then heard dogs barking. She saw the doorknob moving. She held the doorknob and looked out, observing an African-American man who continued for a moment to try to open the door. He departed and went toward Melinda Pinkerton's residence, two doors away.

When Pinkerton returned home at approximately 2:30 p.m. the same day, the kitchen cabinets had been pulled open and a butcher knife had been placed on the kitchen counter. The sliding door leading to her backyard was open. Her camera was missing, and her lingerie had been moved. Six rings and a gold chain were missing.

Defendant pawned two of Pinkerton's rings that same afternoon, using the name Rodney Higgs. After defendant's arrest, when his automobile was searched, the police found Pinkerton's camera and a wallet containing identification belonging to Rodney Higgs.

*Count 21—perjury*

Defendant used false identification and signed a false name when he pawned Melinda Pinkerton's property.

*Count 22—the attempted burglary of Karyl Oldenburg's residence*

Karyl Oldenburg returned home from her workout at the Miramar Road Family Fitness Center at approximately 11:30 a.m. on January 22, 1991. Once inside her home, she heard the doorknob on the front door jiggling. Through the peephole she witnessed defendant standing with something in his hands, not knocking or ringing the doorbell. As she went to telephone her husband, she observed defendant approaching the back door. She proceeded to the garage and drove away. When a few months later she saw defendant's photograph in the newspaper, she telephoned the police to report the incident. She identified defendant at a video lineup and at trial.

*Count 23—the burglary of Patricia Van's residence*

Approximately one month after the attempted burglary of the Van residence (count 19), Patricia Van's home was burglarized. On January 21, 1991, Van's husband discovered that the sliding door to the patio had been damaged with a tool of some kind. On January 23, 1991, at approximately 9:20 a.m., Van returned from her usual class at the Miramar Road Family Fitness Center. Once inside her home, she discovered that the patio door was open; a window screen was propped up in the kitchen, and the kitchen window was broken. The residence had been ransacked. A butcher knife had been placed on the kitchen counter. Jewelry had been stolen, and that same afternoon defendant drove his acquaintance Mary Ann Knight to a pawnshop where she pawned an earring similar to one stolen from Van.

*Count 24—the attempted burglary of Angela and Renata Yates's residence*

On January 24, 1991, an African-American man driving a gray vehicle with a loud muffler followed Angela Yates, then 19 years of age, as she drove home from the Miramar Road Family Fitness Center. She became aware that she was being followed, and attempted to evade her pursuer. She arrived home, and while she showered, her mother, Renata, observed a shadow moving in the backyard. Upon inspecting, Renata discovered defendant, whom she later positively identified. When he moved toward a sliding door, Renata screamed to her daughter to call the police and to "grab the gun." Their dog ran outside, and defendant ran away. Neighbors witnessed an African-American man jump over the Yates's fence and run to his vehicle. He

appeared agitated as he attempted to enter the vehicle, and drove off rapidly. The muffler of the vehicle was noisy.

*Count 25—the burglary of Louis Depamphillis's residence*

Louis Depamphillis returned to his home on Nobel Drive close to midnight on February 1, 1991. He had left his screened front window ajar. When he returned, the screen had been removed. His camera bag and jewelry boxes had been moved. When he went to a friend's apartment to telephone the police, he noticed an African-American man driving away in an older model bluish-gray vehicle with a loud muffler, possibly matching the photograph of defendant's automobile. When the police responded to Depamphillis's call, they noticed an adjacent apartment had an open front window from which the screen had been removed. Police left a note for the occupant stating the apartment had been burglarized. When he eventually was arrested, defendant was wearing a ring that had been stolen from Depamphillis's residence during the burglary.

*Count 26—the burglary of Judy Kinney's residence*

On February 3, 1991, after a two-day absence, Judy Kinney returned to her apartment on Nobel Drive not far from the Miramar Road Family Fitness Center, where she was a member. The screen to a front window had been removed, and the apartment had been ransacked. Her jewelry and lingerie drawers were open, and lingerie was draped on the drawers. Her emerald ring and a gold chain had been stolen. Defendant gave Kinney's emerald ring to Brittan Lewis and the gold chain to Charla Lewis. Kinney believed she had been followed home from the Family Fitness Center on Miramar Road approximately one month prior to the burglary.

*Count 27—the attempted burglary of Geralyn Peters Venvertloh's residence[2]*

On the morning of February 3, 1991, Geralyn Peters Venvertloh returned home to her Scripps Ranch apartment from her usual morning workout at the Family Fitness Center on Miramar Road. She undressed for a shower, then heard the knob on the front door rattling. She looked out and saw an African-American man leaning against the door with his hands in the area of the doorknob. She dressed and exited from her apartment through a sliding glass door and proceeded to the back of the apartment complex. She screamed for help. Her neighbor, Jeffrey Pich, responded. When Venvertloh

---

[2] This witness had married and changed her surname from Peters to Venvertloh by the time of trial.

and Pich walked to the front of her apartment, they observed the man still standing at the door, bent over and working at the door with some object. He wore gloves. When challenged, the man claimed he was looking for his fiancée or a female friend whom he claimed to have seen entering Venvertloh's home. He walked away calling out a woman's name. Pich walked down the street looking for the would-be intruder and soon observed the man in question driving away in a noisy vehicle at a high rate of speed. Geralyn Peters Venvertloh's then fiancé, Mark Venvertloh, arrived home and also witnessed an African-American man enter an older silver-colored vehicle and drive away noisily at a high rate of speed. Having examined the intruder closely on that occasion, Pich identified defendant as the man he had seen on the front step of his neighbor's residence.

The next day, Geralyn Venvertloh, who was employed at the same location as Charla Lewis, witnessed a man drop off Lewis at work. The man resembled defendant and drove an older model vehicle that had a loud muffler. Pich identified defendant in a photo lineup that same day. One month later Pich identified a photograph of defendant's automobile, and later confirmed that the vehicle sounded like the one he had witnessed when defendant fled from Venvertloh's apartment.

A police officer took statements from Geralyn Peters Venvertloh, Pich, and Mark Venvertloh, and proceeded to the Family Fitness Center on Miramar Road with a description of the vehicle and the suspect. The officer asked fitness center employees to inform the police in the event they witnessed either the man or the vehicle in the vicinity of the establishment. The next morning, February 4, 1991, the fitness center's front desk manager informed the police that she had observed a silver-colored automobile with a loud muffler driven by an African-American man proceed through the fitness center's parking lot, returning 15 minutes later. The employee observed the vehicle parked 30 feet from her office window and watched as the driver moved to the passenger side of the vehicle and slumped down. She was able to observe part of the vehicle license number, which she relayed to the police. Law enforcement officers arrived 15 minutes later and confronted defendant, the occupant of the vehicle.

Defendant informed the officers that he was waiting for his girlfriend, Cindy. A person named Cindy was present at the fitness center at the time, and although she was acquainted with defendant, she was not his girlfriend and had no plan to meet him that day. The officers placed defendant under arrest.

A search of defendant's vehicle uncovered a pair of black leather gloves in the center console and a pair of wool gloves on the driver's seat. Under the

driver's seat was a knife with an eight-inch blade and a five-inch handle. On the right front floorboard was a folding knife with a two-and-one-half-inch blade and a four-inch handle. Under the front seat were a steak knife and a small folding pocket knife.

Other employees of the fitness center had observed defendant's vehicle in the center's parking lot on multiple occasions. They had seen a person who may have been defendant seated in the vehicle, slumped in the passenger seat.

Defendant was questioned and released after providing the police with a blood sample. Subsequently, on February 23, 1991, an undercover police officer witnessed defendant drive into the Miramar Road Family Fitness Center parking lot and, slowing as he observed a marked police vehicle parked in the lot, exit the center's parking lot and drive away at a high rate of speed. The muffler of his vehicle made a loud sound.

Defendant was arrested on March 1, 1991, in Birmingham, Alabama.

As discussed at greater length *post*, FBI Special Agent Larry Ankrom testified that the six murders bore common marks that led him to believe they all were committed by the same person.

### 2. *The defense case*

Two police officers testified that defendant's automobile would not start without manual manipulation under the hood, and would function only if a metal object such as a screwdriver were placed under the hood to make an electrical connection. Officers observed defendant start the vehicle in this manner while they had him under surveillance. Defendant produced evidence indicating that jewelry traced to the burglaries of the Depamphillis and Kinney residences and the murder of Keller was not custom-made but was available commercially. Charla Lewis testified that during the time she resided with defendant, he never arrived home in an agitated state or stained by blood. Defendant introduced evidence establishing that many companies other than his employer distributed to their employees gloves with the distinctive honeycomb or crosshatch pattern that may have been used during the murders.

Statements of various prosecution witnesses were impeached.

Marsha Nelson, who was a neighbor of murder victim Janene Weinhold and observed defendant seated on the steps leading to Weinhold's apartment on the day of the murder, had told a police interviewer immediately after the

crime was discovered that the man she saw on the steps had his head in his hands the entire time she looked at him and that she was unable to see his face. Nelson had circled defendant's number at the live lineup, then crossed it out, explaining that too much time had elapsed since the crime. Karyl Oldenburg (count 22) told the police at the time of the attempted burglary of her home that she might not be able to identify the perpetrator in a lineup. Oldenburg's identification of defendant was made after she had seen his picture in the newspaper, and although she identified defendant in a video lineup and at trial, she testified that unlike defendant, the man she saw at her front door did not have facial hair. Dorothy Curtiss, the apartment manager of the complex where Schultz was murdered, failed to make an identification at the live lineup even though she identified defendant at trial. Rodney Dunn, a maintenance worker at the apartment complex, cast doubt on Curtiss's testimony that it was defendant who approached her seeking assistance on the day of Schultz's murder. On the day Schultz was murdered, Dunn, who was familiar with defendant's appearance, was approached before noon by an African-American man who was *not* defendant. The man asked for a screwdriver because he had locked himself out of his car. The witness assisted the man in unlocking a vehicle that was *not* defendant's. Richard Williams, the maintenance worker who entered murder victim Tarr's apartment with witness Ho to render assistance, had observed the perpetrator running toward him, but described that individual as probably Hispanic and selected someone other than defendant at the lineup.

A witness, Carol Dhillon, testified she had observed an encounter at the Buena Vista Gardens apartment complex similar to the incidents attributed to defendant, but the perpetrator was not defendant. On a morning in mid-March 1990, her 22-year-old daughter was taking a shower when Dhillon observed an African-American man looking up at her apartment. Ten or 15 minutes later, when she retrieved the newspaper from her front step, the man pushed open the front door and said he was looking for his cousin. Dhillon closed the door. The visitor was not defendant. She saw the visitor again approximately two hours later, sitting on or standing by a parked older model automobile.

Shirley Beasley, who on direct examination had testified that he had burglarized homes with defendant and had attributed incriminating statements to defendant, was flown to San Diego, where the police department paid for his lodging while he underwent interrogation. Beasley thereafter was arrested for robbery. He was in custody but had not yet been sentenced when he testified for the prosecution at defendant's preliminary examination. The prosecution's investigator testified on Beasley's behalf at his sentencing, explaining that Beasley had been of assistance in the present case. Beasley was sentenced to four years in prison, a relatively light sentence. He was given immunity from prosecution for the burglaries he committed with defendant and for any other crimes he admitted in the course of his

interrogation in the present case. One of Beasley's comments indicated he was interested in receiving the reward offered for capture of the so-called Clairemont killer.

Christine Fagan testified defendant had lunch with her on May 2, 1990, until approximately 2:30 p.m. on the day Leslie Hughes-Webb was attacked. They met at a location that would have made it extremely difficult for defendant to arrive at the beach by the time of the attack. Fagan observed defendant wearing a gold nugget ring similar to the one the prosecution claimed had been stolen during the Keller murder, but Fagan's meeting with defendant occurred prior to that murder. (Under cross-examination by the People, Fagan added that defendant had stared intently at her during their lunch and aggressively demanded that she go somewhere with him, frightening her.)

Raymond Huntley, the jailhouse informant, was impeached. He had been convicted of multiple burglaries, robberies, and rapes, had escaped from a Florida prison, was facing a sentence of at least 20 years, and was a prison escapee at large in San Diego when he was arrested. He shared a cell only briefly with defendant, later being returned to Florida to complete his prison term. Approximately four months after his conversation with defendant, Huntley contacted the prosecution from Florida to offer information. In exchange for his testimony against defendant, he received various benefits, including a transfer from a Florida prison to one in California and a potential early release date.

Defendant also presented the testimony of an expert in the phenomenon of eyewitness identification. She explained the many flaws in such identification and the factors undermining accuracy, including fear, the lapse of time, the reinforcement of opinion that occurs during multiple proceedings, and the effect of a threat with a weapon on the accuracy of observation. She explained that a person's confidence in his or her identification is not indicative of the reliability of the identification.

In rebuttal, the prosecution presented evidence establishing that the murders occurring at the Buena Vista Gardens apartment complex ceased after defendant moved out in the first week of May 1990.

The jury found defendant guilty of the charged offenses and found true the knife-use and special circumstance allegations.

## B. Penalty Phase Evidence

### 1. The prosecution's case

The prosecution presented evidence indicating that on December 7, 1991, prior to the trial, a search of defendant's jail cell produced a toothbrush with a razor attached—a makeshift weapon typically known as a "shank." The object was hidden between the mattresses on defendant's bed.

The prosecution presented evidence of an additional jailhouse incident involving defendant. Deputy Samuel Sheppard testified that on November 22, 1991, when he arrived to conduct inmates from a recreation area to their cells, defendant told the deputy that he would "kick [his] sweet ass," directing threatening gestures at the deputy while uttering these words. Defendant continued to taunt or threaten the deputy, who grabbed defendant and pushed his face against the wall. Defendant struck Sheppard in the ribs with his elbow and tried to trip him. Sheppard forced defendant to the ground. Other deputy sheriffs assisted in subduing defendant.

The prosecution also presented the testimony of several family members of the murder victims. The parents of murder victims Schultz, Weinhold, and Tarr testified, as did Keller's daughter. They described the victims and the impact of the murders upon the families.

The prosecution played an approximately 25-minute videotape of a television interview with Tarr that had been prepared by a local television station in her hometown a few months prior to her murder. The program marked the accomplishments of certain successful local high school students. In the interview, Tarr described her interests and activities, as well as her plans for college and for a potential career as an actress.

### 2. The defense case

The defense presented the testimony of various members of defendant's family and of one of his friends. These witnesses described defendant's childhood, the circumstance that when he was two years of age his father was convicted of murder and subsequently served 11 years in prison, and defendant's formative years spent in a rundown, crime-ridden housing project in Alabama. Defendant was extremely short in stature as a child. These witnesses offered evidence of defendant's good character, including his close relationship with his paternal grandmother and faithful visits to her, his visits to his father in prison, his industriousness, his protective attitude toward relatives, his compassion, and his generosity. Various relatives and a former girlfriend expressed their love for defendant and asked the jury to spare his life.

A sociologist described the negative attributes of the housing project where defendant resided as a child, and offered the opinion that circumstances such as family violence, inadequate housing conditions, poor education, drug and alcohol abuse, and gang activity were harmful to a child's development. A high school counselor described defendant's development into a responsible person, and a pastor testified concerning defendant's church activities. A former employee of the Department of Corrections described the prison conditions experienced by persons sentenced to life imprisonment without the possibility of parole. The testimony of a fellow inmate suggested that defendant had not been the instigator of the conflict with Deputy Sheppard.

## II. DISCUSSION

### A. *Claims Affecting the Guilt Phase of the Trial*

#### 1. *Motion for change of venue*

Defendant contends extensive pretrial publicity required a change of venue. He claims the trial court's failure to grant his motions for change of venue (§ 1033, subd. (a)) constituted prejudicial error under state law and a violation of his right to due process of law and to a fair trial by an impartial jury as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. We disagree.

##### a. *Factual background*

The charged offenses occurred between January 1990 and February 1991. Defendant was apprehended in March 1991. The preliminary examination commenced on February 24, 1992. Defendant filed a motion for change of venue on September 14, 1992. In support of his motion for change of venue, the defense proffered evidence of the more than 270 newspaper articles that had appeared concerning the crimes, the criminal investigation, defendant's eventual arrest in Alabama and extradition, and the preliminary examination. There was evidence suggesting that television coverage was similar in extent, as the parties stipulated. It also was stipulated that one television station used defendant's image in quick cuts along with the images of Robert Alton Harris and Craig Peyer, persons who had been convicted of murder in San Diego County. Defendant's image was on the screen for "under a second and a half."

As might be expected when a series of six similar murders occurs in a community over a period of approximately one year without a culprit being quickly identified, the publicity in the present case was pervasive and occasionally potentially prejudicial—particularly during the period the crimes

remained unsolved and the perpetrator remained at large. Newspaper articles recounted the growing fear among residents of the neighborhoods where the crimes occurred; articles noted the apparent connection among the crimes, and the eventual designation of the murders as "serial killings"; articles recounted the increasing police resources devoted to the investigation, which eventually was the most extensive in San Diego County history; articles recounted the disproportionate impact of the investigation upon African-American men in the affected neighborhoods, and assertedly prejudicial articles predicted another attack and compared the crimes to those committed by the notorious Jack the Ripper.

Defendant also proffered articles recounting his arrest in Alabama and the relief that ensued among residents of San Diego, especially in neighborhoods in which the murders had occurred; his efforts to resist extradition from Alabama; and providing negative information concerning his family, including his father's conviction of murder. In addition, he presented articles in which persons surmised they had experienced close brushes with defendant and might have been his next victim. News articles noted that defendant was suspected of having committed two additional unsolved murders and mentioned his Navy court-martial for theft. An article described defendant's eviction from the Top of the Hill apartment complex for participating in a fight. The crimes were featured on the television program *America's Most Wanted*.

Defendant also presented evidence indicating that the news media had reported on damaging evidence that was uncovered during the investigation and also at the preliminary examination, including testimony by identification witnesses, statements to the press, and preliminary examination testimony attributing incriminating statements to defendant, lab results claiming a DNA match between samples taken from defendant and evidence found at the scene of the Weinhold murder, and the circumstance that defendant's girlfriend possessed jewelry stolen from the victims.

The defense also presented the testimony of Paul Strand, an expert who conducted a public opinion survey in February 1992, prior to the preliminary examination. According to Strand, approximately 74 percent of the 300 persons surveyed were aware of the case despite the circumstance that only two related news items had appeared during the previous six months. Of those aware of the case, Strand reported that 25 percent were predisposed to find defendant guilty. Strand conducted another survey in September 1992. Seventy-seven percent of the respondents were aware of the case and, of that group, 24 percent were predisposed to find defendant guilty. There had been a burst of publicity around the time of the preliminary examination in February and March of 1992, but very few news items appeared between April and mid-September of 1992.

The trial court acknowledged that the crimes had been serious and the publicity intense. The court noted that neither the victims nor defendant had been prominent or notorious other than in connection with the charged crimes. To the extent defendant was an outsider, the court observed that San Diego is a Navy town, where many individuals might be considered outsiders. The court observed that Tarr, one of the murder victims, also was an out-of-town visitor, and commented that other victims lacked long-standing ties to the community.

The court also commented that sensational news coverage concerning crime permeates our culture in general, and surmised that citizens become inured to such coverage or accord it the same weight as entertainment. The court distinguished the present case from another San Diego County prosecution, that of Robert Alton Harris (see *People v. Harris* (1981) 28 Cal.3d 935 [171 Cal.Rptr. 679, 623 P.2d 240]), concluding that the news coverage in the present case lacked the animosity and prejudgment that had been conveyed in press reports concerning Harris and, rather, left open the question of defendant's guilt. Moreover, the investigation continued for a protracted period, during which two persons other than defendant were arrested, and residents appeared uncertain whether defendant actually was the culprit. Turning to the public opinion surveys, the court commented upon the size and diversity of the county's population and upon the circumstance that the surveys demonstrated that a low percentage of potential jurors had formed an opinion concerning defendant's guilt. Under these circumstances, the court could not conclude it was reasonably likely that counsel and the court would be unable to empanel a fair jury.

The court anticipated that "we're going to see a lot of people on the panel who are familiar with the case," but also anticipated that even persons who casually stated a belief in a defendant's guilt to a polltaker would find that, as jurors, the seriousness of the trial would cause them to set aside their assumptions and judge the case based upon the evidence presented in court.

Further, the court reminded counsel that "it's going to be one of our tasks in jury selection to talk to people who've seen the evidence and ask whether they've come to a conclusion. And whatever they say, whether it's 'yes' or 'no,' that's obviously not going to be conclusive . . . ."

Defendant moved for reconsideration, supplying previously unavailable videotapes of television news coverage of the crimes. According to defendant's pleadings, San Diego's channel 39 repeatedly combined defendant's image with the images of *three* convicted murderers from San Diego and various other newsworthy images as part of the brief "spots" promoting one

of its news programs. According to defendant, this advertisement appeared 950 times over a 13-month period ending approximately six months prior to the present trial.

Speaking in connection with his motion for reconsideration, defense counsel stated that he expected to renew the motion for change of venue "once we commence jury selection and once the court really sees the nature of publicity, how it has affected people." Counsel did not renew the motion, however.

The case was reassigned to another judge for trial. That judge denied the motion for reconsideration, adopting the analysis and conclusion of the court that had heard the original motion.

### b. *Analysis*

State law provides that a change of venue must be granted when the defendant demonstrates a reasonable likelihood that a fair trial cannot be held in the county. (§ 1033; *People v. Vieira* (2005) 35 Cal.4th 264, 278–279 [25 Cal.Rptr.3d 337, 106 P.3d 990].) " ' "The factors to be considered are the nature and gravity of the offense, the nature and extent of the news coverage, the size of the community, the status of the defendant in the community, and the popularity and prominence of the victim." ' " (*Id.* at p. 279.)

On appeal, we conduct de novo review of the evidence presented to the superior court to determine whether the court should have granted a change of venue. (*People v. Jenkins* (2000) 22 Cal.4th 900, 943 [95 Cal.Rptr.2d 377, 997 P.2d 1044].) In addition, on appeal " ' "the defendant must show both that the court erred in denying the change of venue motion, i.e., that at the time of the motion it was reasonably likely that a fair trial could not be had, and that the error was prejudicial, i.e. that it [is] reasonably likely that a fair trial was not *in fact* had." ' " (*Ibid.*)

We agree with the superior court that the nature of the crimes and the intensity of publicity in the present case might weigh in favor of a change of venue, but " 'the same could be said of most multiple or capital murders. This factor is not dispositive. . . .' [Citation.]" (*People v. Dennis* (1998) 17 Cal.4th 468, 523 [71 Cal.Rptr.2d 680, 950 P.2d 1035].) San Diego County's population at the time of the trial was estimated at two million persons, and " '[t]he larger the local population, the more likely it is that preconceptions about the case have not become imbedded in the public consciousness.' . . . The key is whether . . . the population is of such a size that it 'neutralizes or dilutes the impact of adverse publicity.' [Citation.]" (*People v. Jennings* (1991) 53 Cal.3d 334, 363 [279 Cal.Rptr. 780, 807 P.2d 1009], citation omitted; see also

*People v. Harris, supra,* 28 Cal.3d at p. 949.) We have concluded that even a lower population of 1.4 million (Santa Clara County) "suggests that any prejudicial publicity's effect would be diluted or neutralized over time." (*People v. Dennis, supra,* 17 Cal.4th at p. 523.)

Neither defendant nor the victims were prominent or notorious apart from their connection with the present proceedings. As in other cases, "[a]ny uniquely heightened features of the case that gave the victims and defendant any prominence in the wake of the crimes, which a change of venue normally attempts to alleviate, would inevitably have become apparent no matter where defendant was tried." (*People v. Dennis, supra,* 17 Cal.4th at p. 523.) We acknowledge the prejudice that may have attended the circumstances that defendant is African-American and the victims all were White women, and that the crimes included one rape and other crimes having sexual undertones. (See *People v. Williams* (1989) 48 Cal.3d 1112, 1129 [259 Cal.Rptr. 473, 774 P.2d 146].) This element of possible prejudice presumably would follow the case to any other venue, however. (See *People v. Dennis, supra,* 17 Cal.4th at p. 523; see also *People v. Cooper* (1991) 53 Cal.3d 771, 806 [281 Cal.Rptr. 90, 809 P.2d 865].) The publicity did not emphasize defendant's race or employ inflammatory terms to kindle racial hatred.

We also observe that the bulk of the publicity upon which defendant relies was disseminated between the time of the second murder in February 1990 and the time the preliminary examination took place in February 1992, and that approximately one additional year elapsed between that hearing and the commencement of jury selection in March 1993. The television promotional material of which defendant complained was withdrawn in July 1992. The passage of time ordinarily blunts the prejudicial impact of widespread publicity. (See *People v. Jenkins, supra,* 22 Cal.4th at p. 944; *People v. Dennis, supra,* 17 Cal.4th at p. 524; see also *People v. Robinson* (2005) 37 Cal.4th 592, 623 [36 Cal.Rptr.3d 760, 124 P.3d 363].) We also may presume that potential and seated jurors did not read or watch news reports concerning the case against defendant that may have been disseminated during jury selection and the ensuing trial, because the jury questionnaire directed potential jurors not to expose themselves to news coverage for the duration of their service.

■ Defendant also fails to establish a reasonable likelihood that pretrial publicity in fact deprived him of a fair trial. Pervasive publicity alone does not establish prejudice. (*People v. Panah* (2005) 35 Cal.4th 395, 448 [25 Cal.Rptr.3d 672, 107 P.3d 790].) Jurors who have been exposed to publicity still may serve. " ' "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." ' " (*Ibid.*; see also *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 45 [17 Cal.Rptr.3d 710, 96 P.3d 30].)

The superior court's confidence that, despite the publicity, the venire would consist primarily of persons who had not formed an opinion as to defendant's guilt was borne out by subsequent proceedings. Although a high percentage of the prospective jurors and 12 of the 13 jurors who actually served at trial (one juror was excused after the guilt phase and an alternate was substituted) had been exposed to the publicity, the jurors' responses to the juror questionnaire and voir dire did not disclose any prejudgment or emotional bias. Rather, for the most part they displayed only a vague recollection of past news coverage, a circumstance suggesting the absence of prejudice. (See *People v. Jenkins*, *supra*, 22 Cal.4th at p. 945.) Significantly, the jurors asserted that the publicity would not prevent them from serving as unbiased jurors. (See *People v. Panah*, *supra*, 35 Cal.4th at p. 448 [relying upon similar assertions]; *People v. Coffman and Marlow*, *supra*, 34 Cal.4th at p. 46 [same].) Defendant refers to voir dire answers of three of the seated jurors: Juror H.E., Juror J.G., and Juror A.W. None of these jurors made statements suggesting they had prejudged the case or were biased because of the pretrial publicity. (Juror H.E.—the juror remembered when defendant was arrested, but said it was not of great moment to him; Juror J.G.—he knew nothing specific, just that there were some killings in a certain neighborhood, and he had read nothing about the case since the time defendant was extradited to California; Juror A.W.—she read about the case and was frightened. When defendant was arrested, she asked herself, "is it him or not?")

Defendant insists we cannot believe jurors who are aware of publicity but profess not to have formed an opinion concerning guilt or otherwise to have been prejudiced by publicity. Although "such assurances are not conclusive" (*People v. Jennings*, *supra*, 53 Cal.3d at p. 361), neither do we presume that exposure to publicity, by itself, causes jurors to prejudge a defendant's guilt or otherwise become biased. (*People v. Jenkins*, *supra*, 22 Cal.4th at p. 945.) "[T]he Supreme Court has made clear that we cannot, as a general matter, simply disregard a juror's own assurances of his impartiality based on a cynical view of 'the human propensity for self-justification.'" (*DeLisle v. Rivers* (6th Cir. 1998) 161 F.3d 370, 384.) It was the function of the voir dire examination to expose actual bias or prejudice, but the voir dire in this case did not demonstrate a biased or prejudiced jury. Courts must distinguish between "mere familiarity" with the defendant or the crime and an "actual predisposition" against the defendant. (*Murphy v. Florida* (1975) 421 U.S. 794, 800, fn. 4 [44 L.Ed.2d 589, 95 S.Ct. 2031].) A court may discount a juror's claim to be untouched by publicity when "most veniremen will admit to a disqualifying prejudice" (*id.* at p. 803), but the venire in the present case was not pervaded by bias in this manner.

Moreover defense counsel did not renew the motion for change of venue at the conclusion of voir dire and, moreover, did not exhaust defendant's peremptory challenges. Putting aside any question whether counsel's inaction

constituted a forfeiture of the issue on appeal, counsel's conduct supports a reasonable inference that the defense did not believe that pretrial publicity had prejudiced the seated jurors or rendered them unable to afford defendant a fair trial. Indeed, " '[t]he failure to exhaust peremptories is a strong indication "that the jurors were fair and that the defense itself so concluded." ' " (*People v. Dennis, supra,* 17 Cal.4th at p. 524; see also *People v. Robinson, supra,* 37 Cal.4th at p. 623; *People v. Coffman and Marlow, supra,* 34 Cal.4th at p. 46.)

Defendant urges that no rational inference that counsel was satisfied with the jury can be drawn from counsel's failure to exhaust peremptory challenges. He contends that the denial of the motion for change of venue had left defense counsel with a venire that was saturated with persons who had been exposed to the pretrial publicity and that included a substantial proportion of jurors who must have prejudged defendant. He adds that defense counsel were aware of which juror would be called should they exercise a peremptory challenge and may have found the next prospective juror even worse than the juror they might have excused.[3]

In essence, defendant claims that the publicity was so pervasive and inflammatory that, under federal constitutional guarantees, prejudice must be presumed.

In exceptional cases, " 'adverse pretrial publicity can create such a *presumption* of prejudice in a community that the jurors' claims that they can be impartial should not be believed,' [citation] . . . ." (*Mu'min v. Virginia* (1991) 500 U.S. 415, 429 [114 L.Ed.2d 493, 111 S.Ct. 1899], italics added.) "The category of cases where prejudice has been presumed in the face of juror attestation to the contrary is extremely narrow. Indeed, the few cases in which the [high] Court has presumed prejudice can only be termed extraordinary, [citation], and it is well-settled that pretrial publicity itself—'even pervasive, adverse publicity—does not inevitably lead to an unfair trial' [citation]." (*DeLisle v. Rivers, supra,* 161 F.3d at p. 382.) This prejudice is presumed only in *extraordinary* cases—not in every case in which pervasive publicity has reached most members of the venire. We do not

---

[3] Defendant also claims that "comments made by defense counsel, in seeking additional challenges after exhausting all they had for alternate jurors, demonstrated a dissatisfaction with the entire selected jury, not just the alternates. Defense counsel stated: 'We are in very bad—we didn't use hardly any, used any challenges on the major part. We are stuck with some very bad jurors. We are very upset with the jurors that we have.' " The quoted comments, however, *relate to the alternates* and suggest dissatisfaction with the venire's attitude toward the death penalty, and do not connect counsel's dissatisfaction with the pretrial publicity.

believe the present case falls within the limited class of cases in which prejudice would be presumed under the United States Constitution.[4]

We acknowledge that the high court has held that prejudice may be presumed in some limited instances. The court declared that although jurors who are familiar with some facts of the crime may be qualified to serve because they can put aside their views and reach a verdict based upon the facts in evidence, "[a]*t the same time*, the juror's assurances that he is equal to this task cannot be dispositive of the accused's rights, and it remains open to the defendant to demonstrate 'the actual existence of such an opinion in the mind of the juror as will raise the *presumption of partiality*.' [Citation.]" (*Murphy v. Florida, supra*, 421 U.S. at p. 800, italics added.)

The United States Supreme Court decisions that have presumed that pretrial publicity was prejudicial involved extreme circumstances, however. In one case in which the high court reversed a judgment, the critical feature was that a local television station in a relatively small community on several occasions broadcast the entire spectacle of the defendant's jailhouse confession. (*Rideau v. Louisiana* (1963) 373 U.S. 723, 727 [10 L.Ed.2d 663, 83 S.Ct. 1417].) Explaining two other cases in which the high court presumed prejudice, the court stated that "[t]he trial in [*Estes v. Texas* (1965) 381 U.S. 532 [14 L.Ed.2d 543, 85 S.Ct. 1628]] had been conducted in a circus atmosphere, due in large part to the intrusions of the press, which was allowed to sit within the bar of the court and to overrun it with television equipment. Similarly, [*Sheppard v. Maxwell* (1966) 384 U.S. 333 [16 L.Ed.2d 600, 86 S.Ct. 1507]] arose from a trial infected not only by a background of extremely inflammatory publicity but also by a courthouse given over to accommodate the public appetite for carnival. The proceedings in these cases were entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of a mob. They cannot be made to stand for the proposition that juror exposure to information about a state defendant's prior convictions or to news accounts of the crime with which he is charged alone presumptively deprives the defendant of due process." (*Murphy v. Florida, supra*, 421 U.S. at

---

[4] As in previous cases in which a defendant claimed error in denying a change-of-venue motion, "[d]efendant argues he was denied a reliable determination of his penalty guaranteed by the Eighth Amendment, citing *Caldwell v. Mississippi* (1985) 472 U.S. 320, 328–329 [86 L.Ed.2d 231, 105 S.Ct. 2633], which held that 'it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere.' He also cites *Woodson v. North Carolina* (1976) 428 U.S. 280 [49 L.Ed.2d 944, 96 S.Ct. 2978], which invalidated a law that provided a mandatory penalty of death for all first degree murders. Defendant fails to explain how either of these [principles] has any relevance to the present case." (*People v. Ramirez* (2006) 39 Cal.4th 398, 436 [46 Cal.Rptr.3d 677, 139 P.3d 64].)

p. 799.) The reviewing court instead must look for "indications in the totality of the circumstances that [the defendant's] trial was not fundamentally fair." (*Ibid.*)

Defendant has not demonstrated similarly extreme circumstances. We acknowledge that in the present case there was extensive print and television coverage of the crimes, the search for the perpetrator, the fears engendered by the nearly yearlong series of murders, and defendant's subsequent arrest and extradition. A further spike in publicity occurring at the time of the preliminary examination served to summarize the earlier events and added potentially prejudicial information, such as an overstatement of the incriminating value that the cautious trial court eventually permitted to be attributed to the DNA evidence, defendant's incriminating statements to a friend, the murder conviction of defendant's father, and the circumstance that some of the victims' jewelry could be traced to defendant. Some elements of the news coverage could be labeled inflammatory or sensational, for example when the perpetrator—then unidentified—was compared with Jack the Ripper, or a television announcer referred to a "reign of terror," when newspaper and television articles emphasized the community fear provoked by the murders, and when the television promotional spot repeatedly exhibited defendant's image along with those of locally well-known convicted murderers. As noted, the crimes were of a nature that might arouse racial animus, although the news coverage itself did not exploit this circumstance.

On the other hand, the bulk of the newspaper articles and television reports merely recounted the facts of the crimes, the course of the investigation, and the circumstances of defendant's arrest. There were articles and reports concerning the arrest and potential prosecution of other persons and, as the trial court observed, it appeared from the news reports that the community remained uncertain whether it was defendant who actually was the perpetrator. The great bulk of the articles and reports was framed in neutral terms and did not "amount[] to an 'out-of-court campaign to convict,' reflecting ' "inflamed public sentiment," ' [citation], such as when a defendant is persistently labeled in incendiary terms: 'a "werewolf," a "fiend," a "sex-mad killer," and the like,' [citations]. As the . . . Court observed, coverage that consists of 'straight news stories rather than invidious articles which would tend to arouse ill will and vindictiveness,' [citation], is not so troubling." (*DeLisle v. Rivers, supra,* 161 F.3d at p. 385.)

In the present case, defendant does not allege that there was a barrage of publicity immediately preceding the trial. "[C]essation of publicity for some period prior to trial will go a long way toward undoing the damage of a previous media blitz." (*DeLisle v. Rivers, supra,* 161 F.3d at p. 385.) Defendant's own expert noted the small number of articles and reports that

were published between the preliminary examination and the hearing on the motion to change venue. The promotional television spot upon which defendant places great weight was withdrawn approximately six months prior to trial. The juror questionnaire instructed prospective jurors not to expose themselves to any further media coverage. Defendant does not contend on appeal that the media intruded and created a circus atmosphere at trial. The entire venire contained only a small proportion of persons who had formed an opinion as to defendant's guilt, and nothing in the record suggests the panel of seated jurors harbored any opinion concerning defendant's guilt. Contrary to defendant's claim, "we cannot, as a general matter, simply disregard a juror's own assurances of his impartiality based on a cynical view of 'the human propensity for self-justification.' [Citation.]" (*Id.* at p. 384.)[5] On balance, defendant fails to persuade us that his was one of the extraordinary cases in which prejudice must be presumed. We conclude that defendant has failed to demonstrate a violation of his federal constitutional right to a trial by an impartial jury or to due process of law.

### 2. *Expert opinion evidence*

Defendant contends the trial court abused its discretion and deprived him of a fair trial when, on motion of the prosecution, it permitted FBI Special Agent Larry Ankrom to testify as an expert that, based on his experience comparing the records of hundreds of crime scenes, various common marks among the six charged homicides led him to conclude the crimes were committed by the same person. Defendant asserts a violation of his constitutionally guaranteed right to the presumption of innocence absent proof of guilt beyond a reasonable doubt. (U.S. Const., 5th & 14th Amends.) He also claims a denial of his right to reliable factfinding in a capital case (U.S. Const., 8th Amend.; *Caldwell v. Mississippi, supra,* 472 U.S. 320), and what he terms an "arbitrary deprivation of the state-created protection of Evidence Code section 800" in violation of his right to due process of law. (U.S. Const., 5th & 14th Amends.)

The prosecution announced prior to trial that it intended to call FBI Special Agent John Douglas to testify as an expert on crime scene analysis and "signature crimes," anticipating Douglas would express his opinion that all

---

[5] Indeed, "it is beyond question that mere prior knowledge of the existence of the case, or familiarity with the issues involved, or even some preexisting opinion as to the merits, does not in and of itself raise a presumption of jury taint; such a standard would be certainly unsalutary, and likewise impossible to achieve: [¶] 'It is not required . . . that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case.' " (*DeLisle v. Rivers, supra,* 161 F.3d at p. 382.)

six charged murders had been committed by the same person. Evidently the prosecution also anticipated that Douglas would testify concerning psychological elements involved in serial murders.

Defendant objected to the proposed testimony on multiple grounds, including Douglas's lack of qualifications as an expert on psychological matters (Evid. Code, § 720), improper subject matter for expert testimony (Evid. Code, § 801), relevance (Evid. Code, § 210), and the testimony's prejudicial impact outweighing its probative value (Evid. Code, § 352). Defendant also relied upon "the Fifth and Fourteenth Amendments to the United States Constitution and analogous provisions of the California Constitution."

The court conducted a lengthy pretrial hearing, receiving extensive testimony from Douglas and his colleague, FBI Special Agent Ankrom. The court did not believe the witnesses' training or experience qualified them to express an opinion regarding the probable state of mind of the perpetrator, and that aspect of the proposed testimony was excluded. The court concluded the witnesses had sufficient training and experience in crime scene investigation, however, and that the subject matter of "crime scene analysis and the signature crimes" was beyond common experience. The court ruled the proposed testimony on that limited topic was admissible. The prosecution elected not to call Douglas; only Ankrom testified.

Ankrom's qualifications as a crime scene expert were significant. As he testified, he was a 13-year veteran special agent for the FBI. For the five years preceding the trial, he had been assigned to the FBI's National Center for the Analysis of Violent Crime (Center), a clearinghouse and pool of experts from whom law enforcement agencies throughout the nation sought advice and assistance. In conjunction with his position with the Center, Ankrom received two years of intensive training in criminology and other academic topics and, more specifically, was trained to review comprehensive information concerning crimes and to perform a "criminal investigative analysis" of the case material for various purposes, including to develop a profile of the perpetrator, to make recommendations on interview strategy, and to give advice regarding "linkage" between potential serial crimes.

Ankrom's experience was based not only on his training but also on his five years as an active agent who had been called upon to review comprehensive information regarding hundreds of crimes and to offer expert advice to law enforcement agencies whose investigations in these cases faced obstacles or had failed to produce results. Ankrom's experience included reviewing records related to various serial homicide cases and conducting lengthy interviews with eight convicted serial killers for the purpose of identifying evidence that would link the crimes committed by each perpetrator. He had

reviewed autopsy reports, police reports, photographs, and other records for "well over a hundred" female homicide victims who had been stabbed to death, and he testified that in his experience the multiple deep, clustered stab wounds such as occurred in the present case were unusual.

According to Ankrom, he and other agents at the Center analyze crime evidence for "linkage" by looking for common methods of operation among groups of crimes—that is, the methods used by the criminals to complete their crimes and to achieve the intended murder, rape, or other crime. In addition to identifying common methods in a series of crimes, the agents look for signature elements—actions that were not necessarily involved in or necessary for completing the crimes, but that served as distinctive common denominators among the crimes.

Ankrom further testified that the San Diego Police Department contacted the Center in early 1990 concerning the Schultz and Weinhold murders. Ankrom reviewed autopsy reports, crime scene photographs, autopsy protocols, criminal investigative reports, maps, and social histories of the victims. In April 1990, the San Diego Police Department contacted him to report the Tarr murder. In September 1990, that agency reported the Clark murders to him. At the request of the San Diego Police Department, which relied upon his superior expertise in crime scene analysis, Ankrom thereafter met personally with members of the San Diego Police Department investigative team, reviewed the evidence with them, and offered his advice. The department informed him in February 1991 of the Keller murder.

Ankrom testified that it was his opinion that all six murders were committed by the same person. During his analysis of the crimes, he noted certain common features, as follows: The murders occurred in a small geographical area of San Diego, the first three having occurred in adjacent apartment complexes. Most occurred between 10:00 a.m. and 2:00 p.m., and they occurred in the victims' residences. There was no mark of forced entry. The weapon used was a knife, and the victims were White females. Beyond these features exhibiting a common modus operandi, the crimes bore certain distinctive marks. In each murder except that of Tarr, where the murder was interrupted, there were numerous stab wounds that were tightly clustered in each victim's chest and were extremely deep, sometimes penetrating to the victim's back. According to Ankrom, another distinctive common denominator was the position of the victims when found. They were lying on their backs, nude or in a state of partial undress, and seemed to Ankrom to be positioned for display. The expert's opinion that all the murders were committed by the same person was "very firm."

Defendant contends Ankrom's testimony was inadmissible under state law because it concerned matters that were not beyond the common experience of

jurors. He points out, for example, that jurors are charged with evaluating whether similarities among charged and uncharged crimes suggest the same person committed the crimes or that the perpetrator's intent or motive was the same in committing each crime. (Evid. Code, § 1101.)[6] On the other hand, he urges, expert opinion is restricted to subjects that are "sufficiently *beyond common experience* that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a), italics added.)

We apply an abuse of discretion standard in reviewing a trial court's decision to admit the testimony of an expert. (*People v. Robinson, supra*, 37 Cal.4th at p. 630.) The trial court obviously *exercised* its discretion in the present case; it gave very careful attention to the issue, holding an extensive hearing, engaging in discussion with counsel, and ultimately excluding any testimony concerning the perpetrator's probable state of mind, motive, or intent. We conclude for a number of reasons that the trial court did not *abuse* its discretion in the present case.

■ First, although ordinarily courts should not admit expert opinion testimony on topics so common that persons of " 'ordinary education could reach a conclusion as intelligently as the witness' " (*People v. McDonald* (1984) 37 Cal.3d 351, 367 [208 Cal.Rptr. 236, 690 P.2d 709], disapproved on another ground in *People v. Mendoza* (2000) 23 Cal.4th 896, 914 [98 Cal.Rptr.2d 431, 4 P.3d 265]), experts may testify even when jurors are not "wholly ignorant" about the subject of the testimony. (*People v. McDonald, supra*, 37 Cal.3d at p. 367.) "[I]f that [total ignorance] were the test, little expert opinion testimony would ever be heard." (*Ibid.*)

Rather, the pertinent question is whether, even if jurors have some knowledge of the subject matter, expert opinion testimony would assist the jury. (Evid. Code, § 801, subd. (a); *People v. McDonald, supra*, 37 Cal.3d at p. 367.)

We acknowledge that ordinarily jurors are equipped to examine crime scene photographs and autopsy evidence and to form an opinion, in the context of their own perception of the evidence in the particular case, whether the wounds depicted are so similar they suggest the wounds were inflicted by the same person.[7]

---

[6] We summarily reject defendant's claim that the various charged crimes were not sufficiently similar to have been admissible pursuant to Evidence Code section 1101. That statute has no application to charged crimes.

[7] Contrary to the suggestion of defense counsel at oral argument that Ankrom simply reviewed the same crime scene photographs reviewed by the jury, Ankrom testified he also reviewed, both in the present case and the hundreds of other cases he had analyzed, autopsy photographs, protocols from the autopsies, police investigative reports (concentrating on the

Notwithstanding the ability of jurors to review the evidence before them and draw commonsense inferences, it may aid them to learn from a person with extensive training in crime scene analysis, who has examined not only the evidence in the particular case but has in mind his or her experience in analyzing hundreds of other cases, whether certain features that appear in all the charged crimes are comparatively rare, and therefore suggest in the expert's opinion that the crimes were committed by the same person. A juror could assume that most stabbing victims are found on their backs, or that tightly clustered six-and-a-half-inch stab wounds to the chest are characteristic of murders by stabbing. In the present case, however, Ankrom was asked whether in his extensive experience "the tight clustered wound pattern, the depth of the wounds, in combination with the women being found on their backs, is that distinct?" And he testified in response: "It is. In my opinion it's something that we would find in our review of other cases to be a rare occurrence," especially in conjunction with the additional and consistent similarities in modus operandi he identified among the murders in the present case. He added: "To see that the wound pattern takes place in that exact spot repeatedly is something that is a distinct common denominator." Under these circumstances, we cannot conclude the testimony was of no assistance to jurors who previously never had examined crime scene evidence other than the evidence before them, nor can we conclude Ankrom's evidence " ' "would add nothing at all to the jury's common fund of information." ' " (*People v. Farnam* (2002) 28 Cal.4th 107, 163 [121 Cal.Rptr.2d 106, 47 P.3d 988].)

Another basis for our conclusion that the trial court did not abuse its discretion in admitting Ankrom's testimony is that other courts have permitted expert opinion testimony in comparable circumstances. Experts on the subject of crime scene reconstruction, for example, ordinarily may be permitted to give opinion testimony concerning such matters as the probable location where the crime occurred, notwithstanding the jury's ability to examine photographs, coroner's reports, and other evidence to form their own commonsense conclusions regarding the crime scene. (*People v. Farnam*, *supra*, 28 Cal.4th at pp. 162–163.)

Perhaps even more to the point, courts have held an expert may testify concerning criminal modus operandi and may offer the opinion that evidence seized by the authorities is of a sort typically used in committing the type of crime charged. An experienced police officer may testify as an expert, for example, that tools discovered in a defendant's automobile are of the type commonly used in burglaries. (*People v. Jenkins* (1975) 13 Cal.3d 749, 755 [119 Cal.Rptr. 705, 532 P.2d 857].) A police inspector may explain that

report of the officers who were first on the scene), maps, background information concerning the victims, and the history of crimes in the pertinent geographic locations.

conduct such as that engaged in by the defendant constituted the " 'usual procedure' " followed in committing the crime of "till tapping." (*People v. Clay* (1964) 227 Cal.App.2d 87, 93 [38 Cal.Rptr. 431]; see also *People v. Ochoa* (2001) 26 Cal.4th 398, 438 [110 Cal.Rptr.2d 324, 28 P.3d 78] [a detective with relevant training may furnish expert opinion concerning the gang-related significance of the defendant's tattoo]; *People v. Gardeley* (1996) 14 Cal.4th 605, 617 [59 Cal.Rptr.2d 356, 927 P.2d 713] [the expert properly testified concerning the culture and habits of criminal street gangs, opining on whether certain behavior constituted gang-related activity]; *People v. Martinez* (2003) 113 Cal.App.4th 400, 413–414 [7 Cal.Rptr.3d 49] [an expert properly testified that a gang ordinarily will exact revenge upon a gang member who reveals gang confidences]; *People v. Gamez* (1991) 235 Cal.App.3d 957, 965 [286 Cal.Rptr. 894] [based upon his expertise concerning the modus operandi of armed robbers, an officer properly testified concerning the probable intent to commit robbery exhibited by persons who acted as the defendants did].)

Federal cases have upheld the admissibility of testimony by a trained police officer explaining "that a defendant's activities were consistent with a common criminal modus operandi." (*U.S. v. Webb* (9th Cir. 1997) 115 F.3d 711, 713, and cases cited; see also *U.S. v. Cross* (D.C. Cir. 1991) 928 F.2d 1030, 1050, and cases cited; *U.S. v. Espinosa* (9th Cir 1987) 827 F.2d 604, 612.) Such modus operandi evidence " 'helps the jury to understand complex criminal activities, and alerts it to the possibility that combinations of seemingly innocuous events may indicate criminal behavior.' " (*U.S. v. Webb, supra,* 115 F.3d at p. 714.) Testimony concerning criminal modus operandi may be helpful to the jury even if the modus operandi is not particularly complex. (*Ibid.*; see also *U.S. v. Hankey* (9th Cir. 2000) 203 F.3d 1160, 1168–1169 [explaining the trial court's duty to evaluate the reliability of the evidence].)

In *United States v. Rogers* (9th Cir. 1985) 769 F.2d 1418, the court determined that it was appropriate for an FBI agent to testify as an expert that of the 1,800 robberies that had occurred in Los Angeles, only two were perpetrated in a bank vault by a person wearing a bandana. The evidence was relevant to prove that the two charged robberies were committed by the same person. The court commented that it is settled that "[l]aw enforcement officers may testify concerning the techniques and methods used by criminals." (*Id.* at p. 1425.) The court continued: "The testimony as to the frequency of bandana wearing in Los Angeles area bank robberies was relevant to the identity of the perpetrator of the robberies. The fact that very few robberies involve this garb make it more likely that the same person committed both robberies." (*Id.* at p. 1426.)

One sister-state decision specifically extends the rule permitting experienced officers to testify concerning criminal modus operandi to the topic of

expert opinion testimony on modus operandi admitted for the purpose of establishing *linkage* among crimes. The Delaware Supreme Court concluded that an FBI agent *properly* was permitted to testify as an expert regarding serial murders, and that he properly could opine that the three charged murders were committed by the same person. (*Pennell v. State* (Del. 1991) 602 A.2d 48, 55.) The court determined that the expert had extensive and specialized experience with signature crimes and crime analysis. (*Ibid.*) It added that the expert's testimony could assist the jury in understanding behavior "unknown to the general public." (*Ibid.*)

Respondent has acknowledged and brought to our attention one state court decision reaching a different conclusion on so-called linkage evidence. In that case, the defendant was prosecuted for murder and the state introduced evidence of an *uncharged* rape and attempted murder. The prosecution called upon an expert from the FBI to testify that the charged murder, which occurred in New Jersey, and the uncharged attempted murder, which occurred in Maine (and during which the defendant was apprehended), bore common marks in terms of their modus operandi and their "ritualistic" elements, and that the same person committed both crimes. The New Jersey Supreme Court determined that the "linkage" evidence was inadmissible, reasoning that the expert's opinion was based upon behavioral science of doubtful and unproven reliability. (*New Jersey v. Fortin* (2000) 162 N.J. 517 [745 A.2d 509, 513–514].) The New Jersey court believed that the "linkage" concept had not "attained such a state of the art as to have the scientific reliability of DNA testing" (*id.*, 745 A.2d at p. 514), and there was no evidence it was accepted in the scientific community or even that it could be tested outside the FBI center where the theory had been developed. (*Ibid.*)

To the extent the New Jersey expert was offering testimony similar to Ankrom's, we believe the New Jersey court erred in comparing such testimony to DNA evidence. In our view, that court applied an incorrect standard in searching the "scientific community" for "peers to test [the expert's] theories" and "duplicate his results." (*New Jersey v. Fortin, supra*, 745 A.2d at p. 514.) Ankrom's testimony was based upon his extensive *experience*, not theories that normally would be subject to peer review or that would be otherwise comparable to DNA testing. (See *U. S. v. Hankey, supra*, 203 F.3d at p. 1169 [expert opinion on gang culture is not examined for acceptance in the scientific community, nor should it be subject to peer review]; see also *Pennell v. State, supra*, 602 A.2d at p. 55 [distinguishing FBI agent's "linkage" testimony on the same basis].)[8]

---

[8] We do not mean to imply that expert testimony based upon experience rather than technical expertise is not subject to scrutiny for *reliability*. (See *U. S. v. Hankey, supra*, 203 F.3d at p. 1169 [exhaustively discussing trial court's gatekeeping responsibility]; *U. S. v. Vesey* (8th Cir. 2003) 338 F.3d 913, 916–917 [trial court erred in excluding the testimony of a defense

Defendant contends Ankrom's testimony falls under a different line of judicial decisions. He likens this testimony to "profile" evidence, which defendant asserts must be excluded. A profile ordinarily constitutes a set of circumstances—some innocuous—characteristic of certain crimes or criminals, said to comprise a typical pattern of behavior. In profile testimony, the expert compares the behavior of the defendant to the pattern or profile and concludes the defendant fits the profile. (See *People v. Robbie* (2001) 92 Cal.App.4th 1075, 1084 [112 Cal.Rptr.2d 479]; see also *People v. Smith* (2005) 35 Cal.4th 334, 357, 358 [25 Cal.Rptr.3d 554, 107 P.3d 229].)

■ The comparison is unavailing because, unlike profile evidence, Ankrom's testimony did not refer to defendant at all. We agree with the Delaware Supreme Court, which in rejecting a claim that similar linkage testimony constituted "profile" evidence, explained, " 'Profile' evidence is that which attempts to link the general characteristics of serial murderers to specific characteristics *of the defendant.*" (*Pennell v. State, supra,* 602 A.2d at p. 55, italics added.) The testimony in that case indicating that three murder scenes bore such common marks that, in the opinion of the expert, they suggested the crimes had been committed by the same person did not seek to tie characteristics of serial murderers to *characteristics of the defendant.* (*Ibid.*)

Significantly, Ankrom's testimony did not evaluate *defendant's* behavior against a pattern or profile. Ankrom did not offer an opinion that he believed defendant was the culprit, nor did he relate his findings to defendant at all. Instead, he compared documentary evidence of the crime scenes in the present case and, based upon his observation of common marks and his experience, concluded the crimes had been committed by a single person. In any event, profile evidence does not describe a category of always-excluded evidence; rather, the evidence ordinarily is inadmissible "only if it is either irrelevant, lacks a foundation, or is more prejudicial than probative." (*People v. Smith, supra,* 35 Cal.4th at p. 357.) In sum, "[p]rofile evidence is objectionable when it is insufficiently probative because the conduct or matter that fits the profile is as consistent with innocence as guilt." (*Id.* at p. 358.)

Defendant next claims that Ankrom's testimony that he was confident the same person committed all the crimes invaded the province of the jury and constituted testimony concerning the ultimate issue of guilt or innocence. Having argued the jury was perfectly *capable* of using common sense to determine whether similarities at the crime scenes suggested all the crimes

---

expert, a convicted drug trafficker, who would have testified concerning the usual practice in drug transactions, and explaining scope of court's discretion in assessing reliability]; Kaye et al., New Wigmore Treatise on Evidence (2004) Expert Evidence, § 9.3.3, pp. 323–325 [analyzing reliability requirement in light of *Kumho Tire Co. v. Carmichael* (1999) 526 U.S 137 [143 L.Ed.2d 238, 119 S.Ct. 1167]].)

were committed by the same person, defendant claims Ankrom's testimony rendered the jurors *incapable* of making such a determination. According to defendant, it was solely the jury's obligation to determine whether the asserted similarities among the crimes warranted the inference that a single person had committed them. In essence, defendant argues, the expert improperly rendered an opinion on guilt or innocence in violation of Evidence Code section 800 and defendant's right under the Eighth and Fourteenth Amendments of the federal Constitution to reliable factfinding in a capital case, and the admission of this testimony also constituted an arbitrary deprivation of state procedural rights and to due process of law in violation of the Fifth, Sixth, and Fourteenth Amendments of the federal Constitution.

■ Despite the circumstance that it is the jury's duty to determine whether the prosecution has carried its burden of proof beyond a reasonable doubt, opinion testimony may encompass "ultimate issues" within a case. Evidence Code section 805 provides that "[t]estimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact." (See *People v. Valdez* (1997) 58 Cal.App.4th 494, 507 [68 Cal.Rptr.2d 135] [a gang expert testified that the defendant was a member of a particular gang and that his activities were undertaken on behalf of the gang].)

Of course an expert's opinion that a defendant is guilty is both unhelpful to the jury—which is equally equipped to reach that conclusion—and too helpful, in that the testimony may give the jury the impression that the issue has been decided and need not be the subject of deliberation. But Ankrom did not testify that defendant was guilty, nor did Ankrom tell the jury whom to believe or direct the jury toward a specific conclusion on any element of the charged crimes. His testimony did not mention defendant at all. Ankrom's conclusion, based upon special training and experience in evaluating the records of hundreds of crime scenes, that he believed all the crimes were committed by the same person, did not bind the jury, nor would Ankrom's testimony be understood as essentially directing a verdict. The court instructed the jury that they were the exclusive judges of credibility (CALJIC No. 2.20), and that they were not bound by an expert's opinion, being free to accord the opinion the weight it deserves after considering the basis for the opinion (CALJIC No. 2.80).

Defendant next contends Ankrom's testimony constituted or closely resembled improper "mathematical probability evidence" such as that disapproved by this court in *People v. Collins* (1968) 68 Cal.2d 319 [66 Cal.Rptr. 497, 438 P.2d 33]. In that case, an expert witness (a mathematics instructor) testified that there was a one-in-12-million chance that the defendants were not guilty. (*Id.* at p. 325.) An eyewitness had observed some characteristics of

the perpetrators, such as that they seemed to be a White woman with a blonde ponytail accompanied by an African-American man with a beard in a yellow automobile, and the expert used these assertedly distinctive features to calculate the probability that a couple other than the defendants could have met this description. This court reversed the judgment, because the expert's opinion testimony had no basis in the facts. For example, one of the "factors" relied upon by the expert was the presence of a yellow automobile at the scene, but there was no evidentiary basis for the expert's bold assertion that "one out of every ten cars which might have been at the scene of the robbery was partly yellow." (*Id.* at p. 327.) Further, there was no proof that the characteristics selected for analysis were mutually independent—a necessary precondition to the statistical operation known as the " 'product rule.' " (*Id.* at p. 328; see also *id.* at p. 325 [the product rule "states that the probability of the joint occurrence of a number of mutually independent events is equal to the product of the individual probabilities that each of the events will occur" (italics & fn. omitted)]; see also *People v. Soto* (1999) 21 Cal.4th 512, 525 [88 Cal.Rptr.2d 34, 981 P.2d 958].) We found the error prejudicial, because it distracted the jury from its task and encouraged jurors to rely upon "an engaging but logically irrelevant expert demonstration." (*People v. Collins*, *supra*, 68 Cal.2d at p. 327.)

The present case is distinguishable, because Ankrom's testimony was not cloaked in scientific garb but was expressed as a matter of professional experience gained over a lengthy period of observation. Moreover, as defendant does not deny, the facts relating to the charged crimes analyzed by Ankrom were well established, and Ankrom did not employ a mathematical formula to add a specious weight to his conclusion.

*People v. Hernandez* (1997) 55 Cal.App.4th 225 [63 Cal.Rptr.2d 769] is of no assistance to defendant. There a computer was used to search a police database respectively for sex crimes committed in a restricted area prior to the defendant's arrival in the neighborhood, and for such crimes committed subsequent to his arrest and incarceration. The search was directed at crimes that bore similarity to those with which the defendant was charged. The prosecution's argument was that the *absence* of similar crimes in the database when the defendant no longer was in the neighborhood demonstrated that the defendant likely was guilty. The reviewing court reversed for lack of a proper foundation establishing that the data entered into the computer was accurate and complete. (*Id.* at p. 240.)

By contrast, Ankrom analyzed multiple sources, including primarily his own professional experience, in drawing the conclusion that the same person had committed all of the charged murders. He did not rely upon the absence of evidence shown by a system of data collection that might omit pertinent evidence.

Next defendant contends the trial court abused its discretion under Evidence Code section 352 in permitting Ankrom to testify, asserting that the probative value of the evidence was slight and the potential for undue prejudice was great. He argues that the trial court arbitrarily violated the principles underlying Evidence Code section 352, thereby denying him various constitutional rights, including his right to due process of law under the Fifth and Fourteenth Amendments to the federal Constitution, his right to a reliable penalty determination pursuant to *Beck v. Alabama* (1980) 447 U.S. 625 [65 L.Ed.2d 392, 100 S.Ct. 2382], and his rights under the Fifth and Fourteenth Amendments to the presumption of innocence and to the requirement that the prosecution meet its burden of proving defendant's guilt of the charged crimes beyond a reasonable doubt.

Defendant claims the evidence had slight probative value, because Ankrom failed to recognize salient distinctive features in the various crimes and overstated the evidentiary value of the asserted similarities. These claims go to the weight, not the admissibility of the evidence. It was for defendant to expose the weaknesses in the expert's opinion on cross-examination—and defendant did so. Nor do we see the overwhelming prejudicial impact posited by defendant. We do not believe that Ankrom's stature as an FBI agent employed at the special center he described would cause the jury to abandon its function as fact finder, especially in light of the guidance offered to the jury by the court's jury instructions.

We also reject defendant's various constitutional claims. At trial, defendant objected to Ankrom's testimony "based on the Fifth and Fourteenth Amendments to the United States Constitution and analogous provisions of the California Constitution." Assuming, without deciding, that the points asserted by defendant properly were preserved (see *People v. Partida* (2005) 37 Cal.4th 428, 433–434 [35 Cal.Rptr.3d 644, 122 P.3d 765]), they are without merit for the same reasons that defendant's state law claims have been rejected. (See *People v. Ward* (2005) 36 Cal.4th 186, 211 [30 Cal.Rptr.3d 464, 114 P.3d 717].) As we have concluded in past cases, "[a]pplication of the ordinary rules of evidence generally does not impermissibly infringe on a capital defendant's constitutional rights." (*People v. Kraft* (2000) 23 Cal.4th 978, 1035 [99 Cal.Rptr.2d 1, 5 P.3d 68].) Defendant has not persuaded us that his case presents an exception to this rule.

Finally, defendant contends Ankrom's testimony that the Center's work had *exonerated* an innocent person in the past violated defendant's constitutional rights. Defendant claims: "The jurors would have undoubtedly understood this aspect of Agent Ankrom's testimony as meaning that Ankrom's unit reviewed many thousands of homicide cases, and if they had found any others that were similar to the crimes charged against [defendant], they would

have surely brought that to the attention of the appropriate authorities. Furthermore, the implication was clear that such review would continue in the future, and if they discovered after the present trial that somebody else was committing similar crimes, that would be brought to the attention of the authorities. Thus, even if [defendant] were wrongly convicted and sentenced to death, he would nonetheless be freed before any execution occurred. [¶] . . . Thus, the jury was not merely encouraged to rely on the Agent's expertise to overcome their own doubts; in addition, they were encouraged to rely on Agent Ankrom's unit to discover and correct any error they might make." According to defendant, these circumstances deprived him of the reliable factfinding that is required in capital cases under *Caldwell v. Mississippi, supra*, 472 U.S. 320.

Defendant did not object on this basis during Ankrom's testimony or proffer the constitutional argument he has made in this court, and this aspect of his claim therefore is forfeited. (*People v. Partida, supra*, 37 Cal.4th at pp. 433–434.) In any event, we find no error. Defendant has not cited any rule of evidence that would require the exclusion of such testimony, and his concerns about the effect upon the jury of the testimony in question rest solely upon speculation.

### 3. *Discovery*

During discovery, the defense received a report prepared by Ankrom regarding the investigation he conducted in the present case. The report expressed the opinion the crimes were linked, citing considerable evidence and Ankrom's experience. The report also mentioned that FBI agents at the Center maintained a database of the various violent crimes that had been reported to them and that the database (called the VICAP database) was designed to track serial killers. Of the 5,000 homicides in the database at the time of the present crimes, some involved multiple stabbing deaths of female victims in their homes, but none were similar to the signature aspects of the crimes charged in this proceeding.

The defense moved for discovery of the VICAP database, claiming it formed one of the bases for Ankrom's opinion and was critical to adequate cross-examination. The prosecution responded that it lacked authority to disclose the confidential VICAP database, that the request should be addressed to the FBI, and that the prosecution had disclosed to the defense all material relating to the present crimes that Ankrom had referred to in his report. After a hearing, the trial court agreed that in the event Ankrom proposed to testify concerning the VICAP database and the extent to which it provided a basis for his opinion, the defense was entitled to examine the database record of the cases in which female murder victims had been stabbed multiple times in their homes.

Ankrom responded that he would not testify concerning the VICAP database and instead would base his trial testimony on his personal experience, which the court had established was substantial. Agent Douglas agreed the database results were not essential to support an opinion that the murders in the present case were linked.

The court ruled that Ankrom would not be permitted to testify regarding the VICAP database but stated it credited Ankrom's testimony that his opinion would not be based upon the FBI database.

The defense renewed the discovery request at the conclusion of Ankrom's testimony on direct examination, claiming Ankrom's conclusion that the clustered stabbing pattern in the present case was "in our experience a rare occurrence" must have been based on a comparison of the present case with the cases in the FBI database, and that discovery of that database was essential to permit adequate cross-examination.

The court denied the motion, stating: "I don't think it's necessary for this witness, or any other witness for that matter, to bring in each and every prior case that one has examined in order to provide a fair opportunity to cross-examine that witness."

Defense counsel then cross-examined Ankrom, eliciting testimony that he never had worked as a homicide investigator and never had been to a homicide crime scene, and that he never had examined a map of the entire San Diego County area and was not certain of the location of the sites of the murders within the area. Defense counsel vigorously challenged the witness's view that certain elements of the crimes were similar and distinctive, asking him to compare the present crimes with others in which the perpetrator left bizarre "signature" marks. Under cross-examination, Ankrom conceded that another unsolved stabbing case that occurred in San Diego County while defendant was in custody bore certain similarities to the charged murders. Defense counsel himself then elicited the information that the witness had consulted a large FBI database, and attempted unsuccessfully to bring before the jury the circumstance that the defense had not been provided access to that database. On inquiry by defense counsel, the expert again expressed his opinion that the crimes were committed by a single person, but that this opinion was not based on the database.

On appeal, defendant contends the trial court erred in denying his discovery motion directed at the FBI database allegedly used by Ankrom (and Douglas) in forming the opinion that all the murders charged in the present case were committed by the same person.

Defendant claims the denial of discovery deprived him of fundamental fairness because, he claims, it impaired his ability to cross-examine the expert

as to the basis for his opinion. Defendant also relies upon Evidence Code section 721, subdivision (a), which provides that "a witness testifying as an expert may be cross-examined to the same extent as any other witness and, in addition, may be fully cross-examined as to . . . (3) the matter upon which his or her opinion is based and the reasons for his or her opinion." Defendant's argument is premised upon the circumstance that an expert's stated opinion is only as reliable as the matter that forms the basis for his or her opinion. In the view of the defense, it was "forced to accept the mere conclusions of the witness, without the materials needed to test their strength."

■ "The defendant generally is entitled to discovery of information that will assist in his defense or be useful for impeachment or cross-examination of adverse witnesses. [Citation.] A motion for discovery must describe the information sought with some specificity and provide a plausible justification for disclosure. [Citation.] The court's ruling on a discovery motion is subject to review for abuse of discretion. [Citation.]" (*People v. Jenkins, supra,* 22 Cal.4th at p. 953.)

The defense was not entitled to examine all the written records generated during Ankrom's career in order to be able to cross-examine him concerning his own professional experience. (See *People v. Roberts* (1992) 2 Cal.4th 271, 299 [6 Cal.Rptr.2d 276, 826 P.2d 274] [a defendant's right to confrontation was not violated by the court's denial of a request for discovery of the many sources of the expert's gang expertise, including conversations with inmates and other investigations].) Nor was the defense entitled to challenge the basis for the expert's opinion by examining him concerning a database not relied upon by the expert.

Defendant disputes that Ankrom could have formed his opinion without relying upon the database. He claims the distinctive marks identified by Ankrom as the basis for his opinion were not truly distinctive, so that the only true basis for Ankrom's opinion must have been his mental comparison of the charged crimes with all the other crimes in the VICAP database. We are not persuaded. At the pretrial hearing on the admissibility of the expert's testimony, the court credited the expert's claim that his opinion was not based upon the database, and Ankrom had ample personal experience upon which to base his opinion.

With respect to defendant's right of confrontation and cross-examination at trial, defendant's lack of access to the VICAP database did not impair his ability to cross-examine the expert concerning the basis for his opinion, nor was it unfair to permit the expert to testify without providing such access. The expert informed the court that the database was not the basis for his opinion, and the court credited this claim. Ankrom personally had reviewed

records in more than 100 murder cases in which a female victim was stabbed to death. The trial court acted well within its discretion in concluding that Ankrom based his opinion upon his personal experience in the field of crime analysis, and at trial Ankrom's testimony conformed to this expectation on the part of the trial court. Defendant cross-examined the expert regarding his training and the scope of his experience, and challenged the expert's opinion by questioning him on the differences that existed among the charged crimes. In addition, as the trial court noted, the defense could have impeached the witness by presenting coroner's testimony that the stabbing wounds in each murder were distinctive.

Defendant contends that an arbitrary deprivation of state-created discovery rights deprived him of due process of law, citing *Hicks v. Oklahoma* (1980) 447 U.S. 343 [65 L.Ed.2d 175, 100 S.Ct. 2227], but he fails to identify any violation of such rights.[9]

Defendant also relies upon *People v. Price* (1991) 1 Cal.4th 324 [3 Cal.Rptr.2d 106, 821 P.2d 610] for the proposition that a defendant should be given "wide latitude in the cross-examination of experts to test their credibility. [Citation.] If a witness frustrates cross-examination by declining to answer some or all of the questions, the court may strike all or part of the witness's testimony [and] . . . may decline to admit the testimony in the first instance." (*Id.* at p. 421, citation omitted.) In that case, we concluded the court did not abuse its discretion in excluding the testimony of a defense witness concerning prison gangs, because the expert was unwilling to identify the persons he had interviewed for the study that formed the basis for his opinion. The court was within its discretion in concluding that the expert's unwillingness to disclose would unduly impair cross-examination. (*Ibid.*) But in the present case, the database that defendant wished to examine was *not* the basis for the witness's opinion.

Defendant contends that withholding access to the FBI database violated his constitutional right to effective counsel, thus denying him the right to present a meaningful defense, a fair opportunity to be heard, and the

---

[9] Defendant claims the court at least should have conducted in camera review of the FBI database in order to determine whether "due process and fundamental fairness required making some of the materials available to the defense." In support he cites *White v. Superior Court* (2002) 102 Cal.App.4th Supp. 1 [126 Cal.Rptr.2d 207], where the appellate department of the superior court concluded the trial court did not abuse its discretion in ordering an in camera hearing to determine whether the defendant's right to impeach the credibility of a peace officer, who investigated allegations that the defendant assaulted a ward in a juvenile facility, should overcome the inspector general's claim that disclosure would be against the public interest. The appellate department simply determined that the trial court had not abused its discretion, and certainly did not hold that an in camera hearing should be held whenever a defendant seeks access to materials that he or she believes provided a basis for an expert's opinion.

constitutional right to reliable factfinding in a capital case. Defendant has not identified a state law or constitutional right affording access to the FBI database, so his right to effective counsel was not impacted. There was no denial of a state-created right; as we have seen, defendant had the opportunity to present a meaningful defense and had a fair opportunity to be heard with respect to the admissibility of the expert testimony, and his inability to examine the expert concerning something the expert *denied* considering as a basis for his opinion did not undermine the reliability of the factfinding process.

Defendant invokes his right to compulsory process, claiming his lack of access to the FBI database "depriv[ed] [him] of evidence clearly bearing on the credibility of key prosecution witnesses." In support, he cites *Brady v. Maryland* (1963) 373 U.S. 83 [10 L.Ed.2d 215, 83 S.Ct. 1194], *Kyles v. Whitley* (1995) 514 U.S. 419 [131 L.Ed.2d 490, 115 S.Ct. 1555], and *Pennsylvania v. Ritchie* (1987) 480 U.S. 39, 57–58 [94 L.Ed.2d 40, 107 S.Ct. 989]. As these cases recognize, the prosecution must disclose material exculpatory evidence to the defense. (See also *In re Brown* (1998) 17 Cal.4th 873, 879 [72 Cal.Rptr.2d 698, 952 P.2d 715] [discussing application of this principle to information under the control of separate agencies that form part of the prosecution team]; *In re Sassounian* (1995) 9 Cal.4th 535, 543–544 [37 Cal.Rptr.2d 446, 887 P.2d 527] [discussing the right to disclosure of evidence that would impeach a prosecution witness].) But the database is not part of the record, and the record on appeal does not indicate there exists any material or exculpatory evidence in the database. "As we have done in the past, '[b]ecause defendant's claim is dependent upon evidence and matters not reflected in the record on appeal, we decline to consider it at this juncture.' " (*People v. Jenkins, supra*, 22 Cal.4th at p. 952.)[10]

Finally, defendant claims that Ankrom's testimony "encouraged the jury to ignore any reasonable doubts" and to rely upon his expertise, while the denial of defendant's discovery request left the defense unable to "test the strength of the bases of the witness's conclusions." The consequence, defendant claims, was that the court "improperly lightened the prosecution's burden of

---

[10] To the extent defendant's claim concerns pretrial discovery and is based upon the confrontation or compulsory process clauses of the Sixth Amendment, it is on a weak footing. "As we have previously observed, in light of the divided views of the justices of the Supreme Court . . . it is not at all clear 'whether or to what extent the confrontation or compulsory process clauses of the Sixth Amendment grant pretrial discovery rights to the accused.' [Citations]." (*People v. Hammon* (1997) 15 Cal.4th 1117, 1126 [65 Cal.Rptr.2d 1, 938 P.2d 986]; see also *People v. Gurule* (2002) 28 Cal.4th 557, 592 [123 Cal.Rptr.2d 345, 51 P.3d 224] [discussing the limits on a defendant's constitutional right to disclosure prior to trial]; *People v. Anderson* (2001) 25 Cal.4th 543, 577, fn. 11 [106 Cal.Rptr.2d 575, 22 P.3d 347] ["the high court has never held that the confrontation clause requires more than the opportunity to ask the witness questions pertinent to his or her credibility" (italics omitted)]; *Alvarado v. Superior Court* (2000) 23 Cal.4th 1121, 1134–1135 [99 Cal.Rptr.2d 149, 5 P.3d 203].)

proof beyond a reasonable doubt." We reject this claim, having determined that Ankrom properly was permitted to testify as an expert and that defendant had an adequate opportunity to challenge the basis for Ankrom's opinion.

### 4. *Admissibility of evidence of defendant's statements*

Defendant contends the trial court abused its discretion in permitting the testimony of Robin and Robert Romo and Ernest Tu'ua recounting defendant's incriminating statements.

### a. *The Romos' testimony*

Robin Romo testified she resided in an apartment in the Buena Vista Gardens complex with her husband Robert and a roommate, Tony. Defendant visited her home weekly, partly to see her roommate, with whom he worked out in the gym on an almost daily basis. Within one or two days after the murder of Holly Tarr, defendant visited her. Robin Romo informed him of Tarr's murder, and he said, "Yes, I remember. I was at the pool. I saw her leaving." Defendant did not explain how he had recognized Tarr prior to the publicity surrounding her murder. One or two days later, defendant visited again while Robin's husband and two other persons were present. Robin testified that defendant told them "that he had gone out on a date with this woman and was taking her home. He knew that she wanted him. When they got there she had changed her mind and said that he was crazy. And so he forced himself on her. Then when he was done, got up, turned around, she was crying, so he said he went back and did her again, got dressed and left."

Robert Romo testified that defendant had discussed his relations with women and had said something about a girl crying. Defendant may have mentioned "slapp[ing] her around." In sum, "he was leaving some girl, she was crying and she had said something to him. He had said that he went back to her, did her again." According to Robert, defendant was graphic and vulgar in describing his relations with women.

David Holden, who was an acquaintance of defendant's early in 1991, testified that defendant told him he had met a girl named Janene and had worked out with her at a club. Defendant told Holden that he had gone to the woman's home and had sex with her on one or two occasions, but that he could not continue the relationship because the woman was married.[11]

---

[11] Defendant mentions this evidence, but it is difficult to determine whether on appeal he is challenging the admission of Holden's testimony. Any claim of error is forfeited, because defendant did not object to this testimony at trial. (Evid. Code, § 353; *People v. Marks* (2003) 31 Cal.4th 197, 228 [2 Cal.Rptr.3d 252, 72 P.3d 1222].)

Prior to trial, defendant objected to the admission of the incriminating statements he made to Robin Romo, citing the corpus delicti rule and Evidence Code sections 352 and 1101, as well as the Fifth and Fourteenth Amendments to the United States Constitution and parallel provisions of the California Constitution. Defendant's theory was that the statement admitted the commission of another rape (not the rape of Janene Weinhold), that a corpus delicti had not been established for the other rape, that the uncharged rape constituted improper bad character evidence under Evidence Code section 1101, and that this evidence should have been excluded under Evidence Code section 352 as more prejudicial than probative. The superior court (Wellington, J.) determined that circumstantial evidence tied defendant to the rape of Weinhold, and that defendant's admission was relevant to prove that defendant had raped Weinhold. The court declared: "By itself, unsupported by the rest of the evidence, it would be pretty unpersuasive and perhaps inadmissible; but in context with the rest of it, frankly, it is my impression that it is a substantial and significant point." In the court's view, defendant's claim that the connection to the Weinhold murder was too tenuous to make this evidence admissible went to the weight of the evidence, not its admissibility. When the case was transferred to the trial court, Judge Hayes adopted Judge Wellington's comments and rulings, adding that the evidence did not constitute bad character evidence under Evidence Code section 1101, because it related to a charged crime.

At trial (after Robin Romo and David Holden already had testified), defendant objected to the admission of Robert Romo's testimony on the same grounds raised with regard to Robin Romo's testimony, emphasizing that Robert's testimony should be excluded as character evidence barred by Evidence Code section 1101, that it was cumulative to Robin's testimony, and that it was unduly prejudicial. The court thereafter ordered the witness to be examined outside the presence of the jury, warning him not to refer to defendant's statement that he had tied up a woman and not to volunteer any information. Defendant renewed his objection under Evidence Code section 352. The court responded that the evidence was relevant and that its probative value outweighed its prejudicial impact, overruling the objection on the same basis upon which it earlier had ruled on the admissibility of Robin Romo's testimony.

Defendant contends the statements made by Robin Romo were of slight probative value, because they were made some seven weeks after Weinhold's murder, they did not identify the woman to whom defendant referred in his admission, there was no evidence defendant had a consensual dating relationship with Weinhold, the statement's reference to a "date" seems inconsistent with a midday murder, and the statement was ambiguous. On the other hand, defendant argues, the prejudicial impact of the evidence was great because it

suggested defendant had a "disposition to sexually assault women" and, he claims, the evidence was used in the prosecutor's closing argument to just that effect.

We examine the court's action for abuse of discretion (*People v. Rowland* (1992) 4 Cal.4th 238, 264 [14 Cal.Rptr.2d 377, 841 P.2d 897]) and conclude that the court did not abuse its discretion in denying defendant's Evidence Code section 352 motions to exclude the Romos' testimony. Contrary to defendant's claim, this testimony had a "tendency in reason to prove or disprove any disputed fact" (Evid. Code, § 210), namely that he had raped Weinhold in the weeks prior to his conversation with the Romos. Defendant was linked to the crime by the DNA evidence, his statement to Holden that he had been dating a woman named Janene, and the testimony of Weinhold's neighbor that she had observed defendant sitting on the stairs leading to Weinhold's apartment. Indeed, as the trial court observed, the statements defendant made to the Romos had considerable probative value. Further, these statements were admissible even if they were not "clear and unambiguous" admissions, and even though they did not include any admission of the murder. (*People v. Kraft, supra,* 23 Cal.4th at p. 1035.) Contrary to defendant's claim, the statements did not constitute evidence of *other* crimes reflecting negatively on defendant's general character—their reference was to a charged crime.

■ Defendant contends the court did not expressly weigh the prejudicial impact of the evidence against its assertedly slight probative value. Although the record must "affirmatively show that the trial court weighed prejudice against probative value" (*People v. Padilla* (1995) 11 Cal.4th 891, 924 [47 Cal.Rptr.2d 426, 906 P.2d 388], disapproved on another point in *People v. Hill* (1998) 17 Cal.4th 800, 822–823, fn. 1 [72 Cal.Rptr.2d 656, 952 P.2d 673]), the necessary showing can be inferred from the record despite the absence of an express statement by the trial court. (*Ibid.*) The record indicates the court gave careful consideration to defendant's claims at hearings held outside the presence of the jury. The court considered an offer of proof as to the anticipated testimony of Robert Romo and excluded certain damaging elements of the witness's statements from evidence. The court referred to the high probative value of the evidence, and we properly may infer that the court determined that the probative value outweighed any undue prejudice.

Defendant contends the trial court also erred in its ruling admitting Robert Romo's testimony for the reason that this testimony was cumulative and added highly prejudicial matter through Romo's volunteered statement that he "didn't know if he slapped her around" and that defendant's conversation was so "vulgar and graphic" that Romo left the room. The circumstance that defendant may have "slapped around" a woman who may have been one of

the murder victims was relevant to the rape charge, and the defense could cross-examine the witness on this point. The reference to vulgar and graphic conversation simply described the tone of the conversation and was of negligible prejudicial impact.

### b. *Tu'ua's testimony*

In June and July of 1990, Ernest Tu'ua was defendant's supervisor at Expo Builders Supplies. Tu'ua testified that defendant told him he was having sex with a mother and her daughter, using the term "doing" to indicate sexual relations. Defendant told him the mother was a massage therapist. Defendant said he was able to manipulate the daughter and play "mind games," disrupting the close relationship between the mother and the daughter.

Defendant objected on the basis of relevance and Evidence Code section 352, and renews those claims in this court. We conclude the trial court was within its discretion in finding the evidence relevant and determining that its probative value was not outweighed by its prejudicial impact. The evidence tied defendant to the subsequent murders of Pamela and Amber Clark. The two victims were mother and daughter, and Pamela was a massage therapist. In light of the other evidence demonstrating defendant's modus operandi and planning activity, the circumstance that the murders occurred some weeks subsequent to the conversation does not eliminate the probative value of the conversation. The circumstance that defendant presented evidence that he had patronized another massage therapist, Gayle Sovinee, during this period, did not render Tu'ua's testimony irrelevant—it was for the jury to determine whether to believe that the massage therapist to whom defendant referred in his conversation with Tu'ua was Pamela Clark or Sovinee. (Sovinee did not have a daughter and testified she treated defendant on only one occasion and did not date him.)

Having contended the Romo and Tu'ua testimony was without probative value and was irrelevant, and that its prejudicial impact far outweighed its probative value under state law, defendant also claims the admission of the testimony constituted an arbitrary deprivation of state-guaranteed rights in violation of the Fifth and Fourteenth Amendments to the United States Constitution, citing *Hicks v. Oklahoma, supra*, 447 U.S. 343. He adds that the admission of this testimony denied him the right to a reliable verdict under the Eighth Amendment and *Beck v. Alabama, supra*, 447 U.S. 625, 638, footnote 13, and *Woodson v. North Carolina, supra*, 428 U.S. 280.

Application of the ordinary rules of evidence generally does not impermissibly infringe upon a capital defendant's constitutional rights. (*People v. Kraft, supra*, 23 Cal.4th at pp. 1035–1036.) The trial court did not err under state

law, and defendant does not provide any persuasive reason for us to conclude that the application of California's rules of evidence violated his constitutional rights, nor does he establish any basis for concluding that the admission of this evidence rendered the jury's death penalty verdict unreliable.

### 5. *Exclusion of Tiffany Schultz's statements concerning conflict with her boyfriend*

Christopher Burns testified as a prosecution witness. He was Tiffany Schultz's boyfriend. The couple shared a two-bedroom apartment with another man, Daniel Ganss. Burns testified that when he left for work on the day of Schultz's murder, she was still in bed. Burns returned from work at approximately 5:30 p.m. He testified that he believed the front door was locked. Schultz's towel, some suntan oil, and the top of her swimsuit were on a lawn chair located by the front door, and the rear screen door and sliding glass door were open. Ordinarily, the sliding door was left open if someone was home, but the screen was kept closed. The door to Ganss's room was closed. Burns departed for a 6:15 p.m. appointment at a tanning salon. He returned home after 7:00 p.m., straightened up the apartment, and prepared some food. Ganss returned home and Burns, having become worried, asked him if he knew where Schulz was. When Ganss opened his bedroom door, the two men discovered her body. Law enforcement officers arrested Burns for the murder but released him three days later.

Prior to trial, anticipating that the defense would seek to use certain evidence either in cross-examination of Burns or in its case-in-chief, the prosecution filed an in limine motion seeking exclusion of police reports of the statements of six witnesses who were acquainted with Schultz. The declarants had informed law enforcement officers that Schultz had made statements to them asserting that Burns had struck her and threatened her with a knife, that the couple had furious arguments over Schultz's employment as an exotic dancer, and that Burns enjoyed pornography. The prosecutor asserted that during the trial, he would not examine Burns concerning his relationship with Schwartz, leaving the topic unavailable for cross-examination. The prosecutor contended that the six statements constituted inadmissible hearsay, adding that defendant lacked evidence to demonstrate third party culpability that would be admissible pursuant to *People v. Hall* (1986) 41 Cal.3d 826, 833 [226 Cal.Rptr. 112, 718 P.2d 99] (*Hall*), in which we declared that otherwise admissible evidence of third party culpability should be admitted if it is "capable of raising a reasonable doubt of [the] defendant's guilt."

Defendant, for his part, filed a motion "in support of admissibility of out-of-court statements made by Tiffany Schultz." Specifically, the motion

sought an order permitting counsel to cross-examine Burns "regarding certain out-of-court statements made by Tiffany Schultz shortly before her death." The motion relied in part upon the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and parallel provisions of the state Constitution. Defendant claimed primarily that he should be permitted to use the statements for the purpose of attacking Burns's credibility, but added that if the court determined the statements were being offered for their truth, they then would be admissible as evidence of third party culpability. (Although at times defendant's position has been unclear, the record requires that we reject respondent's claim that the defense did not seek admission of the statements as evidence of third party culpability.) Defense counsel also sought permission to examine Burns concerning his relationship with Schultz. In support of his motion, defendant proffered investigative reports by the San Diego Police Department memorializing police interviews with the six persons in question.[12]

---

[12] The police treated Burns as a suspect for a brief period and interviewed witnesses in January of 1990. Defendant proffered written reports of six of these interviews. (1) Ann Cappiello told an officer that she knew Schultz well and also knew Burns. Cappiello informed the officer that Schultz told her she was unable to join in a social event "because she was having problems with Chris. Tiffany couldn't speak with me until Chris went into the shower. Tiffany said that Chris didn't agree with her working [as an exotic dancer] at Les Girls . . . ." Cappiello informed the officer: "I found Tiffany to be depressed and in tears due to their living arrangements. They had some argument about some Playboy type books that Chris had in the apartment. The books made Tiffany question herself. Tiffany never mentioned any physical violence." (2) Kelly Finn stated that Schultz informed her on January 10, 1990, that the couple argued over Schultz's employment at Les Girls. "She told me they had a fight, he was threatening her with something, I don't know with what. After he threw his temper [tantrum], he left the house abruptly and slammed the door. It was after he left she called me. She was scared and wanted to get out of the apartment." Schultz told Finn she believed Burns would kill her if she didn't quit her job. This was not the first time Finn had heard of such arguments. The witness informed the police of Schultz's statement that she and Burns had a "rough" sex life that included bondage. Burns was a very jealous person, and Schultz told Finn that Burns had struck her about three and one-half weeks previously. Finn herself had seen bruises on Schultz's body that Schultz attributed to Burns's violence. Schultz told Finn that Burns had told her (Schultz) he would kill her if she did not quit her job, and that he had threatened her with a knife. (3) Susan Franco told the investigating officer that Schultz had confided in her on several occasions regarding problems with Burns. Burns did not want her to dance at Les Girls and was withholding sex from Schultz, who felt ugly and insecure as a consequence. There was no mention of violence. The conversation occurred on January 11 or 12, 1990. (4) Daniel Ganss, the couple's roommate, did not report any violence or complaint of violence in the home. Schultz was upset that Burns did not desire her. Burns mentioned some bondage incident, which embarrassed Schultz. (5) Beth Ann Maupin stated that Schultz confided in her during the week preceding her murder, stating that she and Burns were having problems, that Burns did not want her to work at Les Girls, and that the couple had engaged in some bondage that got too rough for Schultz. The witness did not mention any statements concerning other violence. (6) Peggy Maupin said that Schultz had told her that she and Burns were having sexual problems, that Burns did not want her to dance at Les Girls, and that he was jealous.

After a hearing at which counsel and the court analyzed the statements both with regard to their admissibility in cross-examination and as evidence of third party culpability, the court commented: "I don't see them [the statements] as so inherently trustworthy that I ought to make my own exception to the hearsay rule. The things people say in the middle of difficult emotional entanglements are, I think, historically not the kinds of things that are necessarily reliable."

The court also commented that the defense planned to use the statements as evidence of third party culpability but that the statements showed only motive. The court predicted that defense examination of Burns regarding the statements would create a "side show" without producing evidence of any reasonable probative value. Defense counsel stated that he also wished to use the statements for the purpose of impeaching Burns's credibility, but the court questioned why it was even significant for the defense to discredit Burns. The court asked: "What evidence is he giving that you disagree with and need to impeach by showing that he's got a motive to lie?"

The court (Wellington, J.) issued a written ruling denying the defense request on hearsay grounds and also declaring: "This motion is actually broader than its title suggests, and includes requests to cross-examine Schultz's boyfriend, Chris Burns, in an effort to show that he, not defendant killed Schultz. At argument counsel indicated that he is not ready to make an offer of proof regarding third party culpability. When he is (before trial) he will bring this matter back before us for examination. [¶] Finally, should Mr. Burns be called as a witness, defendant should at least be entitled to show, on cross-examination, that Burns had been a suspect in the Schultz killing. This, at least arguably, shows a motive to see defendant convicted."

Immediately prior to the prosecutor's opening statement to the jury, the trial court (Hayes, J.) confirmed Judge Wellington's order and invited the defense to make an offer of proof of nonhearsay evidence that would be admissible to establish third party culpability, and the defense answered that it was *not ready to do so*.

When the guilt phase was nearing its conclusion, the trial court questioned defense counsel concerning potential third party culpability evidence, noted that the court would adhere to its earlier ruling concerning the admissibility of the statements, and declared that "we weren't going to be hearing testimony on that *in the absence of some offer of proof*" consistent with *Hall*, *supra*, 41 Cal.3d 826. Defense counsel responded: "Right now, our witness list, we won't need to address that issue."

Defendant did not make any further offer of proof in support of the admission of evidence demonstrating third party culpability.

On appeal, defendant contends fairness demanded that the statements recounted by the six acquaintances of Schultz in their interviews with the police be admitted as evidence of third party culpability under *Hall, supra,* 41 Cal.3d 826, despite their character as hearsay. He relies upon *Chambers v. Mississippi* (1973) 410 U.S. 284 [35 L.Ed.2d 297, 93 S.Ct. 1038] and *Green v. Georgia* (1979) 442 U.S. 95 [60 L.Ed.2d 738, 99 S.Ct. 2150]. He claims a violation of his right to present a defense, to confront and cross-examine the witnesses against him, and to a fundamentally fair trial. He also claims that without this evidence the verdict was unreliable within the meaning of the Eighth Amendment to the United States Constitution.[13]

We review the trial court's ruling for abuse of discretion. (*People v. Robinson, supra,* 37 Cal.4th at p. 625.) We are not persuaded that exclusion of the out-of-court statements constituted a violation of the right to present a defense or to confront and cross-examine witnesses. Even if the evidence had not been excludable as hearsay, the trial court did not abuse its discretion in excluding it, because defendant failed, despite *several invitations from the court,* to make an offer of proof that was adequate under *Hall, supra,* 41 Cal.3d 826, in support of his theory that the defense possessed evidence demonstrating that Burns was the person who murdered Schultz.

 "[T]hird party culpability evidence is admissible if it is 'capable of raising a reasonable doubt of [the] defendant's guilt,' but . . . '[w]e do not require that *any* evidence, however remote, must be admitted to show a third party's possible culpability. . . . [E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: *there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime.'* " (*People v. Robinson, supra,* 37 Cal.4th at p. 625, quoting *Hall, supra,* 41 Cal.3d at p. 833.) "[I]n making these assessments 'courts should simply treat third-party culpability evidence *like any other evidence*: if relevant it is admissible ([Evid. Code,] § 350) unless its probative value is substantially outweighed by the risk of undue delay, prejudice or confusion [citation].' " (*People v. Robinson, supra,* 37 Cal.4th at p. 625, italics added, fn. omitted.)

As the trial court found, contrary to the guidelines we provided in *Hall, supra,* 41 Cal.3d 826, the statements proffered by defense counsel did not directly or circumstantially connect Burns to the actual commission of the crimes. The statements demonstrated no more than motive. (See *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1137 [124 Cal.Rptr.2d 373, 52 P.3d 572] [noting cases holding "mere evidence of third party's anger toward victim was insufficient," and "third party's possible motive alone insufficient to raise

[13] Respondent is mistaken in asserting that defendant failed to make such a constitutional claim below.

reasonable doubt of defendant's guilt"].) Indeed, defense counsel himself seemed to recognize he had not made a sufficient offer of proof. The trial court also appropriately determined that the probative value of the evidence was slight, whereas its potential for delay and confusion of issues was great. Under the circumstances, the court did not err in excluding this evidence.[14]

As we have done in similar cases, "[w]e . . . reject defendant's various claims that the trial court's exclusion of the proffered evidence violated his federal constitutional rights to present a defense, to confront and cross-examine witnesses, and to receive a reliable determination on the charged capital offense. There was no error under state law, and we have long observed that, '[a]s a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's [state or federal constitutional] right to present a defense.' " (*People v. Robinson, supra,* 37 Cal.4th at pp. 626–627, quoting *Hall, supra,* 41 Cal.3d at pp. 833–834 [referring to third party culpability evidence]; see also *People v. Yeoman* (2003) 31 Cal.4th 93, 141 [2 Cal.Rptr.3d 186, 72 P.3d 1166] [rejecting a claim based upon *Chambers v. Mississippi, supra,* 410 U.S. at p. 302, in a similar context].)

Defendant next contends the prosecutor committed misconduct by suggesting in his closing argument to the jury that there was no evidence of any discord between Schultz and Burns. The prosecutor observed: "Let's go chronologically, if we may, starting off with the murder of Tiffany Schultz. You've heard evidence about Buena Vista Gardens. You heard the evidence when the defendant moved in. It was approximately three weeks after he moves in that Tiffany Schultz is dead, she has been murdered. [¶] She's living there with her boyfriend, Christopher Burns. She was a young student. There is absolutely no evidence prior to her murder that anything was amiss. In Buena Vista Garden[s] apartments, you heard some evidence about a burglary, but as soon as Mr. Prince moves in, we have a series of murders starting off with Tiffany Schultz."

Defendant forfeited his present claim of prosecutorial misconduct by failing at trial to object and seek an admonition (*People v. Welch* (1999) 20 Cal.4th 701, 753 [85 Cal.Rptr.2d 203, 976 P.2d 754]), but in any event, the prosecutor's argument did not contain the suggestion attributed to it. This is apparent from the context in which the prosecutor's statement was made; his point related to the comparative state of affairs at the Buena Vista Gardens apartments before and after defendant moved there. Accordingly, we reject defendant's claim on the merits.

---

[14] As noted above, Burns's testimony at trial merely related Schultz's whereabouts on the morning of her death and described the discovery of her body. The testimony was of slight importance, because Ganss and the physical evidence confirmed what he had to say. To the extent defendant's claim is based upon the limitations the court placed on his ability to challenge Burns's *credibility,* any error would be harmless under any standard.

### 6. *Hughes-Webb testimony*

Leslie Hughes-Webb testified that defendant accosted her at the door of the home where she was staying and forced his way in. After a struggle, she knocked him over and fled. She identified defendant at a live lineup and at trial. At the preliminary hearing she testified a woman who had participated in the lineup told her she had identified another person and that the other woman's certainty had caused Hughes-Webb to question her own identification somewhat. During her trial testimony, defense counsel cross-examined her concerning this source of uncertainty in her identification. Specifically, after the lineup, Hughes-Webb and another woman who had participated in the lineup were given a ride home in a patrol car. The other woman said repeatedly how certain she was of her identification, specifying whom she had identified. Defense counsel asked Hughes-Webb whether she was aware that the other woman had identified a person other than defendant.

The prosecutor objected on the ground that the other woman's statement as to which man she had identified was irrelevant and constituted hearsay. The trial court sustained the objection on hearsay grounds, adding that defense counsel could question Hughes-Webb concerning her own state of mind after the live lineup, including whether the other woman had said something to give her pause.

The court directed the jury to disregard the question concerning the other woman's possible identification of another individual. Under further cross-examination, Hughes-Webb testified she had been in a police car with the other woman, who had talked a great deal and "quite emphatically about her conclusion and feelings." The other woman's comments caused Hughes-Webb to hesitate about the accuracy of her own identification. Hughes-Webb "wanted to believe that [she] didn't pick him" and informed the police detective who was driving her and the other woman that she felt some "uncertainty and hesitation."

Statements made by the out-of-court declarant to whom Hughes-Webb referred properly were excluded as hearsay, to the extent they were offered for the truth of the declaration. To the extent they were admissible as describing Hughes-Webb's state of mind, the court excluded the statements because it feared the jury would be unable to avoid considering them for their truth, despite the absence of any evidence establishing the reliability of the identification made by the other woman. Reviewing these evidentiary rulings for abuse of discretion (see *People v. Robinson, supra,* 37 Cal.4th at p. 625), we uphold them. Defendant had an adequate opportunity to establish that the declarant said something that caused Hughes-Webb to doubt her own identification. If defendant sought to establish that one of the surviving victims or

other witnesses positively had identified someone other than himself, defendant could have subpoenaed and examined the woman as a defense witness. Even if the court erred in excluding the proffered evidence, such error would have been harmless under any standard of review, because the court permitted the defense to question the witness to establish that she had doubted the accuracy of the identification she had made.[15]

Defendant unpersuasively claims the court's ruling denied him his constitutional right to put on a defense, to confront and cross-examine the witnesses against him, and to a fundamentally fair trial and reliable determination of guilt. He also asserts that the ruling constituted a denial of due process of law by arbitrarily depriving him of crucial evidence. There was no error under state law, and as noted above, " '[a]s a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's [state or federal constitutional] right to present a defense.' [Citations.]" (*People v. Robinson*, *supra*, 37 Cal.4th at pp. 626–627, fn. omitted.) Furthermore, as we have noted, even if the evidence should have been admitted, its exclusion would have been harmless under any standard.

### 7. *Evidence of defense counsel's participation in the lineup*

Defendant contends he was deprived of his federal and state constitutional rights to the effective assistance of counsel, to a fair trial, and to reliable factfinding when the trial court failed to "protect him" during the course of testimony given by Jaime Bordine, the homicide detective who conducted the live lineup. Bordine testified that defense counsel were present at the lineup and implied that they had approved the composition of the lineup and selected defendant's placement in it.

Defendant contends that by introducing testimony that defense counsel were present at the lineup and had selected defendant's placement, the prosecution "effectively us[ed] his attorneys as witnesses against him," thereby violating his right to counsel. He claims that the "effect of [the] testimony was an unmistakable implication that counsel were given every opportunity to assure that the lineup was fair, and that they approved the conduct of the lineup and the resulting identifications. The resulting prejudice to him was no different than it would have been if counsel had been called as witnesses and had testified that they had been present, that they had been consulted regarding the adequacy of the other lineup participants, and that

---

[15] Defendant notes that Hughes-Webb stated on cross-examination that when she informed the officer who was driving the patrol car of her doubts, he said she "would know when she saw the evening news." Defendant contends this statement constituted a suggestive identification procedure, citing *Simmons v. United States* (1968) 390 U.S. 377, 384 [19 L.Ed.2d 1247, 88 S.Ct. 967]. Defendant has forfeited this claim because he did not raise it below.

they had made the decision where their client should be placed." Defendant blames the prosecutor for asking these questions and the court for failing to "protect" him.

 As respondent points out, defendant did not object to Bordine's testimony on any of the bases mentioned in the present claim; indeed, he did not object at all during the prosecution's direct examination. Accordingly, his claim is forfeited. (See *People v. Cooper, supra,* 53 Cal.3d at p. 824.) Moreover, it is not improper for counsel for either side to inquire into the circumstances surrounding a lineup, including the presence or absence of counsel. (*People v. Citrino* (1970) 11 Cal.App.3d 778, 783 [90 Cal.Rptr. 80]; see also Cal. Criminal Law: Procedure and Practice (Cont.Ed.Bar 2006) Lineups and Identification, § 22.29, pp. 599–600.)

Defendant asserts the court had a duty to protect him from what he views as an incursion upon his right to counsel, even though counsel failed to object. He cites *People v. Rodriguez* (1981) 115 Cal.App.3d 1018 [171 Cal.Rptr. 798], but that case is of no assistance to him. Rodriguez was charged with robbery, and his defense at trial was based on mistaken identity and the asserted suggestiveness of the police identification procedures. Among other subjects, defense counsel cross-examined the identifying witnesses and the arresting officer concerning the manner in which the lineup was conducted and the appearance of the participants. On redirect examination, the prosecutor asked the officer whether defense counsel, who was present at the lineup, had said: " 'That was not a bad lineup' or 'It's not bad.' " (*Id.* at p. 1020.) The court sustained a hearsay objection, but the prosecutor called defense counsel as a witness, and the court ordered him to testify. Defense counsel ultimately withdrew any objection and testified, confirming that he had made the statement attributed to him by the arresting officer.

Under these circumstances, the Court of Appeal determined that the trial court had failed to protect defendant's right to effective assistance of counsel when it ordered defense counsel to testify *against* his client on a question that was material to the defense. Indeed, the court found that the question "completely undercut" the misidentification defense, because it "bolstered the eyewitnesses' identifications." (*People v. Rodriguez, supra,* 115 Cal.App.3d at p. 1021.) The proceedings undermined the attorney's effectiveness and, the reviewing court stated, would cause the jury to be suspicious of his other efforts on defendant's behalf. "The jury can hardly avoid inferring the defendant's own attorney does not believe in the defense he himself is presenting. It is fundamentally unfair to a criminal defendant to use his own attorney's testimony to convict him, and such a substantial infringement on the right to counsel requires reversal [citations]." (*Ibid.*)

In the present case, the trial court did not make any incursion on defendant's right to counsel. It did not order defense counsel to testify. Moreover, the defense did not ask the jury to find that the *composition* of the lineup had been suggestive, so the evidence of counsel's presence at the lineup did not undercut defense counsel's credibility or ability to pursue a defense of mistaken identification. Rather, the defense stressed that numerous witnesses were unable to identify defendant at the live lineup, and that the witnesses' subsequent identifications were the result of suggestion, primarily from the media coverage that displayed defendant's picture for the first time subsequent to the live lineup.

Defendant contends we must address his claim despite trial counsel's failure to object, because the court and the prosecutor rendered the trial fundamentally unfair in violation of defendant's federal constitutional right to due process of law. He cites *Darden v. Wainwright* (1986) 477 U.S. 168 [91 L.Ed.2d 144, 106 S.Ct. 2464]. There the high court determined that a prosecutor's improper remarks infected the entire trial with such unfairness that the resulting conviction constituted a denial of due process. (*Id.* at p. 181.) We have responded to similar claims by observing that to preserve such an issue on appeal, ordinarily the defendant must object and request an admonition. (*People v. Frye* (1998) 18 Cal.4th 894, 969 [77 Cal.Rptr.2d 25, 959 P.2d 183].) In any event, the present case is not comparable to *Darden v. Wainwright, supra,* 477 U.S. 168. The prosecutor's questions did not infect the entire trial with unfairness, just as they did not violate defendant's right to counsel. Nor has defendant established that the court's failure to "protect" him rendered the verdict unreliable in violation of the Eighth Amendment.

### 8. *Admissibility of knives*

Defendant contends the trial court abused its discretion under state law and violated various of his constitutional rights by admitting into evidence four knives that police seized from defendant's automobile upon his arrest in the Miramar Road Family Fitness Center parking lot. In defendant's vehicle, police discovered a kitchen knife with an eight-inch blade and a five-inch handle, along with a steak knife and two small folding knives. Defendant asserts the knives simply constituted bad character evidence and were used to support the prosecutor's argument that defendant was the kind of person who likes to arm himself with knives.

Defense counsel failed to object when the police officer who performed the search described the knives in his trial testimony. When the parties were discussing the introduction of exhibits into evidence, defense counsel objected on the ground that the admission of the knives would be more

prejudicial than probative. (Evid. Code, § 352.)[16] The prosecutor countered that the knives might have been present in the vehicle for potential use in the various stalking episodes and burglaries that followed the commission of the murders.

The court overruled the objection, observing that a knife had been stolen from at least one of the premises defendant had entered and that there was evidence indicating defendant used his automobile to stalk young women. The court noted evidence establishing that defendant sometimes removed kitchen knives from drawers while committing his crimes and that he used kitchen knives "similar to the one taken from the defendant's vehicle in these homicides." The court concluded that the probative value of the evidence outweighed its potential for prejudice.

As noted above, defense counsel failed to object to the police officer's *testimony* recounting the discovery of the knives during the search of the vehicle. Accordingly, any error with respect to the admission of the *physical evidence* must be viewed as harmless in light of the officer's testimony describing the knives.

Even if we were to reach the merits of defendant's claim, we do not agree that the court abused its discretion. Although none of the knives evidently was used as a murder weapon, it is reasonable to conclude that defendant used one or more of them during the various charged burglaries and attempted burglaries that were committed subsequent to the murders. There was evidence that at least in the Schultz and Keller murders, defendant came armed with his own knife, and the subsequently committed burglaries and attempted burglaries bore enough similarities to those murders (and the burglaries related to those murders) to enable the jury to reasonably conclude he was armed with his own knife (perhaps one of the knives discovered in his automobile) when he committed some of the charged burglaries and attempted burglaries.

Defendant's reliance upon *People v. Riser* (1956) 47 Cal.2d 566 [305 P.2d 1], overruled on another ground in *People v. Morse* (1964) 60 Cal.2d 631, 648–649 [36 Cal.Rptr. 201, 388 P.2d 33], is misplaced. In that case the evidence established that a murder had been committed with a Smith and Wesson .38-caliber Special revolver, which never was recovered. We concluded it was error to admit evidence that the defendant possessed a Colt .38-caliber revolver that could not have been the murder weapon. The only

---

[16] As respondent points out, defense counsel objected to certain numbered exhibits, and the numbers represented only the steak knife and the folding knives. The transcript of the hearing on the objection, however, makes it clear that the court and counsel assumed the objection went to the larger knife as well.

purpose of admitting the evidence would be to demonstrate that the defendant is "the sort of person who carries deadly weapons." (*People v. Riser, supra*, 47 Cal.2d at p. 577; see also *People v. Archer* (2000) 82 Cal.App.4th 1380, 1392–1393 [99 Cal.Rptr.2d 230].)

The knives seized from defendant's vehicle apparently were not used to inflict the fatal wounds upon the murder victims, but the charge of murder was not the only one faced by defendant. As noted, the knives bore some relevance to the weapons shown by the evidence to have been involved in other charged crimes. They did not simply constitute bad character evidence. (See *People v. Cox* (2003) 30 Cal.4th 916, 956–957 [135 Cal.Rptr.2d 272, 70 P.3d 277] ["[w]e have also held that when weapons are otherwise relevant to the crime's commission, but are not the actual murder weapon, they may still be admissible. [Citations.] Thus, in *Neely* we admitted evidence of a rifle located in the defendant's truck parked near the crime scene even though the rifle was not the murder weapon, as it was 'not irrelevant' to the charged offenses. [Citation.] In *Lane*, we upheld the admission of guns found in an 'abandoned truck miles from the scene of the homicide,' not as relevant to the homicide per se, but as weapons 'of a character which could be used in armed robbery . . . in furtherance of the criminal plan' "].)

Defendant unpersuasively contends the court's ruling denied him his constitutional right to put on a defense, to confront and cross-examine the witnesses who testified against him, and to a fundamentally fair trial. He also claims the ruling denied him due process of law by arbitrarily depriving him of crucial evidence. We conclude there was no error under state law, and " '[a]s a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's [state or federal constitutional] right to present a defense.' [Citations.]" (*People v. Robinson, supra*, 37 Cal.4th at pp. 626–627, fn. omitted.)

Defendant next contends that the prosecutor committed misconduct when in closing argument he relied upon the knives as evidence of defendant's bad character. Defendant complains the prosecutor stated that whoever committed the crimes obviously liked to use knives, pointing to the exhibits of knives seized from defendant's vehicle and asking why defendant would carry such knives. Defendant also characterizes as misconduct the prosecutor's discussion of statements made by defendant concerning knives and the prosecutor's subsequent argument: "[Defendant] brags about these knives. He has them in his car. He is that type of person that gets his thrills off of imagining knives and blood dripping off those knives."

Again, there was no objection on the basis of prosecutorial misconduct, nor did the defense request that the court admonish the jury. (See *People v. Frye*,

*supra*, 18 Cal.4th at p. 969.) Even assuming that the court's ruling on defendant's objection to the introduction of the knives into evidence rendered further objection futile (see *People v. Hill, supra*, 17 Cal.4th at p. 820), defendant's claim lacks merit. This is not a situation in which the prosecutor asked the jury to draw the inference that defendant had a bad character because he possessed a weapon *unconnected* with the charged crimes. Rather, the prosecutor legitimately referred to the knives in connection with the matter of motive. He argued that the evidence from the crime scenes established that whoever committed the crimes liked to use knives—implying that employing knives was an aspect of the murderer's sexual perversion and that sexual perversion as expressed by the use of knives was the murderer's motivation. The prosecutor discussed the similarities among the victims, particularly that they were attractive women, most of whom had been accosted or attacked while scantily clothed. He argued that the women had been stalked, and that whoever killed the victims was motivated by a sexual perversion. "That's the mold of domination, of sexual perversion—wanting to kill to see blood. Somebody who isn't quite right. Somebody who has a desire to dominate, to express his sexual perversion by seeing the breasts of women bleed." Then the prosecutor asked the jury to conclude that defendant was a person who liked to use knives, a circumstance that would support the inference that he shared the motivation of the murderer. In support, the prosecutor pointed to the knives defendant kept in his car and to statements defendant made to friends. The prosecutor did not ask the jury to conclude that defendant was the murderer because other uncharged crimes showed he had a bad character or even because he traveled armed—the prosecutor asked them to conclude defendant was the murderer because there was circumstantial evidence of his motivation. This argument was permissible.

Defendant also contends that the evidence of the knives was inadmissible because the police violated his Fourth Amendment rights by conducting the warrantless search of his automobile in which the knives were discovered. At a hearing held prior to trial pursuant to section 1538.5, the court determined that the police had probable cause to conduct the search in conjunction with defendant's arrest. It is unnecessary for us to recite here the events that led to the arrest, the seizure of the automobile, and the inventory search conducted the following day, because even if the knives were to be viewed as the fruit of a search conducted in violation of defendant's rights under the Fourth Amendment, any error would have been harmless beyond a reasonable doubt. Although we have concluded that the knives had some relevance, they were of limited probative value—as defendant himself contends. In light of the overwhelming evidence of defendant's guilt of the charged crimes, the admission of the knives, if error, would have to be viewed as harmless beyond a reasonable doubt.

### 9. *Sufficiency of the evidence*

Defendant contends the presentation of the evidence was confusing and that the jury may have assumed that if defendant was guilty of one crime, he must be guilty of all of the charged crimes. Defendant does not offer any support for this claim. The jury properly was instructed to decide each count separately (CALJIC No. 17.02), and both the prosecution and the defense made the point during closing argument that the jury should consider separately its verdict on each charge. Accordingly we reject this claim.

Defendant attacks the sufficiency of the evidence to support many of the counts charged against him, raising his claims in multiple subparts.

We " 'review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Hillhouse* (2002) 27 Cal.4th 469, 496 [117 Cal.Rptr.2d 45, 40 P.3d 754]; see also *People v. Berryman* (1993) 6 Cal.4th 1048, 1082–1083 [25 Cal.Rptr.2d 867, 864 P.2d 40] [same standard under the state and federal due process clauses].) We presume " 'in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citation.] This standard applies whether direct or circumstantial evidence is involved." (*People v. Catlin* (2001) 26 Cal.4th 81, 139 [109 Cal.Rptr.2d 31, 26 P.3d 357].)

#### a. *The murder of Tiffany Schultz (count 1)*

Defendant contends there was insufficient evidence to connect him to the murder of Tiffany Schultz. "Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) "Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (§ 188.) Premeditated murder is murder in the first degree. (§ 189.)

We reject defendant's challenge to the sufficiency of the evidence connecting him to the murder of Tiffany Schultz. There was sufficient evidence from which the jury could infer defendant's identity as the murderer. Defendant recently had moved into the apartment complex across the street from where Schultz was murdered. The jury could infer that on the morning of the murder, defendant was seen, not in his own apartment complex, but near Schultz's apartment, an hour or two prior to the murder, giving a false

account for his presence and in a position where he could have observed Schultz sunbathing at her open doorway. The jury could have drawn these inferences from the testimony of Dorothy Curtiss, the manager of the Canyon Ridge apartment complex where Schultz lived, who testified she saw Schultz sunbathing in a bikini in the doorway of her apartment around 10:00 a.m. on the morning of her murder. Schultz's next door neighbor saw Schultz sunbathing in the same location at approximately 12:20 p.m. Schultz spoke to a friend between 10:00 and 10:30 a.m., but failed to call the friend later in the morning, as the friend had expected. Telephone calls to her placed around 12:30 p.m. went unanswered, and about the same time witnesses heard sounds in Schultz's apartment that were consistent with a violent struggle.

Curtiss further testified that between 10:30 and 10:45 on the morning of Schultz's murder, she encountered a man in front of her office whom she was relatively certain was defendant. The office abutted the stairs leading to Schultz's second-story apartment. The man requested a hanger, stating he had locked himself out of his automobile. Curtiss retrieved a hanger from her nearby apartment and gave it to the man. To Curtiss's surprise, the man proceeded toward the back of the complex rather than out to the street, where he had indicated his automobile was located. Curtiss departed on an errand at some time between 11:00 and 11:30 a.m., and did not see anyone working on an automobile on the street at that time or upon her return.

In addition, the jury could infer the identity of Schultz's murderer from evidence establishing substantial similarities among this murder and the other murders: the similarities between Schultz herself and the other murder victims; the type of clustered, deep stab wounds inflicted on Schultz and the other murder victims; the partially disrobed or nude condition of the bodies in all the murders, including that of Schultz; the proximity of the location of the Schultz murder to the location of the ensuing similar murders of Weinhold and Tarr; and other evidence establishing that defendant was a habitual burglar who preyed primarily on young White women whom he followed to their homes.

In addition, the interior and exterior doorknobs of the door leading into the room where Schultz's body was found were marked with bloody handprints in a honeycomb or crosshatch design consistent with a sock or gloves. Witness Beasley testified that defendant wore socks over his hands when they committed burglaries together. Similar bloody marks were discovered at some of the other murder scenes.

In light of all the evidence, a jury reasonably could conclude defendant was guilty of murdering Schultz despite minor distinguishing marks consisting of her having been stabbed more times than the other victims and

suffering an additional cut across her throat, and despite nothing apparently having been stolen from her apartment.

Defendant also contends there was insufficient evidence of premeditation and deliberation to support a first degree verdict as to the murder of Schultz.

" 'Generally, there are three categories of evidence that are sufficient to sustain a premeditated and deliberate murder: evidence of planning, motive, and method. [Citations.] When evidence of all three categories is not present, "we require either very strong evidence of planning, or some evidence of motive in conjunction with planning or a deliberate manner of killing." [Citation.] But these categories of evidence, borrowed from *People v. Anderson* (1968) 70 Cal.2d 15, 26–27 [73 Cal.Rptr. 550, 447 P.2d 942], "are descriptive, not normative." [Citation.] They are simply an "aid [for] reviewing courts in assessing whether the evidence is supportive of an inference that the killing was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse." [Citation.]' " (*People v. Elliot* (2005) 37 Cal.4th 453, 470–471 [35 Cal.Rptr.3d 759, 122 P.3d 968].)

With regard to planning, there is evidence from which the jury could infer defendant noticed Schultz sunbathing in her bikini up to two hours prior to the murder, giving him ample time to consider and plan his crime prior to his return to the scene. The jury could infer he possessed criminal intent prior to his commission of the crime, because he employed a ruse to explain his presence near Schultz's apartment. The bloody handprints in a honeycomb or crosshatch pattern that were discovered at the scene support the inference the perpetrator of the murder planned far enough in advance to bring gloves or socks for his hands so he would not leave fingerprints. With regard to motive, evidence of the other crimes committed by defendant indicated he harbored animus against young White women. With regard to method, the clustered stab wounds support an inference of a deliberate killing. (See *People v. Elliot, supra,* 37 Cal.4th at p. 471 ["[T]hree potentially lethal knife wounds . . . [and] 80 other stab and slash wounds to her body [could have been] construed . . . as intimating a preconceived design to kill"].) The similarities between the Schultz murder and the other murders support the inference defendant went to Schultz's home armed with a knife and with the intent to kill. (See *People v. Carter* (2005) 36 Cal.4th 1114, 1184–1185 [32 Cal.Rptr.3d 759, 117 P.3d 476] [the circumstances of three similar murders by strangulation occurring in a short period of time "strongly indicate" the killings were premeditated, and the record as a whole "is inconsistent with any suggestion that the killings were not willful, premeditated, and deliberate"]; *People v. Catlin, supra,* 26 Cal.4th at pp. 140–141 [a common scheme among charged and uncharged murders supplied evidence of the defendant's guilt of murder with malice aforethought].)

In sum, sufficient evidence supports the verdict of guilty as to the first degree premeditated murder of Schultz.

> b. *The murder and rape of Janene Weinhold and the burglary of her residence (counts 2, 3, and 4)*

Defendant contends there was insufficient evidence to establish that he was responsible for the murder and rape of Janene Weinhold. It is unclear whether he also challenges the sufficiency of the evidence regarding the burglary of Weinhold's apartment.

█ We disagree with defendant's claim that the evidence was insufficient as to any of the charges involving Weinhold. As noted, "[m]urder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) Murder in the course of certain enumerated felonies, including rape and burglary, is murder in the first degree. (§ 189.) Forcible rape is "an act of sexual intercourse" that is "accomplished against a person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another." (§ 261, subd. (a)(2).) █ A person who enters a dwelling "with intent to commit grand or petit larceny or any felony is guilty of burglary." (§ 459.)

There was ample evidence demonstrating that defendant was responsible for the murder of Weinhold. A neighbor observed defendant seated on the steps leading to Weinhold's apartment close to the time of the murder. The murder fit the pattern of the other murders—Weinhold was a young White woman who was murdered in her home at the Buena Vista Gardens apartment complex in the middle of the day. Her body lay positioned on the floor wearing only a bra. She had suffered 22 deep stab wounds closely clustered in the chest area and administered with force sufficient to penetrate bone. As in some of the other murders, the assailant used a kitchen knife belonging to the victim. DNA evidence strongly connected defendant to the crime. With respect to the rape verdict, the evidence indicated that the victim was not involved in any intimate relationships and that defendant was unknown to the victim, circumstances supporting an inference that sexual intercourse occurred against her will. Two months after the commission of this crime, defendant told an acquaintance that he had gone on a date and forced himself on the woman. Defendant much later remarked to a coworker that he had sexual relations with a woman named Janene. Seminal fluid found at the scene indicated a match with defendant's DNA that would occur in one out of 120,000 persons. It reasonably could be inferred from all the evidence that defendant entered the apartment with the intent to commit larceny or rape.

Defendant contends that his statements to his acquaintance were made after the crime was committed and did not clearly refer to the victim or to any

charged offense. Nonetheless, they supplied a reasonable inference in support of the verdicts. Defendant objects that the DNA evidence demonstrated that there were 20 other African-American persons in the San Diego area who could have left the semen stains at the scene. But the circumstance that defendant was one of 20 persons who could have done so, when considered with all the other evidence linking him to the crimes, constituted weighty evidence of his guilt.

Defendant points to various distinctions between the murder of Janene Weinhold and the other murders. According to defendant, the murder of Weinhold was the only one in which a sexual assault accompanied the murder, and there was no evidence the perpetrator had stolen her property or that she had been followed from a swimming pool or a fitness center.

We disagree that the other murders lacked sexual overtones. The various victims were fully or partially unclothed and their bodies appeared to be displayed, sometimes with legs apart. Although it does not appear that Weinhold was followed from a pool or fitness center and there is no proof that defendant stole her property, she bore the characteristics of the type of person targeted by defendant, namely young, attractive White women who were alone in their homes during the middle of the day in a certain neighborhood. The distinctions among the murders did not preclude a jury from reasonably concluding that defendant was responsible for the crimes committed against Weinhold.

### c. Attempted burglaries of the residence of Sarah Canfield and Stephanie Squires (counts 7 and 8)

Defendant contends the evidence was insufficient to link him to these crimes and to establish the element of intent to steal. As noted, burglary consists of entry into a home or certain other structures "with intent to commit grand or petit larceny or any felony." (§ 459.) "An attempt to commit a crime consists of two elements: a specific intent to commit the crime, and a direct but ineffectual act done toward its commission." (§ 21a.)

We are not persuaded by defendant's claim that there was insufficient evidence of his identity as the perpetrator of the attempted burglaries. In the first incident, Stephanie Squires recognized defendant (perhaps from her having previously resided at the Buena Vista Gardens apartment complex) when he followed her to the pool at the Torrey Pines Village apartment complex. On both April 25 and April 28, 1990, an African-American man climbed the stairs to Squires's apartment and tried the door handle. Canfield identified defendant as the person who, on April 28, 1990, appeared at her door. Other evidence established that defendant's vehicle was seen departing

from the parking lot soon after the second incident. A jury reasonably could infer, particularly in light of the modus operandi involved in many of the other crimes, that the man who tried the door on both occasions was defendant. For the same reason, a jury reasonably could determine that his intent was, in part, theft. (*People v. Ramirez, supra*, 39 Cal.4th at pp. 463–464.) Contrary to defendant's claim, there was evidence he already had stolen from his victims, namely, that he had stolen an opal ring from Tarr.

Defendant claims that Canfield was not completely certain of her identification when she viewed the video lineup, and that her identification was tainted by her prior observation of defendant's image on television news. Canfield was quite confident of her identification at trial, however, and even at the video lineup she was almost positive. In addition, the testimony of the apartment manager and her husband supported Canfield's identification.

### d. *Burglary of the residence occupied by Leslie Hughes-Webb (count 9)*

Defendant challenges the sufficiency of the evidence to establish that he was responsible for pushing his way into the residence where Leslie Hughes-Webb was staying, in light of the testimony of another witness who testified defendant was at a distant spot in Old Town San Diego until 2:30 p.m. on the day of the attack. The jury was entitled to determine that Hughes-Webb, who positively identified defendant as her assailant, was more credible than the other witness, Christine Fagan. Contrary to defendant's assertion that there was no evidence indicating that defendant entered the home with the intent to commit theft, the similar crimes he committed in other homes provided a basis for a jury to reasonably conclude that his intent was, at least in part, to commit theft.

### e. *Burglary of the residence of Michael Gromme (count 17)*

With respect to the burglary of Michael Gromme's residence, although the question is closer than in other counts, we believe the evidence was sufficient to support this conviction. Shirley Beasley testified that he and defendant burglarized an apartment that was "right upstairs" from their own and removed all the liquor they found in the home in order to provide supplies for a party. Beasley testified that defendant retrieved a knife from the kitchen and walked through the apartment. Beasley further testified that he and defendant spoke with an older couple, the occupants of the apartment, shortly after the burglary and that he commiserated over the burglary, falsely claiming the apartment he shared with defendant also had been burglarized. On the other hand, Beasley claimed he and defendant committed the burglary of the

apartment of an older couple whom he saw seated at the apartment complex's pool as the burglary proceeded, even though Gromme resided alone and was at work when the burglary occurred.

When we consider that Gromme's apartment was indeed "right upstairs" from the apartment shared by defendant and Beasley, that Gromme's account of the peculiar burglary (in which the perpetrators removed his entire liquor supply) matched Beasley's account, and that Gromme and Beasley both recalled an interaction shortly after the burglary in which Beasley commiserated over the burglary and claimed to have suffered one himself, we believe the evidence as a whole permitted the jury reasonably to conclude that Beasley was mistaken or lied when he stated the apartment belonged to an older couple whom he had seen at the pool. The unusual burglary of Gromme's residence was sufficiently similar to the burglary described by Beasley, and Beasley's statements to Gromme were so similar to the statements described by Beasley, that it would be reasonable for the jury to conclude both witnesses were describing the same incident. Although Beasley was an accomplice, his testimony was corroborated by Gromme's account of the target and location of the burglary, the other evidence establishing Beasley and defendant's partnership in crime during the relevant period, and Beasley and defendant's presence together shortly after the crime. (See *People v. Gurule, supra*, 28 Cal.4th at p. 628.)

> f. *Attempted burglary of the residence of Patricia Van (count 23)*

Defendant contends the evidence of attempted burglary of the residence of Patricia Van on December 19, 1990, consisted of nothing more than an innocent knock at the door, accompanied by an inquiry after a friend. We believe, however, that the evidence was sufficient to prove an attempted burglary. A neighbor saw defendant examining the backyards of residences in that vicinity, then witnessed him approach the Van residence through the side yard. Defendant arrived there shortly after Van returned from working out at the Family Fitness Center, and the evidence strongly suggests he had stalked Van and followed her home. His approach to the front door and request for a person who did not reside there was consistent with his approach during the commission of other crimes. In addition, a completed burglary of the home of Patricia Van took place one month after the attempt, and one of Van's stolen earrings was traced to defendant. There was ample evidence that the December 19, 1990 approach to the Van residence also constituted an attempted burglary in which defendant's activities went beyond mere preparation but were frustrated by the vigilance of the victim's neighbor.

### g. Attempted burglary of the residence of Karyl Oldenburg (count 22)

Defendant contends there was insufficient evidence to support the guilty verdict of attempted burglary of Karyl Oldenburg's residence. We disagree. The jury reasonably concluded that defendant was stalking Oldenburg and that he followed her home from her workout at the Family Fitness Center. Defendant appeared at her front door and, without knocking or ringing the bell, started manipulating the doorknob. There was evidence suggesting he used a credit card to unlock doors that were not deadbolted, and his activity on this occasion was consistent with such an effort, especially because he seemed to have something in his hands as he turned the doorknob. In addition, Oldenburg witnessed him in her backyard, where he had no legitimate business, approaching a sliding glass door similar to the ones he had used to gain entry to other residences that he had burglarized. There was sufficient evidence to establish that defendant attempted to enter this residence with the intent to steal.

### h. Attempted burglary of the Yates residence (count 24)

Contrary to defendant's claim, sufficient evidence supported the verdict that he was guilty of the attempted burglary of the residence occupied by Angela Yates. There was evidence indicating that defendant followed Yates home from the Family Fitness Center, parked at some distance from her residence, then entered the backyard of the residence as Angela showered. He approached a sliding glass door at the rear of the residence, but was frightened off when Angela's mother saw him and screamed and the family dog emerged from the house. Defendant was observed jumping over the fence of the Yates property and driving off at a high rate of speed. In light of the evidence connecting defendant to similar crimes, there was sufficient evidence to establish that he stalked Angela Yates with the intent to enter her residence for the purpose, at least in part, of committing theft.

### i. Burglaries of the residences of Depamphillis and Kinney (counts 25 and 26).

Defendant contends there was insufficient evidence he was responsible for the Depamphillis and Kinney burglaries. He relies upon evidence reflecting that these burglaries occurred late at night, unlike the other crimes. But the burglarized apartments were located in the vicinity of the other crimes, and a car similar to that used by defendant was observed at the scene. Moreover, items stolen during these burglaries subsequently were traced to defendant.

### j. Attempted burglary of the residence occupied by Geralyn Peters Venvertloh (count 27)

Defendant contends there was insufficient evidence to link him to the attempted burglary of Geralyn Venvertloh's residence, and of his intent to commit theft in the course of that incident. We disagree. Although Venvertloh was unable to make a positive identification at a photo or live lineup, her neighbor Jeffrey Pich witnessed defendant attempting to break into Venvertloh's residence and positively identified defendant and his vehicle. Defendant's intent to steal was established by his attempt to gain surreptitious entry to a residence that did not belong to him, and by his having committed numerous other burglaries in the same manner with the intent to commit theft.

### k. Felony-murder theory

Defendant contends there was insufficient evidence to support the burglary convictions associated with the murders of Weinhold, Tarr, Keller, and Pamela and Amber Clark, and therefore insufficient evidence to support the murder verdicts as to these victims if the verdicts were based upon a burglary or rape felony-murder theory. (Defendant was not charged with a burglary in connection with the murder of Tiffany Schultz.)

 Murder committed in the perpetration of certain felonies, including burglary and rape, constitutes murder in the first degree. (§ 189.) " 'We have required as part of the felony-murder doctrine that the jury find the perpetrator had the specific intent to commit one of the enumerated felonies [in section 189] . . . . [Citations.]' [Citation.] It also is established that the killing need not occur in the midst of the commission of the felony, so long as that felony is not merely incidental to, or an afterthought to, the killing." (*People v. Proctor* (1992) 4 Cal.4th 499, 532 [15 Cal.Rptr.2d 340, 842 P.2d 1100].) In addition, a homicide occurs in the perpetration of an enumerated felony for the purpose of the felony-murder rule if both offenses were parts of " 'one continuous transaction.' " (*People v. Sakarias* (2000) 22 Cal.4th 596, 624 [94 Cal.Rptr.2d 17, 995 P.2d 152].)] " 'There is no requirement of a strict "causal" [citation] or "temporal" [citation] relationship between the "felony" and the "murder." ' " (*People v. Hart* (1999) 20 Cal.4th 546, 608–609 [85 Cal.Rptr.2d 132, 976 P.2d 683].) In addition, "[c]ircumstantial evidence may provide sufficient support for a felony-murder conviction." (*People v. Elliot, supra,* 37 Cal.4th at p. 469, citing *People v. Marks, supra,* 31 Cal.4th at pp. 230–231 ["sufficient evidence supported [a] robbery-murder conviction based on evidence that [the] victim usually carried several $1 bills, no paper currency was found on [the] victim or in his taxi, and defendant had seven $1 bills on his person at the time of his arrest"].)

Defendant contends the evidence left open the possibility that he was invited into each murder victim's home and did not enter with felonious intent, a necessary element for proof of a burglary. Defendant employs an incorrect test in assessing the sufficiency of the evidence. The test is whether a reasonable juror could have believed from all the evidence that defendant entered the homes with intent to commit an enumerated felony. (*People v. Hillhouse, supra,* 27 Cal.4th at p. 496; *People v. Proctor, supra,* 4 Cal.4th at p. 532.) There was ample evidence establishing that defendant entered each residence with the intent to commit theft, considering defendant's modus operandi and the other similar burglaries he committed that clearly were theft related. In addition, the jury properly was instructed that felony murder is not proven unless the intent to commit the felony was formed prior to entry into the residence, and that felony murder is not established by proof that the defendant entered with the intent to commit murder.

Defendant reiterates that there was no evidence indicating he entered Janene Weinhold's residence with the intent to steal or rape. He notes the absence of evidence of a forced entry, the absence of evidence that property was missing from the residence, and the absence of direct evidence concerning the interaction between Weinhold and defendant when he presented himself at her door. But the jury may rely upon circumstantial evidence to find that a felony murder occurred (see *People v. Elliot, supra,* 37 Cal.4th at p. 469; *People v. Marks, supra,* 31 Cal.4th at pp. 230–231), and specifically to establish the intent of the defendant. The defense's claim that defendant may have been invited into the apartment before he formed the intent to rape Weinhold or steal from the apartment is inconsistent with the voluminous evidence of defendant's stalking behavior, including his acts prior to the commission of the Weinhold murder, his statement that he had forced himself on a victim, his many similar burglaries, the circumstance that he was evidently unknown to Weinhold and that she was not interested in dating, and the circumstances that his encounter with her was accompanied by loud sounds and that she bore defensive wounds. The evidence suggests that the sexual contact between defendant and his victim was not consensual, that Weinhold did not voluntarily admit defendant to her home, and that he did not form an intent to commit a theft or rape only after he entered and on the spur of the moment, as a purely incidental objective. A forced entry was not necessary to support the burglary verdict. (See *People v. Frye, supra,* 18 Cal.4th at p. 954.) The jury reasonably could conclude that defendant, well before he gained admission to the apartment, intended to force himself upon the victim or at least steal from her.

Defendant also contends there was insufficient evidence to demonstrate that he formed the intent to steal prior to his entry into the Tarr apartment. Again, the absence of evidence of a forced entry is not determinative. The evidence of defendant's modus operandi constituted evidence of a common intent to

steal that was formed prior to entry into the residences of his victims. As noted, defendant did steal an opal ring from Tarr. The jury reasonably could believe that when he entered, defendant already intended to steal rather than forming such intent only after the death of his victim.

The prosecutor suggested that defendant took the ring as a souvenir, and defendant contends the evidence supports the view that he stole a single ring from Keller merely as a souvenir rather than entering her residence with a preexisting intent to steal. The murder of Keller followed that of Tarr, and the acquisition of a second souvenir reasonably could be viewed as one of the objects of defendant's entry into Keller's home rather than as a reflection of a spontaneous impulse experienced following entry into the home.

With respect to the Clark murders, defendant reiterates there was insufficient evidence of an intent to steal prior to entry into the residence because, as he views the matter, there was no evidence concerning the circumstances under which the perpetrator entered the home, whereas there was evidence indicating that defendant was dating persons who met the description of the Clarks. The jury reasonably could conclude defendant was not dating the Clarks, but entered their home with intent to commit theft—an intent he carried out in this and many other instances.

Defendant contends that because his convictions were based upon insufficient evidence, he was deprived of his federal constitutional "rights to a fair jury trial in accordance with due process of law, to be free from conviction of any crime absent proof beyond a reasonable doubt [citation], and to reliable fact-finding underlying capital guilt and penalty phase verdicts." The evidence was sufficient to support each of the felony-murder verdicts, as we have explained. That the evidence in some instances might be reconciled with a contrary finding or that a jury reasonably could have determined that each murder was not a felony murder is not a basis for reversal of any of defendant's conviction. (See *People v. Lewis* (2001) 26 Cal.4th 334, 368 [110 Cal.Rptr.2d 272, 28 P.3d 34].)

Defendant also contends that because in his view the evidence in support of the burglary convictions involving the murder victims was inadequate, it was improper for the court to instruct on felony murder. We disagree, having found the evidence of preexisting intent to commit an enumerated felony to be sufficient with regard to each of the murders.

Defendant next claims—still under his general challenge to the sufficiency of the evidence—that it was improper for the court to instruct on felony murder, because the thefts necessarily were merely incidental afterthoughts to planned murders and thus could not support a felony-murder verdict. (See

*People v. Green* (1980) 27 Cal.3d 1, 52–54 [164 Cal.Rptr. 1, 609 P.2d 468]; *People v. Thompson* (1980) 27 Cal.3d 303, 321–325 [165 Cal.Rptr. 289, 611 P.2d 883].) This claim is untenable in view of the number of occasions on which defendant entered residences with the intent to steal and either pawned the proceeds or used them as gifts for friends.

If defendant's claim is that, because he committed premeditated killings, he could not also have committed burglary for the purpose of the felony-murder rule, his assertion is unconvincing. The felony-murder rule " 'do[es] not apply to a burglary committed for the sole purpose of assaulting or killing the homicide victim. [Citations.]' " (*People v. Ramirez, supra,* 39 Cal.4th at p. 463, quoting *People v. Seaton* (2001) 26 Cal.4th 598, 646 [110 Cal.Rptr.2d 441, 28 P.3d 175].) On the other hand, "*concurrent* intent to kill and to commit the target felony or felonies does not undermine the basis for a felony-murder conviction." (*People v. Gutierrez, supra,* 28 Cal.4th at p. 1141, italics added; see also *People v. Mendoza* (2000) 24 Cal.4th 130, 183 [99 Cal.Rptr.2d 485, 6 P.3d 150].)

### 1. *The murder of Schultz*

Still pursuing his instructional claims under the general heading of the sufficiency of the evidence, defendant challenges the first degree murder instruction as it applied to the murder of Schultz. The trial court gave the jury a general instruction that first degree murder could be established by proof of premeditation and deliberation or by proof that the killing was committed in the perpetration of an enumerated felony. Defendant complains the court did not instruct the jury that the felony-murder theory would *not* apply to the charge that defendant murdered Schultz. Defendant contends the jury— even though a burglary was not charged in connection with the Schultz murder—nonetheless *might* have determined that defendant entered Schultz's home with the intent to commit theft, and therefore *may* have applied the felony-murder theory. We are not persuaded that any error occurred. The jury may convict on a felony-murder theory if the felony is proved beyond a reasonable doubt even if the underlying felony has not been charged. (*People v. Davis* (1995) 10 Cal.4th 463, 514 [41 Cal.Rptr.2d 826, 896 P.2d 119]; see also *People v. Kipp* (2001) 26 Cal.4th 1100, 1131 [113 Cal.Rptr.2d 27, 33 P.3d 450].) Moreover, in light of the other murders, the evidence taken as a whole was sufficient to permit a reasonable jury to conclude that defendant entered Schultz's home with the intent to commit theft.

### 10. *Failure to instruct on second degree murder*

The prosecutor requested that the court instruct on second degree murder. His concern was to avoid any possibility of an issue on appeal concerning

instructional error. Defense counsel agreed the instruction should be given, voicing a desire that the jury have something to consider other than an all-or-nothing choice between first degree murder convictions and acquittal. At the court's request, defense counsel proposed an evidentiary basis for a second degree murder instruction. Counsel stated: "I can envision, with respect to the first homicide, the defendant being invited inside, there being an argument, something brewing in between himself and the perpetrator and Tiffany Schultz, and the state of mind of the perpetrator that is not indicative of premeditation, deliberation, because of a fight, something being found, some argument, then a struggle there and grabbing hold of the knife which was inside the apartment and stabbing, but in a semi-heat-of-passion as opposed to during the commission of a rape or during the commission of a burglary where he's been invited inside. That's the scenario that could quite possibly have happened. That could be carried through to at least one other homicide, maybe the Holly Tarr homicide as well as the Keller homicide."

The court responded that counsel had provided "at least a plausible argument," explaining: "Although I'm skeptical, [counsel], you have provided at least a scenario that could be based upon this evidence. That's as to count one. Other counts, the Clark counts, for example, I can't imagine any scenario . . . that would be anything other than first degree." The court reflected that to instruct on second degree murder as to the Schultz murder alone might cause the jury to conclude the court was directing a verdict on the other murder counts, so the court concluded it would instruct on second degree murder without limiting the instruction to the Schultz murder.

Although defense counsel favored instruction on second degree murder, defendant himself vigorously opposed such instruction. During extensive hearings, the court went to great length to ensure that defendant understood the issue and that he knowingly and voluntarily wished to forgo instruction on second degree murder. Defense counsel conceded he had no intention of arguing a second degree murder theory to the jury but, contrary to his client, believed the instruction would serve to give the jury choices.[17]

On the basis of language set forth in *People v. Frierson* (1985) 39 Cal.3d 803 [218 Cal.Rptr. 73, 705 P.2d 396], the trial court concluded that the ultimate authority as to whether lesser included offense instructions should be

---

[17] We note defendant's statement to the trial court: "I do not want second degree at all. I'll use the court's words, all or nothing." The court pressed him on his understanding of the issue, and defendant responded, "What you're trying to tell me, your honor, is that if I was to be found guilty and I have to go back to the appeal, I can't say that it was your fault on the error because those are my wishes. [¶] But I still say . . . the same thing. I do not want second degree. Because I feel that second degree is telling the jury that I [did] something. I do not want that at all." Later he said: "I haven't done anything. So why should I go any lower to second degree."

given was the defendant himself, not his or her attorney. The court took additional steps to ensure that defendant understood the choice he was making by opposing instruction on second degree murder, including that defendant would not be able to claim error on appeal. The court again asked defense counsel to state the evidentiary basis he believed supported the instruction. Defense counsel maintained that he could "conceive of a state of facts where a person was invited in. That is, there was no burglary, no felony burglary which would be the basis of an automatic first degree murder finding where the individual inside is confronted by the female, either after having been invited in by her for whatever reasons, got that person inside. There was an argument, a discussion." Counsel surmised that perhaps "somehow there was a struggle, struggle over the knife [obtained from inside the home]. At least one blow caused death . . . . Could have been a killing absent premeditation and deliberation." Counsel concluded that such a theory would apply to all the killings except the Clark murders.

The court then stated its view that, despite defense counsel's recitation, the evidence was not sufficient to place a sua sponte duty on the court to instruct on second degree murder, commenting that all of the evidence supported guilty verdicts as to *first degree* murder, if any. The court nonetheless undertook further discussion with defendant designed to ensure that defendant's decision to forgo instruction on second degree murder (despite defense counsel's request) was knowing and voluntary. The court asked him whether he would "waive any right that you would otherwise have to . . . [¶] [a] second degree [murder] . . . instruction being provided to the jury," and defendant responded in the affirmative. The court determined that it would not instruct on second degree murder and announced that its decision stemmed both from its view of the evidence and from defendant's request.

Defendant now contends, despite his request at trial that the instruction not be given, that the court's failure to instruct on second degree murder constituted reversible error, assigning various constitutional bases for his argument.

 " ' "[A] defendant has a constitutional right to have the jury determine every material issue presented by the evidence [and] . . . an erroneous failure to instruct on a lesser included offense constitutes a denial of that right . . . ." [Citation.]' " (*People v. Elliot, supra*, 37 Cal.4th at p. 475.)

The trial court has authority to determine whether to instruct on a lesser included offense such as second degree murder, and if the court determines that there *is* sufficient evidence to warrant such an instruction, the court should give the instruction. It is for the *court* alone to decide whether the evidence supports instruction on a lesser included offense. (*People v. Barton*

(1995) 12 Cal.4th 186, 196 [47 Cal.Rptr.2d 569, 906 P.2d 531].) As we have stated, "neither the prosecution nor the defense should be allowed, based on their trial strategy, to preclude the jury from considering guilt of a lesser offense included in the crime charged." (*Ibid.*) Indeed, " 'California decisions have held for decades that even absent a request, and *even over the parties' objections*, the trial court must instruct on a lesser offense necessarily included in the charged offense if there is substantial evidence the defendant is guilty only of the lesser. [Citations.]' " (*People v. Carter, supra*, 36 Cal.4th at p. 1184, italics added & italics in *Carter* omitted.)

Despite the circumstance that it is the *court* that is vested with authority to determine whether to instruct on a lesser included offense, the doctrine of invited error still applies if the court accedes to a defense attorney's tactical decision to request that lesser included offense instructions not be given. Such a tactical request presents a bar to consideration of the issue on appeal. (*People v. Barton, supra*, 12 Cal.4th at p. 198; see also *People v. Horning* (2004) 34 Cal.4th 871, 905 [22 Cal.Rptr.3d 305, 102 P.3d 228].) In the present case, however, defense counsel did *not* make such a tactical decision—on the contrary, counsel *requested* the instruction.

We need not determine whether this procedural bar to our consideration of the issue on appeal applies when defense counsel has requested the instruction but the defendant objects. As we shall explain, we believe that the trial court correctly concluded that the evidence adduced at trial was not such that the trial court was required to instruct on second degree murder as a lesser included offense.

Instructions on lesser included offenses " 'are required whenever evidence that the defendant is guilty only of the lesser offense is "substantial enough to merit consideration" by the jury. [Citations.] "Substantial evidence" in this context is " 'evidence from which a jury composed of reasonable [persons] could . . . conclude[]' " that the lesser offense, but not the greater, was committed. [Citations.]' " (*People v. Hughes* (2002) 27 Cal.4th 287, 366–367 [116 Cal.Rptr.2d 401, 39 P.3d 432], italics omitted.) In the present case, the evidence in support of any second degree murder conviction was not substantial enough to warrant consideration by the jury. There was no sua sponte duty to instruct, and the court did not err in refusing a request for an instruction that was not supported by substantial evidence. (*People v. Flannel* (1979) 25 Cal.3d 668, 684–685 [160 Cal.Rptr. 84, 603 P.2d 1]; *People v. Ceja* (1994) 26 Cal.App.4th 78, 85 [31 Cal.Rptr.2d 475].)

██ "Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) "Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take

away the life of a fellow creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (§ 188.) "Murder that is committed with malice but is not premeditated is of the second degree." (*People v. Ramirez,* *supra,* 39 Cal.4th at p. 464; see § 189.)

Despite the strong evidence of premeditation discussed above, defendant insists the evidence was such that the jury could have concluded that the People had failed to prove premeditation and deliberation or felony murder, the two bases upon which the first degree murder verdicts rested. Defendant argues it was "entirely possible" that the killings occurred in a quick explosion of violence after "the encounters be[gan] in a friendly fashion with the perpetrator invited inside." He urges that there was slight evidence of planning or motive, and that the manner of the killings—according to the defense, potentially representing an explosion of violence—would suggest malice but not premeditation. He notes that the prosecutor suggested the perpetrator of the murders was mentally disturbed, and claims it would be difficult to prove premeditation on the part of a deranged person. Defendant also points to the prosecutor's argument that the thefts may have been afterthoughts, in support of his claim that there was evidence suggesting he entered the victims' homes without criminal intent.

We disagree. Defendant was not entitled to have the jury instructed on all possible lesser included offenses, but only on those offenses as to which there was evidence of substantial weight. (*People v. Hughes, supra,* 27 Cal.4th at pp. 366–367.) In the present case, such evidence of lesser included offenses would have to suggest that defendant killed the victims with the general intent to kill or with a reckless disregard for human life, but that he did not kill in the course of committing a felony or with premeditation and deliberation. But the evidence demonstrating premeditation was overwhelming, and there was no evidence that defendant happened upon the victims and rashly decided to kill them. There was no evidence of substantial weight indicating that defendant entered the victims' homes at their invitation; defendant relies upon only speculation in making such a claim. Although an unpremeditated explosion of violence may constitute a second degree murder, evidence of defendant's motive and modus operandi supplied overwhelming proof that he did *not* kill on a rash impulse, but according to a premeditated design. As the trial court observed, defense counsel's request for a second degree murder instruction was based upon "speculative scenarios" without any evidentiary basis. Finally, we observe that the defense was alibi and mistaken identity, not that defendant intended to kill but did not premeditate. Defense counsel announced the defense had no intention of arguing a second degree murder theory to the jury even if the court were to instruct on it.

We reached a similar conclusion in *People v. Carter, supra,* 36 Cal.4th 1114. In that case, within a period of a few days, three women were fatally strangled under closely similar circumstances. "Not only does the manner in which each of these three killings was perpetrated strongly indicate in itself that each of the killings was willful, premeditated, and deliberate, but the entire course of conduct clearly revealed by the evidence, taken as a whole, is inconsistent with any suggestion that the killings were not willful, premeditated, and deliberate." (*Id.* at pp. 1184–1185; see also *People v. Valdez* (2004) 32 Cal.4th 73, 116 [8 Cal.Rptr.3d 271, 82 P.3d 296] [speculation that the victim might have been shot during a struggle did not require a second degree murder instruction].)

Defendant refers to his statements that he was dating the Clarks and a woman named Janene, and suggests in this court that this evidence would support a claim that he entered the Clark and Weinhold residences without intent to commit a felony and without a premeditated intent to kill. But the jury, having convicted defendant of burglary in connection with the Clark and Weinhold murders and of rape in connection with the Weinhold murder, specifically rejected the theory that he entered the Clark and Weinhold residences without intent to commit a felony. In addition, there is no evidence that defendant entered the residences and then suddenly decided to kill the victims in an explosion of violence. All the evidence pointed to premeditation.

Even if we were to agree with defendant that the court should have instructed on second degree murder (and that this issue was not forfeited), any error in failing to give such instructions would have been harmless. "The erroneous failure to instruct on a lesser included offense generally is subject to harmless error review under the standard of *People v. Watson* (1956) 46 Cal.2d 818, at pages 836–837 [299 P.2d 243]. Reversal is required only if it is reasonably probable the jury would have returned a different verdict absent the error or errors complained of. [Citations.]" (*People v. Rogers* (2006) 39 Cal.4th 826, 867–868 [48 Cal.Rptr.3d 1, 141 P.3d 135], fn. omitted; and see *id.* at p. 868, fn. 16 [the footnote describes potential exceptions for certain federal constitutional violations]; see also *People v. Ledesma* (2006) 39 Cal.4th 641, 716 [47 Cal.Rptr.3d 326, 140 P.3d 657]; *People v. Sakarias, supra,* 22 Cal.4th at p. 621 [a violation of the duty imposed by state law to instruct on lesser included offenses is evaluated under the *Watson* standard]; *People v. Breverman* (1998) 19 Cal.4th 142, 165 [77 Cal.Rptr.2d 870, 960 P.2d 1094] [same]; but see *People v. Elliot, supra,* 37 Cal.4th at p. 475 [characterizing erroneous failure to instruct on a lesser included offense as a denial of due process of law to be evaluated on appeal under the standard set forth in *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]].) Having considered " 'whether the evidence supporting the existing judgment is . . . *relatively* strong, and the evidence supporting a different

outcome is . . . *comparatively* weak' " (*People v. Rogers, supra,* 39 Cal.4th at p. 870), we do not believe it is reasonably probable that the absence of a second degree murder instruction could have affected the outcome of the jury's deliberations. Indeed any error would have been harmless beyond a reasonable doubt. As we have seen, the evidence in support of second degree murder verdicts not only was weak—it was insubstantial, whereas the evidence relating to the manner and circumstances of each crime and the modus operandi and common marks among all the crimes overwhelmingly established premeditation.

Even assuming the existence of *some* evidence in support of defendant's claim that he killed in a sudden, unpremeditated explosion of violence, we observe that the jury also convicted defendant of burglary as to five of the murders—all but the Schultz murder, as to which burglary was not charged— thereby necessarily determining that, contrary to defendant's suggestion on appeal, defendant did not enter the victims' residences lacking felonious intent. The verdicts also strongly indicate, in view of the facts underlying the crimes, that the jury believed defendant had committed five felony murders. In addition, the jury found true the special circumstance allegation that he killed Janene Weinhold in the course of a rape or attempted rape (§ 190.2, subd. (a)(17)), thereby specifically establishing that the jury determined that the Weinhold murder was a felony murder. (See *People v. Elliot, supra,* 37 Cal.4th at pp. 475–476; *People v. Chatman* (2006) 38 Cal.4th 344, 392 [42 Cal.Rptr.3d 621, 133 P.3d 534]; see also *People v. Hinton* (2006) 37 Cal.4th 839, 883 [38 Cal.Rptr.3d 149, 126 P.3d 981] [the jury necessarily rejected defendant's sole defense of duress when it convicted him of attempted robbery, so that any lack of clarity in the second degree murder instructions was harmless].)

Further, we already have rejected defendant's claim that there was insufficient evidence to support the burglary and rape verdicts involving the murder victims, and his renewal of this claim in the context of the present argument does not alter our conclusion. As for the remaining murder count involving the murder of Schultz, we do not believe the jury would have convicted defendant of the second degree murder of Schultz had it been instructed on that offense, in light of the jury's verdicts as to the five other homicide charges.

Defendant contends that omission of the second degree murder instruction constituted federal constitutional error. Specifically, he asserts that if his state law instructional error claim is barred by the invited error doctrine, he still must prevail because the court's failure to instruct on second degree murder constituted a violation of his rights under the Eighth and Fourteenth Amendments to the United States Constitution. He relies upon *Beck v.*

*Alabama, supra*, 447 U.S. 625, and related cases.[18] We have not relied upon the invited error doctrine in rejecting defendant's instructional claim, however. Defendant adds that his federal constitutional argument applies regardless of the cause of the court's failure to instruct, relying upon the same principles. We also reject this claim. *Beck v. Alabama, supra*, 447 U.S. 625, and its progeny do not require that a court instruct upon a lesser included offense as to which substantial evidence is lacking. (*People v. Valdez, supra*, 32 Cal.4th at p. 118 ["Because there was no substantial evidence supporting an instruction on second degree murder, the high court's decision in *Beck* is not implicated"].) Nor, unlike the situation in the *Beck* case, does our state prohibit the giving of lesser included offense instructions in capital cases. Nor under our state law can the absence of a lesser included offense instruction force the jury into a choice between acquittal and a murder conviction that necessarily would lead to the death penalty; even after finding true an alleged special circumstance, a California jury may elect to sentence the defendant to life in prison without the possibility of parole. (*People v. Valdez, supra*, 32 Cal.4th at pp. 118–119.)[19]

Defendant further contends that the absence of a second degree murder instruction violated the federal constitutional principle that the jury, not the court, must decide the factual basis for every element of a criminal charge, and essentially constituted a directed verdict of first degree murder. He urges that the standard of review for federal constitutional error established in *Chapman v. California, supra*, 386 U.S. 18, 24, should apply.

Contrary to defendant's claim, the court's failure to instruct on second degree murder did not constitute a directed verdict of first degree murder. Defendant's reliance on *People v. Figueroa* (1986) 41 Cal.3d 714 [224 Cal.Rptr. 719, 715 P.2d 680], is misplaced. In that case the trial court

---

[18] "The law at issue in *Beck* prohibited giving lesser included offense instructions in capital cases while they remained available in noncapital cases. Additionally, the jury was instructed that if they found the defendant guilty, they were mandated to impose the death penalty. (*Beck* [*v. Alabama*], *supra*, 447 U.S. at p. 639, fn. 15.) In such a case, the jury was left with only 'two options: to convict the defendant of the capital crime, in which case they were required to impose the death penalty, or to acquit.' (*Hopkins v. Reeves* (1998) 524 U.S. 88, 95 [141 L.Ed.2d 76, 118 S.Ct. 1895].)" (*People v. Valdez, supra*, 32 Cal.4th at p. 118, fn. 23.)

[19] Because the court must instruct on lesser included offenses for which there is evidence of substantial weight without respect to the wishes of the prosecution or the defense, we need not reach defendant's claim that it would constitute a denial of equal protection and other constitutional rights to adopt an arbitrary system whereby some, but not all, defendants are permitted to control instruction of the jury on lesser included offenses, depending upon the policy of the individual court in which the defendant happens to appear. We need not respond to defendant's claim that the court's failure to instruct on second degree murder removed an element of the offense from the jury's consideration and constituted an impermissible directed verdict, because there was no substantial evidence suggesting that defendant had committed second degree murder.

instructed the jury on all the elements of the charged securities law violation, including the requirement that the item at issue actually be a security. Then the court instructed the jury that the item *was* a security, thereby improperly removing that element from the jury's consideration. In the present case, however, the court did not instruct the jury that any element of the crime of murder had been established.

 Finally, defendant contends that omission of the second degree murder instruction caused the jury to fail to fix the degree of the crime as required by section 1157, which requires that when a defendant is convicted of a crime that is divided into degrees, the fact finder must find the degree of the crime—and that failing such action by the fact finder, the crime will be "deemed to be of the lesser degree." (§ 1157.) This claim lacks merit. The question of degree properly was not before the jury, and section 1157 had no application. (See *People v. Mendoza, supra,* 23 Cal.4th at p. 910.) That statute does not require the jury to make a determination of the degree of the murder when substantial evidence does not exist that would warrant the jury's considering the homicide to be anything less than first degree murder. Defendant fails to provide any authority or persuasive argument to the contrary.

### 11. *Testimony of Anna Cotalessa-Ritchie*

Over defense objection that the evidence was more prejudicial than probative and should be excluded pursuant to Evidence Code sections 352 and 1101, Anna Cotalessa-Ritchie testified as follows. She resided in the Buena Vista Gardens apartment complex. At approximately noon on March 25, 1990, a few days prior to the April 3, 1990 murder of Holly Tarr, the witness walked from her residence to a nearby convenience store. On her way to the store she saw defendant, whom she later identified, standing at a bus stop across the street from the store. On her return, at first she did not see defendant, but then observed him walking toward her as she walked toward her home. He stared at her during the time it took for her to proceed approximately 50 yards, until they crossed paths. Several times she looked away and looked back, and he still was staring at her. She passed him and proceeded 20 to 30 yards to the door of her second-story apartment. She fumbled for her keys for a moment, then noticed defendant, now standing at the foot of the stairs staring at her. When she looked at him, he bent over as if to tie his shoes, which already were tied, but continued to stare at her. She entered the apartment and locked the door. The incident made her nervous, and she informed her husband of it. She reported the incident to the police the day after the Tarr murder. In June 1991, she identified defendant at a video lineup, having been instructed not to view any publicity regarding the case prior to the lineup. In his offer of proof, the prosecutor stated that the witness was a young woman in her early 20's.

The prosecution offered the foregoing testimony on the issue of identity and as evidence of modus operandi, relying upon the asserted similarity between the incident and the crimes committed against Tarr and Weinhold. The court overruled defendant's objection, explaining that the incident occurred close in time and place to the Tarr and Weinhold murders, adding its determination that the evidence was not more prejudicial than probative.

■ Ordinarily, evidence of a person's character is inadmissible to demonstrate his or her conduct on a particular occasion (Evid. Code, § 1101, subd. (a)), except that evidence is admissible to establish "that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than his or her disposition to commit such an act." (Evid. Code, § 1101, subd. (b).) Evidence going to the issue of identity must share *distinctive* common marks with the charged crime, marks that are sufficient to support an inference that the same person was involved in both instances. (*People v. Gray* (2005) 37 Cal.4th 168, 202 [33 Cal.Rptr.3d 451, 118 P.3d 496].) " 'A somewhat lesser degree of similarity is required to show a common plan or scheme . . . .' (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402–403 [27 Cal.Rptr.2d 646, 867 P.2d 757].) . . . [W]e review a trial court's ruling . . . for abuse of discretion. [Citation.]" (*People v. Gray, supra,* 37 Cal.4th at p. 202.)

The trial court did not abuse its discretion. Cotalessa-Ritchie's testimony provided evidence of defendant's "other act" that was relevant to issues apart from his character or disposition, namely identity and common scheme or plan. There was evidence that defendant had followed other victims— including witnesses who testified at trial—to their homes during the middle of the day; Tarr and Weinhold were murdered in their apartments in the same complex where Cotalessa-Ritchie resided and at the same time of day. The women had been murdered within a short time of the Cotalessa-Ritchie incident, and Schultz was murdered in an adjacent complex. There was evidence that murder victims Tarr and Schultz both had been followed home by a young African-American man after they left their apartments for a brief period, and murder victim Weinhold had gone in and out of her apartment while doing laundry. Schultz, Tarr, and Weinhold had been followed up a flight of stairs to their second-story apartments; defendant followed Cotalessa-Ritchie to the bottom of the stairway leading to her second-story apartment. Finally, Cotalessa-Ritchie was of a similar age and belonged to the same race and gender as all the murder victims and most of the other burglary or attempted burglary victims. It was within the trial court's discretion to conclude that the Cotalessa-Ritchie incident was highly similar to the stalking activity engaged in by the perpetrator of several of the other charged crimes, thereby providing evidence that it was defendant and not some other man who committed the charged crimes. The trial court properly

could find that the similarity of the incident to the evidence of defendant's stalking behavior in many other instances provided evidence of a common scheme or plan. Nor was the evidence of the incident more prejudicial than probative.[20]

### 12. *Exclusion of third party culpability evidence*

Defendant contends the trial court erred in excluding certain third party culpability evidence. Specifically, defendant made an offer of proof that Faie Fiorito would testify that a young African-American man watched her as she worked out at the Family Fitness Center located on Balboa Avenue in San Diego at approximately 6:30 p.m. on April 9, 1990. When she emerged into the parking lot some minutes later, the man was seated behind her automobile and seemed to be trying to examine her vehicle license plate and write something down. She watched for two minutes, then drove home and telephoned the police. She participated in the live lineup and would testify that defendant was not the person who had watched her on that occasion, although that person met the general description of the assailant in the series of murders with which defendant was charged.

The prosecution objected that the offer of proof was inadequate under the standard established in *Hall, supra,* 41 Cal.3d 826. Specifically, there had been nothing linking the Balboa Avenue Family Fitness Center to the crimes, and defendant also had failed to provide any evidence concerning the location of Fiorito's residence. The court excluded the evidence, commenting that it had admitted the Dhillon testimony over the prosecution's objection because it described an event bearing many common marks with the charged crimes, in that it took place at the same time of day and in the same location as some of the charged murders, the same type of victim was targeted, and the same method of entry into a home was attempted. By contrast, the court found no suggestion in the evidence that a young African-American man had displayed interest in a woman at a location and time different from those involved in the charged offenses so as to link that event to the present case.

Contrary to defendant's position, there was nothing in the proposed Faie Fiorito testimony that would link the person she had seen watching her to the charged crimes. The proposed testimony would not have provided "direct or circumstantial evidence linking the third person to the actual perpetration of

---

[20] Defendant contends admission of the evidence "arbitrarily deprived him of a state entitlement in violation of federal 5th and 14th Amendment due process rights . . . and affected the reliability of the guilt verdict that later supported a death judgment, violating [defendant's] federal 8th and 14th Amendment rights." Because we have not found a violation of state law and because the evidence did not undermine the reliability of the guilt verdict, we reject this claim.

the crime." (*Hall, supra*, 41 Cal.3d at p. 833.) Defendant's attempt to equate the Fiorito testimony with the testimony of Cotalessa-Ritchie is unavailing. As explained, the latter testimony described an event that occurred close in time and place to two of the charged murders and that shared significant common marks with the charged crimes.

Defendant contends the evidence in question was admissible on an additional ground—to rebut the prosecution's evidence linking defendant to the Miramar Road Family Fitness Center. Defendant's offer of proof did not pertain to any purported impeachment value of the evidence, however, nor did the trial court rule upon any such claim. Accordingly, this claim is forfeited. (Evid. Code, § 353; *People v. Partida, supra,* 37 Cal.4th at pp. 434–435 [stating the general rule in the context of an Evidence Code section 352 objection, but permitting the defendant to make a narrow due process argument on appeal based upon such a statutory objection at trial].) Nor do we believe this evidence would have had any value for impeachment purposes.

Defendant complains that it was a violation of basic principles of fairness to admit testimony by Cotalessa-Ritchie but to exclude Fiorito's testimony, and that the court's error in this regard violated various of his constitutional rights.[21] Even if this claim was not forfeited, it is not persuasive. Cotalessa-Ritchie identified defendant and described behavior occurring in the same location, at the same time of day, in the same general period, and of a nature similar to the conduct of the person who murdered Tarr and Weinhold. The circumstance that Fiorito observed a person do something different at a location different from any involved in the present crime and at a different time of day, and that this person was not defendant, is not much more probative than recounting the activities of any young man of the same racial background as defendant who exhibited interest in a young White woman in San Diego at any time of day during the period in which the murders were being committed. The only other point of similarity is that Fiorito described an incident that occurred at a Family Fitness Center but, as noted, it was a facility different from any connected to any of the crimes underlying the present case.

---

[21] We also are unpersuaded by defendant's claims that the "inconsistent" rulings on the Fiorito and Cotalessa-Ritchie testimony constituted an arbitrary and fundamentally unfair application of state evidentiary rules (see U.S. Const., 5th & 14th Amends.; *Hicks v. Oklahoma, supra,* 447 U.S. 343, 346) and a deprivation of the right to a fair jury trial in accordance with due process of law, to present all relevant evidence, to compulsory process, to confrontation, and to reliable factfinding (citing U.S. Const., 5th, 6th, 8th, & 14th Amends.).

### 13. *Prosecutorial misconduct*

Defendant contends the prosecutor committed misconduct in his opening statement to the jury by assertedly exaggerating the probative value of a DNA analysis comparing the semen found at the scene of the Weinhold murder with a sample of defendant's blood. Defendant asserts the prosecutor committed further, similar misconduct in examining the experts he called to explain the evidence and in relying upon this evidence in his closing argument to the jury. Defendant argues the prosecutor improperly attributed more weight to the evidence than it deserved, by characterizing the scientific analysis that had been employed as "conservative." He claims that, at the hearing the court conducted pursuant to *People v. Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240] to assess the admissibility of new scientific evidence, the prosecutor failed to establish there was general agreement in the scientific community that the analysis used was, in fact, conservative.[22]

In his opening statement to the jury, the prosecutor stated that the People's DNA experts would inform the jury that "using the most conservative methods, that the odds of any person picked off the street matching this banding pattern that Cleophus Prince shares with the person that left semen, sperm at the scene [of Weinhold's murder], is 1 out of 124,000."

---

[22] The DNA evidence in the present case was subjected to an analysis using the so-called modified product rule.

In testing genetic material for forensic purposes, the final part of the analysis is a calculation of the statistical probability that a characteristic found in the crime scene sample and the defendant's sample would be represented in sample genetic material from a random selection of the population. A statistical operation known as the product rule is employed. " 'The product rule states that the probability of two events occurring together is equal to the probability that the first event will occur multiplied by the probability that the second event will occur.' " (*People v. Jones* (2003) 29 Cal.4th 1229, 1250, fn. 5 [131 Cal.Rptr.2d 468, 64 P.3d 762].) Originally the "product rule" was the subject of spirited debate, some population geneticists arguing that the relevant random samples were composed without regard to "population substructures," that is without adequately accounting for subgroups among various ethnicities. In response, the product rule was artificially *modified* to produce a *conservative* result in order to avoid overstating the incriminating value of the test result, and this court concluded that the modified rule had been accepted in the scientific community and produced evidence admissible under this court's *Kelly* standard. (*People v. Venegas* (1998) 18 Cal.4th 47, 85, 87, 89 [74 Cal.Rptr.2d 262, 954 P.2d 525].) It was the product of this modified statistical operation that the trial court in the present case determined was generally accepted in the relevant scientific field. The prosecution experts testified accordingly. This court subsequently recognized that additional research had resolved the scientific controversy that led to the modified product rule, leaving intact the integrity of the *unmodified* product rule. (*People v. Soto, supra*, 21 Cal.4th at p. 538 ["[s]everal developments . . . indicate that the controversy over population substructuring and use of the unmodified product rule has dissipated"].) Accordingly, in the present case the experts *in fact* did use a conservative method compared with the less conservative "unmodified product rule." (*Ibid.*; see also *id.* at p. 541.)

Prosecution witness Dr. Lisa Forman explained the basis for her evaluation of the probability of a match between defendant's blood sample and the sperm sample found at the scene. She described her calculations and her estimate of the probability of a match. The prosecutor inquired, "what number did you come up with?" Dr. Forman replied: "using the most conservative model, the model that shows the frequency to be as common as it could be in any population, the likelihood that a random person would share those sets of band . . . is approximately one in 120,000." Later the prosecutor asked the witness whether the number she had calculated was "an exceedingly conservative number?" and she replied that it was. When Dr. Glenn Evans testified, the prosecutor asked whether Dr. Forman's "modified ceiling method" of calculating the probability of a match was "an extraordinarily conservative estimate?" Dr. Evans replied that it was "in fact much more conservative than many scientists would like to see. But it is the most conservative estimate one can make. It gives every possible benefit of the doubt."

In closing argument to the jury, the prosecutor made use of the DNA evidence. He reminded the jury that Dr. Forman testified that she applied "the most conservative estimate of probabilities, the ones that would give Mr. Prince the benefit of the doubt using scientific principles, even those most conservative numbers said that it would be one-out-of 120,000 chance" of a random match. The prosecutor added that Dr. Evans had confirmed this characterization of the evidence "three or four times. He goes, every benefit is given. This is a conservative number. Every benefit of the doubt is given—he repeated that—every step of the way."

Defendant contends the references to "conservative" methods in reaching the probability estimate, both in the prosecution witnesses' testimony and during the prosecutor's own statements, constituted misconduct because they invited the jury to speculate that a higher probability of a match actually existed. He suggests that the testimony and argument constituted an effort to place before the jury evidence that the court had deemed inadmissible at the *Kelly* hearing.

Defendant's claim of prosecutorial misconduct is unpersuasive. First, defendant forfeited this claim because he did not object upon that basis, either during testimony or during the prosecutor's argument, and there is no indication an objection would have been futile or that an admonition would not have cured any harm. (See *People v. Welch, supra,* 20 Cal.4th at p. 753.) Nor did he raise such an evidentiary objection to the testimony of the experts. Further, the prosecution presented ample evidence at the *Kelly* hearing that the modified product rule *was* a conservative analytic method created in order to produce a less incriminating result than would be produced by the

unmodified product rule. (See fn. 22, *ante.*) Nor did the prosecutor commit misconduct simply by commenting upon admissible evidence. Defendant's references to the constitutional right to due process of law and a reliable factfinding proceeding add nothing to his claim.

### 14. *Closing the proceedings*

A criminal defendant has a right to a public trial that is guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and by article I, section 15 of the California Constitution. (*Waller v. Georgia* (1984) 467 U.S. 39, 46 [81 L.Ed.2d 31, 104 S.Ct. 2210]; *People v. Woodward* (1992) 4 Cal.4th 376, 382 [14 Cal.Rptr.2d 434, 841 P.2d 954].) Violation of this right requires reversal of the judgment without examination of possible prejudice. (*People v. Woodward, supra,* 4 Cal.4th at pp. 383–384.) Defendant contends the court violated his right to a public trial by closing the courtroom during the brief portion of FBI Special Agent Ankrom's testimony that described a crime scene in a murder committed subsequent to defendant's arrest that remained under investigation.

After considerable litigation, the trial court refused to quash a subpoena directed to records of the San Diego County Sheriff's Department concerning the circumstances of a murder committed subsequent to defendant's arrest. The records at issue consisted of an autopsy report and a package of photographs taken at the autopsy. Counsel were prohibited from copying the information and from publishing or distributing the evidence or the results of their investigation regarding that matter. The court explained that because the prosecution in the present proceedings was relying in part upon evidence indicating that the charged murders were "signature crimes" involving a single perpetrator, the defense was entitled to explore the circumstances of another murder committed subsequent to defendant's arrest which, the court's in camera review disclosed, bore certain common marks with the charged crime. The court acknowledged the sheriff's claim that disclosure could impair an ongoing investigation, but concluded that on balance defendant's interest in a fair trial required disclosure. The court did not rule on the question whether defendant could examine witnesses on the subject of the unsolved crime. The sheriff sought appellate review, but the Court of Appeal denied the petition for writ of mandate as premature, noting that the trial court had not yet determined whether the evidence was admissible and had otherwise demonstrated awareness of the sheriff's concerns. The Court of Appeal "presume[d] the court will take appropriate precautions should it become necessary to admit the material."

At trial, defense counsel sought permission to use the materials to cross-examine the coroner, Dr. Blackbourne. The court granted permission, limiting

questioning to the facts of the autopsy. The name of the victim, the location and precise time of the crime, and evidence discovered at the crime scene were not to be mentioned. Defense counsel questioned the coroner briefly as to the nature of the stab wounds in the unsolved case, and the prosecution questioned the witnesses concerning the dissimilarities between the unsolved crime and the murders charged in the present case.

The issue in question arose again in the context of FBI Special Agent Ankrom's testimony. As described above, Ankrom testified that a number of similarities among the six charged murders justified the conclusion that a single person had committed all the crimes. He referred to the position of the bodies, the number and placement of the wounds, and certain other circumstances. Defendant sought permission to examine Ankrom concerning the circumstances of the other murder that occurred while defendant was in custody, claiming it bore significant similarities to the charged crime and that the evidence supported the inference that the perpetrator of the unsolved crime—who could not have been defendant—might be responsible for the murders charged against defendant. The prosecutor also requested the court's permission to examine Ankrom concerning details of the crime scene in the unsolved case. He pointed out Dr. Blackbourne already had testified concerning this unsolved crime, and that he needed to examine Ankrom to establish that there were important distinctions between the method of killing in the other crime and the charged murders.

The court permitted examination of Ankrom under the same limitations as those applied to Dr. Blackbourne. Defendant elicited testimony that the unsolved murder bore certain similarities to the charged murders, in that it involved a White woman murdered in her residence who suffered more than 20 stab wounds and was discovered in a state of partial undress. The prosecution elicited testimony that Ankrom believed the unsolved murder was not committed by the person who committed the charged murders.

During the prosecutor's questioning, Ankrom volunteered some details concerning the unsolved crime, but the court intervened. A hearing followed on the question whether the details of the unsolved crime could be the subject of further examination. Because of the confidential nature of the information, the court suggested it might be required to close the proceedings to the public.

Counsel for the San Diego County Sheriff objected to any examination that would touch on details of the unsolved crime, particularly the crime scene. The objections were based on the theory that public dissemination of such information would compromise an ongoing investigation into the unsolved crime. After conducting extensive hearings, the trial court concluded that

defendant's constitutional right to present a defense and confront his accusers required that the questioning be permitted to go forward, but agreed with counsel for the sheriff that the public would be excluded if either counsel examined Ankrom concerning the "crime scene facts" underlying the unsolved murder, including certain facts that were unknown to the public, such as the nature of the fatal injuries involved in the other crime. Both defendant and the prosecutor objected.

The trial court acknowledged the right to a public trial, but noted that the right may be curtailed as necessary to serve some "higher value," including, in the court's view, "insuring the integrity of an ongoing murder investigation." The court explained that the sheriff feared that the disclosure of crime scene observations and photographs of the victim would "prevent the sheriff from effectively interviewing potential subjects or targets of the investigation, would create problems from the standpoint of a confession, if confessions are made." The court acknowledged that a trial must be open absent a compelling contrary interest, but concluded after reviewing various options that the potential for interference with the apprehension of the murderer constituted such an interest. "I do find that revealing this detailed information concerning the crime scene, photographs of the victim live or this autopsy would clearly affect the likelihood of the sheriff's successful investigation of this crime, I think closure is the appropriate method of dealing with this issue. [¶] . . . I'll give this notice to all counsel at this point. Any examination of the witness which does not deal with the details of the crime scene should and must be done in open court as a part of the public process. [¶] I will order the proceedings closed if and only if the examination deals specifically with crime scene facts, description of the crime scene in this unsolved case, photographs of the autopsy of the victim in the unsolved case showing the nature of the wounds or live photographs of the victim. [¶] Any other matter other than that information, that could prevent the sheriff from successfully apprehending the perpetrator in this unsolved case will be done in open court." The court explained that it was referring to "very specific information that could only be known to the killer . . . because I want to keep that information out of the public record because that is precisely the type of information that will prevent the sheriff from apprehending the killer who is at large at this point."

Thereafter, when the prosecution and the defense questioned Ankrom concerning the evidence disclosed at the crime scene in the unsolved murder, the courtroom was closed to spectators. The questions during the closed sessions related solely to crime scene evidence and autopsy photographs, as directed by the court. Those portions of the closing arguments that touched upon the sensitive crime scene evidence also occurred in closed session.

The United States Supreme Court "has made clear that the right to an open trial may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information. Such circumstances will be rare, however, and the balance of interests must be struck with special care. We stated the applicable rules in *Press-Enterprise*: [¶] 'The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.' " (*Waller v. Georgia, supra*, 467 U.S. at p. 45; see also *NBC Subsidiary (KNBC-TV), Inc. v. Superior Court* (1999) 20 Cal.4th 1178, 1181 [86 Cal.Rptr.2d 778, 980 P.2d 337].)

Similarly, this court has explained that "a public trial ordinarily is one 'open to the general public at all times.' [Citations.] The Sixth Amendment public trial guarantee creates a 'presumption of openness' that can be rebutted only by a showing that exclusion of the public was necessary to protect some 'higher value,' such as the defendant's right to a fair trial, or the government's interest in preserving the confidentiality of the proceedings. [Citation.] When such a 'higher value' is advanced, the trial court must balance the competing interests and allow a form of exclusion no broader than needed to protect those interests. [Citation.] Specific written findings are required to enable a reviewing court to determine the propriety of the exclusion.' [Citations.]" (*People v. Woodward, supra*, 4 Cal.4th at p. 383, relying primarily on *Waller v. Georgia, supra*, 467 U.S. 39.)

In the present case, the trial court reasonably concluded that the governmental and public interest in apprehending a dangerous criminal justified a very minor infringement upon defendant's right to a public trial—but only during a limited portion of examination of a single witness and a brief segment of the argument to the jury. The trial court balanced defendant's right to present a defense and his right to a public trial with the "government's interest in inhibiting disclosure of sensitive information." (*Waller v. Georgia, supra*, 467 U.S. at pp. 45, 48.) Although "[s]uch circumstances will be rare" and "the balance of interests must be struck with special care" (*id.* at p. 45), we believe that the trial court in the present case identified an overriding state interest in keeping secret certain limited details concerning an unsolved crime. These details concerned evidence that would be known only to the perpetrator—details that clearly should be kept confidential for use in questioning witnesses. The closure affected only a small portion of a single witness's testimony and of the parties' argument to the jury on that portion of the evidence—the public was not excluded from a

substantial portion of the trial or pretrial hearings. (See *People v. Woodward, supra,* 4 Cal.4th at p. 384.)[23]

In the present case, an ample record demonstrates that the trial court's concern for the ongoing investigation of the unsolved crime justified the very limited closure of the courtroom that occurred. The court carefully weighed the competing interests involved and the options available to it, keeping the closure to the minimum necessary to serve the state's interest. As contemplated by the high court in the *Waller* decision, these brief closures did not infringe upon defendant's right to a public trial.

### 15. *Cumulative prejudice*

Defendant contends cumulative prejudice requires reversal of the guilt verdict, noting that the jury deliberated for portions of 10 days. He alleges he was deprived of a fair trial and reliable guilt determination in violation of state and federal constitutional principles.

We have not identified any significant errors at the guilt phase, nor do we believe there was cumulative prejudice.

Defendant claims that the charges were inflammatory and that the jury probably placed the burden of proof upon him, and that the circumstance that the jury convicted him of every charge, even those as to which he believes there was insufficient evidence, indicates the jury did not deliberate carefully. Defendant contends that even if the trial court did not err in refusing to grant the motion for change of venue, the effect of the intense pretrial publicity and the admission of signature-crime evidence undermined the fairness of the trial to his prejudice. He urges that the evidence was insufficient in many respects and that even if we find otherwise, it was extremely weak.

---

[23] We find support for our conclusion in decisions from other jurisdictions. In *U.S. v. Sherlock* (9th Cir. 1989) 962 F.2d 1349, for example, the court commented that the right to a public trial is not absolute, but on occasion "must give way . . . to other interests essential to the fair administration of justice. [Citations.] [¶] Federal courts have recognized limitations on that right where a judge has excluded spectators during a witness's testimony for a justifiable purpose," noting cases that permit carefully tailored closure to protect witnesses from harassment and physical harm. (*Id.* at p. 1356.) Many decisions have approved limited closure during the testimony of undercover officers, both in the interest of the officer's personal safety *and to prevent disruption of the officer's ongoing investigations.* (*Ayala v. Speckard* (2d Cir. 1997) 131 F.3d 62, 72 [closure during undercover officer's testimony to maintain effectiveness of undercover operations]; *United States ex rel. Lloyd v. Vincent* (2d Cir. 1975) 520 F.2d 1272, 1274, and cases cited [same]; *People v. Hinton* (1972) 31 N.Y.2d 71 [334 N.Y.S.2d 885, 286 N.E.2d 265, 267] [closure because of the danger to investigative agent's effectiveness and personal safety]; see *People v. Gonzalez* (App.Div. 2000) 277 A.D.2d 82 [716 N.Y.S.2d 23]; see also *Sevencan v. Herbert* (2d Cir. 2002) 316 F.3d 76, 84–85 [officer's safety was involved, and the closure served an overriding interest and was no broader than necessary].)

In essence, defendant asks us to reevaluate the evidence, claiming that assuming it was sufficient, the evidence was "close" and the eyewitness identifications were weak when factors discussed by his identification expert are considered. He contends his possession of jewelry belonging to the victims was not conclusive evidence that he was involved in stealing the jewelry. But all of this evidence was for the jury to consider; it is not our function to reevaluate the evidence to conclude whether the jury should have reached a different result on the theory that the evidence was close. (See *People v. Manriquez* (2005) 37 Cal.4th 547, 578 [36 Cal.Rptr.3d 340, 123 P.3d 614].) Nor do we agree that serious prosecutorial misconduct undermined the identification of defendant as the perpetrator, arising from the circumstance that the witnesses and the prosecutor commented, without objection, on the presence of defense counsel at the lineup.

We have not found error as to any of these claims, and we are not persuaded by defendant's suggestion that a number of issues he regards as "close" should require reversal on the ground of cumulative prejudice.

### B. *Claims affecting the penalty phase of the trial*

#### 1. *Motion for a separate penalty phase jury*

After the guilty verdicts had been entered, defendant moved for a new penalty phase jury, citing the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. After hearing argument, the court denied the motion.

■■■ Contrary to defendant's claim on appeal, he was not entitled to a separate jury for the penalty phase of the trial. Section 190.4, subdivision (c) "requires that, absent good cause, the same jury decide guilt and penalty at a capital trial." (*People v. Earp* (1999) 20 Cal.4th 826, 890 [85 Cal.Rptr.2d 857, 978 P.2d 15].) The statute expresses a long-standing preference for a single jury to decide guilt and penalty (*ibid.*), and we have rejected claims that this preference in itself constitutes a denial of due process of law or violates the defendant's right to a fair trial and reliable guilt and penalty determination. (*People v. Horton* (1995) 11 Cal.4th 1068, 1094 [47 Cal.Rptr.2d 516, 906 P.2d 478].)

"Good cause to discharge the guilt phase jury and to impanel a new one must be based on facts that appear ' " 'in the record as a demonstrable reality' " ' showing the jury's ' " 'inability to perform' " ' its function." (*People v. Earp, supra*, 20 Cal.4th at p. 891; see *People v. Bradford* (1997) 15 Cal.4th 1229, 1354 [65 Cal.Rptr.2d 145, 939 P.2d 259], and cases cited.) We review the court's denial of defendant's motion for a second jury for abuse of discretion. (*People v. Bradford, supra*, 15 Cal.4th at p. 1353.)

Defendant contends the court abused its discretion because it would be impossible for a jury that had heard the guilt phase evidence to decide upon an appropriate penalty. According to defendant, he was entitled to a new penalty phase jury that had not heard at trial the evidence of the eight charged burglaries and six charged attempted burglaries—offenses that, defendant asserts, were unconnected with the capital crimes. He claims the burglaries and attempted burglaries could not be considered in aggravation pursuant to section 190.3, factor (b), because they did not involve force or violence.

Defendant's argument fails because, as we explain *post*, the court appropriately determined that the evidence of the noncapital burglaries *properly* could be considered in aggravation under section 190.3, factor (b), as evidence of prior "criminal activity . . . which involved the use or attempted use of force or violence or the express or implied threat to use force or violence."

Defendant contends that even if the burglary and attempted burglary counts properly were considered under section 190.3, factor (b), reversible error still occurred because the trial court did not instruct the jury how it should determine whether or not these crimes involved force or violence within the meaning of section 190.3, factor (b).[24] Putting aside the tenuous connection between this claim and defendant's contention that the trial court abused its discretion in denying his motion for a separate penalty phase jury, the claim fails because, as we have held, instruction pursuant to the terms of section 190.3, factor (b) suffices, and a clarifying instruction is not required. (*People v. Dunkle* (2005) 36 Cal.4th 861, 922 [32 Cal.Rptr.3d 23, 116 P.3d 494].)[25]

### 2. Pitchess *motion*

The prosecution informed the defense that it would present in aggravation the testimony of San Diego County Deputy Sheriff Samuel Sheppard, who would recount an incident in which defendant had assaulted him in the

---

[24] The court instructed pursuant to section 190.3, factor (b), and pursuant to CALJIC No. 14.50 on burglary.

[25] Defendant claims that the court's error in denying his motion for a separate penalty phase jury violated various constitutional rights. He claims that when good cause for a separate penalty phase jury has been shown, denial of a motion for a separate penalty phase jury constitutes an arbitrary deprivation of a state entitlement in violation of his right to due process of law. But he did not demonstrate good cause for the empanelment of a separate jury. We also reject defendant's claims that this purported state law "error" rendered the penalty verdict unreliable in violation of the Eighth and Fourteenth Amendments, that the "taint" of the "inadmissible" burglary evidence deprived defendant of his right to a fair jury trial by an unbiased fact finder in violation of the due process clause of the United States Constitution, and that the "error" caused the jury to act without adequate guidance in violation of the Eighth and Fourteenth Amendments. Nor did the unitary jury so "skew" the balancing process that defendant was deprived of his right under the Eighth Amendment to have the jury fairly consider his evidence in mitigation.

county jail during the course of the trial. After the guilt phase verdict had been entered but before commencement of the penalty phase of the trial, defendant filed a motion seeking discovery of documents that recorded complaints against Sheppard for use of excessive force on persons in custody. (See *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 [113 Cal.Rptr. 897, 522 P.2d 305] (*Pitchess*).) In support, defendant supplied defense counsel's declaration recounting the officer's asserted use of force against defendant and also alleging that other individuals had filed complaints against the officer for use of excessive force. Defendant demanded all written records of any instance of the officer's use of force on any person in custody, names, addresses, and telephone numbers of all persons who had submitted complaints against the officer, and any documents recording disciplinary actions taken or investigations or possible disciplinary action to be taken against Sheppard related to the deputy's treatment of persons in custody.

The San Diego County Sheriff did not oppose defendant's request for names, addresses, and telephone numbers of complaining parties and witnesses involved in complaints against Deputy Sheppard during the previous five years, but the sheriff opposed release of any other material. The court evidently concluded that defendant had made a showing sufficient to require the court to order the sheriff's department to produce the records for the court's examination. The court conducted an in camera hearing and reviewed the sheriff's department records. Neither the prosecutor nor defense counsel were present at that hearing.

Subsequently, on the record, the court concluded that "good cause is shown to provide counsel with a list of witnesses which will be provided to all parties and a protective order will issue as to this list," but the court ruled good cause did not exist to order disclosure of any other material named in defendant's discovery motion.

On July 19, 1993, a disclosure and protective order was filed. It directed the sheriff's department to disclose to defendant "the names[] of complainants and witnesses regarding allegations of excessive force or violence by Deputy . . . Sheppard . . . , for the five-year period immediately preceding the arrest of the defendant," subject to a protective order prohibiting dissemination of the information.

Defendant contends the trial court infringed upon his constitutional rights, because he could not examine the sealed record of the in camera hearing in the trial court to determine whether the court ruled correctly on his discovery

motion.[26] More specifically, he contends that the Fifth and Fourteenth Amendments to the United States Constitution guarantee that he have access to a full and accurate record for the purpose of appellate review. He asserts the silence of the record undermines the reliability of the death judgment, and that his Sixth Amendment rights to confrontation and to counsel are implicated.

We are not persuaded by defendant's constitutional claims.

 "[S]tate law entitles a defendant only to an appellate record 'adequate to permit [him or her] to argue' the points raised in the appeal. [Citation.] Federal constitutional requirements are similar. The due process and equal protection clauses of the Fourteenth Amendment require the state to furnish an indigent defendant with a record sufficient to permit adequate and effective appellate review. [Citations.] Similarly, the Eighth Amendment requires reversal only where the record is so deficient as to create a substantial risk the death penalty is being imposed in an arbitrary and capricious manner. [Citation.] The defendant has the burden of showing the record is inadequate to permit meaningful appellate review. [Citation.]" (*People v. Rogers, supra,* 39 Cal.4th at pp. 857–858.) It is also "defendant's burden to show that deficiencies in the record are prejudicial." (*People v. Howard* (1992) 1 Cal.4th 1132, 1165 [5 Cal.Rptr.2d 268, 824 P.2d 1315].)

Defendant fails to demonstrate that the record is inadequate to permit effective review in this court. The in camera hearing to which defendant alludes was transcribed and has been examined by this court. The appellate record available to defendant is not "so deficient as to create a substantial risk the death penalty [was being inflicted] in an arbitrary and capricious manner" within the meaning of the Eighth Amendment. (*People v. Rogers, supra,* 39 Cal.4th at p. 857.) Moreover, the trial court proceedings properly occurred in camera and were sealed, as were the documents that formed the basis for the trial court's ruling. (*People v. Mooc* (2001) 26 Cal.4th 1216, 1229 [114 Cal.Rptr.2d 482, 36 P.3d 21].)

 Certainly, a defendant's right to discovery is intended to ensure a fair trial and an informed defense based upon " ' "all relevant and reasonably accessible information." ' " (*People v. Gonzalez* (2006) 38 Cal.4th 932, 960 [44 Cal.Rptr.3d 237, 135 P.3d 649].) On the other hand, defendant's right to counsel, to put on a defense, and to confrontation were not violated simply because the court followed the practice we outlined in *Pitchess* and have endorsed for many years, a practice we have concluded adequately balances

---

[26] On October 17, 2001, we denied defendant's motion to unseal the transcript of the in camera *Pitchess* hearing.

the defendant's right to a fair trial with the officer's right of privacy. (See *Pitchess v. Superior Court, supra,* 11 Cal.3d 531; see also *People v. Samuels* (2005) 36 Cal.4th 96, 109 [30 Cal.Rptr.3d 105, 113 P.3d 1125]; *Alford v. Superior Court* (2003) 29 Cal.4th 1033, 1043 [130 Cal.Rptr.2d 672, 63 P.3d 228]; *City of Los Angeles v. Superior Court* (2002) 29 Cal.4th 1, 14–16 [124 Cal.Rptr.2d 202, 52 P.3d 129]; *People v. Mooc, supra,* 26 Cal.4th at pp. 1226–1227, 1229; *City of San Jose v. Superior Court* (1993) 5 Cal.4th 47, 50–53 [19 Cal.Rptr.2d 73, 850 P.2d 621].)

In the present case, the trial court found good cause to examine the evidence concerning possible complaints against the officer. The proceedings conducted by the court were consistent with the standard we have established. As we have stated, the court should "review[] the pertinent documents in chambers and disclose[] only that information falling within the statutorily defined standards of relevance. [Citations.] The trial court may not disclose complaints more than five years old, the 'conclusions of any officer' who investigates a citizen complaint of police misconduct, or facts 'so remote as to make [their] disclosure of little or no practical benefit.' [Citations.] Typically, the trial court discloses only the names, addresses, and telephone numbers of individuals who have witnessed, or have previously filed complaints about, similar misconduct by the officer. [Citation.]" (*Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1019 [29 Cal.Rptr.3d 2, 112 P.3d 2].) The trial court followed precisely the procedure we have outlined.[27]

This court routinely independently examines the sealed records of such in camera hearings to determine whether the trial court abused its discretion in denying a defendant's motion for disclosure of police personnel records. (See *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 992 [47 Cal.Rptr.3d 467, 140 P.3d 775]; *People v. Chatman, supra,* 38 Cal.4th at p. 398; *People v. Samuels, supra,* 36 Cal.4th at pp. 110–111; *People v. Hughes, supra,* 27 Cal.4th at p. 330 [noting that customarily appellate counsel are not permitted to view transcripts of sealed *Pitchess* motion hearings].)

The record in the present case is adequate to permit meaningful appellate review. It includes a full transcript of both segments of the in camera hearing and the documents that formed the basis for the court's conclusion that defendant was not entitled to the complaints that had been filed against Sheppard. The court directed that the officer's personnel file not be copied and inserted into the record, but the court adequately stated for the record the contents of that file. (See *People v. Mooc, supra,* 26 Cal.4th at p. 1229 [in

---

[27] Defendant suggests that his trial counsel's presence at the in camera hearing, along with the opportunity to examine witnesses, might have elicited exculpatory evidence, otherwise supported his defense in the present case, or given rise to unknown constitutional claims of error, but this claim finds no support in the record we have reviewed.

some circumstances it suffices for the court to "state for the record what documents it examined"].) The court noted that there was not a single item indicating that Sheppard ever had suffered discipline for any reason.

We have reviewed the record under seal and independently conclude that the trial court did not abuse its discretion in its ruling upon the *Pitchess* motion. (See *People v. Hughes, supra,* 27 Cal.4th at p. 330 [an abuse-of-discretion standard of review applies].) Moreover, the trial court ordered disclosure of the names of complainants and witnesses in the first two incidents (the third being the one involving the complaint filed by defendant). Defendant had access to the information needed to explore the possibility that the deputy had been involved in the prior use of excessive force. Defendant offers no explanation why this information was inadequate, nor do we find any.

### 3. *Victim-impact evidence*

After appropriate objections from defendant and hearings held on several occasions, the court permitted the prosecution to introduce a videotape of a 25-minute interview of Holly Tarr that had been taped a few months prior to her death. Defendant contends the tape was inflammatory and went beyond the type of so-called victim-impact evidence that may be admitted consistently with constitutional principles. He claims a violation of his right to a fundamentally fair trial and to confront and cross-examine witnesses, citing the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. In addition, he claims the introduction of the evidence and its probable emotional impact upon the jury violated his right to due process of law and a reliable penalty determination, citing Evidence Code section 352 and the Fifth, Eighth, and Fourteenth Amendments.

In a capital trial, Eighth Amendment principles ordinarily do not prevent the sentencing authority from considering evidence of "the specific harm caused by the crime in question." (*Payne v. Tennessee* (1991) 501 U.S. 808, 825 [115 L.Ed.2d 720, 111 S.Ct. 2597].) The high court has explained that the prosecution has a legitimate interest in rebutting the mitigating evidence that the defendant is entitled to introduce by introducing aggravating evidence of the harm caused by the crime, " 'reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family.' " (*Ibid.*) "[W]e also have found such evidence (and related 'victim character' evidence) admissible as a 'circumstance of the crime' under section 190.3, factor (a)." (*People v. Robinson, supra,* 37 Cal.4th at p. 650, and cases cited.) We have cautioned, however, "that allowing such evidence under factor (a) 'does not mean that there are no limits on emotional

evidence and argument.' " (*Id.* at p. 651, quoting *People v. Edwards* (1991) 54 Cal.3d 787, 836 [1 Cal.Rptr.2d 696, 819 P.2d 436].)[28] " ' "The jury must face its obligation soberly and rationally, and should not be given the impression that emotion may reign over reason." ' " (*People v. Robinson, supra,* 37 Cal.4th at p. 651.)

Defendant contends the tape-recorded interview was emotionally inflammatory, thereby creating a danger that the jury would reach a decision based purely upon emotion. He claims that under constitutional principles and in accordance with Evidence Code section 352, the prosecution should not have been permitted to introduce victim-impact evidence "in which an attractive, articulate, and talented young performer with a stage background literally comes back from the dead to share her plans and dreams with the jury." He characterizes the videotape as an "extraordinarily emotional presentation."

We have viewed the videotape recording. It comprises a 25-minute interview with the victim, Holly Tarr, conducted at a local television station in the community of Okemos, Michigan. The court also admitted a transcript of the interview, which was provided to defense counsel and members of the jury prior to the playing of the tape. The trial court *excluded* portions of the videotape depicting Tarr's musical performances, because it determined that this evidence would be cumulative. The interviewer devoted nearly the entire interview to Tarr's training and interest in acting and singing, adding a few questions concerning Tarr's ability to balance school and artistic commitments. The tape recording exhibits a young female interviewer and Tarr, seated in chairs in front of a plain backdrop. There is no music and there are no cuts to other images of Tarr—the interview is a calm, even static, discussion of Tarr's accomplishments and interests that takes place entirely in a neutral, bland setting. Under ordinary circumstances, the two young women's discussion would appear unlikely to invite empathy or emotional response.

The jury viewed the videotape near the conclusion of the victim-impact testimony, and the tape was both preceded and succeeded by brief testimony from Tarr's mother. Prior to the playing of the videotape, testimony on the same subject was contributed by her natural father, Paul McKean Tarr, Jr.,

---

[28] Defendant contends that this court's decision in *People v. Edwards, supra,* 54 Cal.3d 787, limits victim-impact evidence to "evidence that logically shows the harm caused by the defendant." (*Id.* at p. 835.) He suggests that victim-impact evidence must be such as to portray the victim as he or she was when the defendant confronted the victim and that the videotape "showed far more than what she was like when her killer saw her, thereby going well beyond showing the harm caused by the killer." We reject the assertion, as we have rejected similar claims in other cases, that our law disallows "evidence of the victim's characteristics that were unknown to his killer at the time of the crime." (*People v. Roldan* (2005) 35 Cal.4th 646, 732 [27 Cal.Rptr.3d 360, 110 P.3d 289], and cases cited, fn. omitted.)

and her stepfather, Mark Rubin. Mr. Tarr spoke at length about his daughter's love for the theatre as well as the drastic effect her murder had had upon his life. Rubin barely spoke his own name before he was reduced to tears, requiring a recess to permit him to compose himself. The jury already had heard testimony from five other family members of victims Schultz, Weinhold, and Keller.

Case law pertaining to the admissibility of videotape recordings of victim interviews in capital sentencing hearings provides us with no bright-line rules by which to determine when such evidence may or may not be used. We consider pertinent cases in light of a general understanding that the prosecution may present evidence for the purpose of " 'reminding the sentencer . . . [that] the victim is an individual whose death represents a unique loss to society' " (*Payne v. Tennessee, supra*, 501 U.S. at p. 825), but that the prosecution may not introduce irrelevant or inflammatory material that " 'diverts the jury's attention from its proper role or invites an irrational, purely subjective response.' " (*People v. Edwards, supra*, 54 Cal.3d at p. 836.)

In one capital case, the court rejected a relevance challenge to the admission of a videotape recording that was used to demonstrate a particular skill for which a victim was nationally recognized. (*Whittlesey v. State* (1995) 340 Md. 30 [665 A.2d 223].) In *Whittlesey*, the court approved the admission of a 90-second videotape of a murder victim playing the piano. The court agreed with the trial court that the tape could illustrate the victim's talent better than any photograph. (*Id.*, 665 A.2d at p. 251.) In response to defense objections that testimony provided by the victim's parents rendered such evidence cumulative, the court stated that "[i]n reviewing objections based on relevance, great deference is afforded the trial judge in regulating the conduct of a trial." (*Ibid.*)

Another court permitted introduction of a videotape recording that had been condensed to three minutes, determining that the evidence fell within the accepted category of a " ' "quick glimpse of the life which [the defendant] chose to extinguish." ' " (*State v. Allen* (1999) 2000 NMSC 2 [128 N.M. 482, 994 P.2d 728, 751].) The court in that capital case also noted that a photograph from the same videotaped event had been presented to the jury without objection. (*Ibid.*; see also *State v. Gray* (Mo. 1994) 887 S.W.2d 369, 389 [videotape of victim's family at Christmas held admissible].)

On the other hand, two courts were particularly reluctant to allow videotape evidence that served as a memorial to the victim, finding that the probative value of such evidence was outweighed by the risk of unfair prejudice to the defendant. (See *U.S. v. Sampson* (D.Mass. 2004) 335 F.Supp.2d 166; *Salazar v. State* (Tex.Crim.App. 2002) 90 S.W.3d 330.) In

*Sampson*, the court excluded a 27-minute videotape that consisted of 200 still photographs depicting the victim at various stages of life from birth until death, set to "evocative contemporary music." (*U.S. v. Sampson, supra*, 335 F.Supp.2d at p. 191.)

Reviewing facts that we characterized as "extreme" (*People v. Robinson, supra*, 37 Cal.4th at p. 652), the Texas Court of Criminal Appeals disapproved of similar videotape evidence in *Salazar v. State, supra*, 90 S.W.3d 330, finding that in this noncapital case the trial court had abused its discretion in admitting a 17-minute videotape tribute to a murder victim. In remanding for an assessment of prejudice, the court stated in *Salazar* that "the punishment phase of a criminal trial is not a memorial service for the victim" (*id.* at pp. 335–336) and that "[w]hat may be entirely appropriate eulogies to celebrate the life and accomplishments of a unique individual are not necessarily admissible in a criminal trial." (*Id.* at p. 336.) The court complained that the trial court had not seen the videotape before it was played to the jury and consequently was unable to weigh the probative value of the tape against its prejudicial impact. (*Id.* at pp. 336–337.) The reviewing court emphasized the risk of unfair prejudice, noting the video contained many images from the adult victim's infancy and childhood. (*Id.* at pp. 337–338.)

 Courts must exercise great caution in permitting the prosecution to present victim-impact evidence in the form of a lengthy videotaped or filmed tribute to the victim. Particularly if the presentation lasts beyond a few moments, or emphasizes the childhood of an adult victim, or is accompanied by stirring music, the medium itself may assist in creating an emotional impact upon the jury that goes beyond what the jury might experience by viewing still photographs of the victim or listening to the victim's bereaved parents. The trial court in the present case clearly understood the power of this type of evidence, commenting early in the proceedings that "I have a great deal of concern about the medium of a videotape creating a situation of grave prejudice," and that "there is a qualitative difference between a videotape and a still photograph from an emotional standpoint." In order to combat this strong possibility, courts must strictly analyze evidence of this type and, if such evidence is admitted, courts must monitor the jurors' reactions to ensure that the proceedings do not become injected with a legally impermissible level of emotion.

Although we caution courts against the routine admission of videotapes featuring the victim, we do not believe that prejudicial error occurred under the circumstances of the present case. The videotaped evidence did not constitute " 'irrelevant information or inflammatory rhetoric that divert[ed] the jury's attention from its proper role or invite[ed] an irrational, purely

subjective response.' " (*People v. Edwards, supra*, 54 Cal.3d at p. 836.) Unlike the material presented in the *Sampson* and *Salazar* cases, as we have explained, the videotaped interview of Holly Tarr did not constitute an emotional memorial tribute to the victim. There was no music, emotional or otherwise. The tape did not, as the trial court in the present case initially feared it might, display the victim in her home or with her family, nor were there images of the victim as an infant or young child. The setting was a neutral television studio, where an interviewer politely asked questions concerning the victim's accomplishments on the stage and as a musician and the difficulty she experienced in balancing her many commitments, touching only briefly upon her plan to attend college in the fall and follow the stage as a profession. If not for the circumstances of her subsequent murder, the videotape admitted at trial likely would be of modest interest to anyone apart from Tarr and her friends and family. The loss of such a talented and accomplished person is poignant even for a stranger to contemplate, but the straightforward, dry interview depicted on the videotaped recording was not of the nature to stir strong emotions that might overcome the restraints of reason.

Significantly, the record on appeal also establishes that the trial court not only excluded portions of the interview displaying Tarr in performance, it also closely observed the jury for signs of emotional distress and made a careful record of its observations. During the numerous hearings on the admissibility of the videotaped evidence, the trial court repeatedly commented that it would not be allowing the proceedings to be hijacked by "an emotional setting of pathos." The court scrutinized the jury for evidence of emotional response during the playing of the tape, focusing on "not only the jurors but on all members of the spectating audience." At the completion of the interview, the court allowed only a few more minutes of testimony from Tarr's mother before dismissing the jury for the remainder of the day. When the session resumed the following morning, the court entertained further objections by defense counsel to the playing of the videotape. The court addressed each of defense counsel's contentions, ultimately concluding that although there was in fact an emotional response from certain members of the jury, the court "didn't see emotion running roughshod over judgment." The court assured both the prosecution and defense counsel that if it had observed an overly emotional response, it would not have hesitated to declare a mistrial, but that such a response simply did not occur.

The trial court concluded that although jurors exhibited sadness, their response was no stronger than they had displayed during the testimony given by members of the victims' families. According to the observations made by the court, no one on the jury broke down and cried or appeared overcome by emotion. The prosecutor did not exploit the emotional impact of the videotape, but instead refrained from any mention of the taped interview in closing

argument. Based upon the nature of the evidence and the court's close observation of the jury, we conclude that defendant's claims are without merit.

Defendant also contends his right to confront and cross-examine witnesses was violated by the introduction of the videotaped interview. He argues the admission of the videotaped interview "effectively amounted to having the victim return from the grave to testify to legally irrelevant matters, with no opportunity for the defense to confront and cross-examine this witness."

The trial court found no merit in defendant's argument, reasoning that the videotaped interview was not being admitted for the truth of its recorded statements. Rather, it was admitted to demonstrate to the jury Tarr's "reactions to the questions, her demeanor" and, the court further stated, "the content of the tape is secondary." The court surmised there would be no significant factual revelations stemming from the playing of the videotape because much of the information pertaining to Tarr's interests and plans already had been presented to the jury via testimony from the victim's family members.

We agree with the trial court that the videotape recording was not offered primarily for the truth of the statements it contained and that even if it was offered in part for the truth of those statements, the information conveyed was cumulative to other testimony as to which defendant did have an opportunity for cross-examination. In addition, as we have explained, we are confident that the admission of the tape recording was not prejudicial under the circumstances of the present case.

### 4. *Instruction on and jury's consideration of the burglaries not directly related to the murders*

Defendant argued at trial that the jury should not be permitted to consider certain guilt phase evidence as a circumstance in aggravation under section 190.3, factor (b). Specifically, he asserted that the jury should not be permitted to consider guilt phase evidence concerning the burglaries and attempted burglaries that were not directly connected with the capital offenses. He argued that these assertedly unrelated offenses did not come within section 190.3, factor (b), because they did not involve force or violence.

The trial court disagreed with defendant. The court instructed the jury that the burglaries and attempted burglaries *may* have involved the use of force or violence or the express or implied threat of violence, but that it was for the jurors to decide whether they believed beyond a reasonable doubt that defendant committed those acts, whether they involved the use or attempted

use of force or violence or the express or implied threat to use force or violence, and whether the acts were criminal. (The court instructed the jury that, as a matter of law, perjury (one of the charged offenses) does not involve force or violence and could not be considered under section 190.3, factor (b).)

██ Defendant contends on appeal that noncapital crimes of which a defendant was convicted in the same proceeding never may be considered at the penalty phase as evidence in aggravation under section 190.3, factor (b), whether the crimes are violent or not. In support he cites *People v. Miranda* (1987) 44 Cal.3d 57 [241 Cal.Rptr. 594, 744 P.2d 1127], disapproved on another point in *People v. Marshall* (1990) 50 Cal.3d 907 [269 Cal.Rptr. 269, 790 P.2d 676], in which we declared that factor (b) pertains "only to criminal activity other than the crimes for which the defendant was convicted in the present proceeding." (*People v. Miranda, supra,* 44 Cal.3d at p. 106.) The quoted language does not carry the meaning that defendant attributes to it, because the issue in the *Miranda* decision involved the danger that a jury would double-count evidence under section 190.3, factor (a) (circumstances of the crime) and factor (b) (other criminal activity involving violence)—not whether convictions in the same proceeding that were unrelated to the capital crimes could be considered under factor (b). Evidence presented at the guilt phase may be considered at the penalty phase of the trial (§ 190.4, subd. (d)), and defendant offers no logical reason to support the conclusion that evidence that otherwise would be admissible under factor (b) would become inadmissible because of a joinder with capital offenses.

Defendant contends the charged burglaries and attempted burglaries that were unconnected temporally with the capital offenses did not all involve violence or the threat of violence. Defendant claims that "thirteen of the fifteen present factor (b) burglaries and attempted burglaries did not involve any evidence of arming or knife movement [*sic*] at all." He contends the jury instructions on the burglary and attempted burglary charges improperly permitted the jury to rely upon the offenses as aggravating evidence even though they did not involve the use or threat of force or violence, in violation of section 190.3, factor (b).

We disagree with defendant and agree with the trial court that, under the circumstances of the present case, the evidence was sufficient to permit a rational trier of fact to conclude beyond a reasonable doubt that the burglaries and attempted burglaries involved at least an implied threat of violence. (See *People v. Clair* (1992) 2 Cal.4th 629, 672–673 [7 Cal.Rptr.2d 564, 828 P.2d 705] [stating standard].) We base our determination on all the evidence concerning defendant's use of violence in the burglaries that culminated in the capital murders; his possession of knives (either his own or those that originated in the home he was burglarizing) in various of the capital and

noncapital crimes; his stalking behavior in most of the noncapital burglaries and attempted burglaries; his repeated attempts to burglarize residences knowing that their young female inhabitants were at home and possibly were showering; his violence during the Hughes-Webb burglary; his statement to his accomplice Moheshea Beasley that if the resident of an apartment had appeared unexpectedly during a burglary, he would have slit her throat; and Shirley Beasley's testimony that during one of their joint burglaries, defendant took a knife from the kitchen of the burglarized residence and instructed Beasley that if the resident returned, Beasley should step aside and defendant would "handle it." Shirley Beasley also testified that defendant told him that if a resident returned to a house defendant was burglarizing, defendant would stab the person in the heart or the neck. (See *People v. Michaels* (2002) 28 Cal.4th 486, 536 [122 Cal.Rptr.2d 285, 49 P.3d 1032] [illegal possession of weapons along with evidence defendant used those or similar weapons in other crimes could be considered under § 190.3, factor (b)]; see also *People v. Montiel* (1993) 5 Cal.4th 877, 936 [21 Cal.Rptr.2d 705, 855 P.2d 1277] [actual or threatened violence in burglary]; *People v. Tuilaepa* (1992) 4 Cal.4th 569, 589 [15 Cal.Rptr.2d 382, 842 P.2d 1142] [illegal possession of weapon in custody constitutes implied threat of violence]; *People v. Clair, supra,* 2 Cal.4th at pp. 676–677 [evidence that defendant picked up a knife during a burglary "to avoid apprehension and make good his escape" could be "an implied threat to use the knife against anyone who might interfere"].)

Defendant contends the court's instructions were inadequate to inform the jury of its responsibilities, and he surmises that the standard instructions on section 190.3, factor (b) would permit a juror to conclude that "any residential burglary is a crime of violence, even if no force was used in making entry."[29]

Defendant's principal contention seems to be that the court should have afforded additional guidance on the meaning of the terms "force" and "violence"—terms he claimed involve "technical legal distinctions not a matter of common knowledge." We previously have rejected the identical claim, and defendant offers no persuasive reason for us to reconsider our holding. (*People v. Dunkle, supra,* 36 Cal.4th at p. 922 [rejecting state law and 8th Amend. claims].)[30]

---

[29] Defendant also complains that the court "never communicated to the jury" its view that the burglaries were not "part of an overall scheme that included the murders." The court's point in making this declaration was to explain why it rejected the prosecutor's argument that all the noncapital burglaries and attempted burglaries could be considered under section 190.3, factor (a), the circumstances of the crime.

[30] Having found no error, we also reject defendant's claim that the asserted error denied him various state and federal constitutional rights.

### 5. *Prosecutorial misconduct*

Petitioner contends the prosecutor committed misconduct during his questioning of defense expert James Park and during argument to the jury.

James Park, a former associate warden at San Quentin prison, testified on defendant's behalf. Park described prison conditions and the daily life experienced by persons sentenced to life imprisonment without possibility of parole. He described the generally "stabilizing" influence of life prisoners upon prisoners serving shorter terms. During cross-examination, the court sustained defendant's objection to the prosecutor's question whether the witness previously had "personalized" his testimony. The prosecutor then asked whether the witness was predicting "how he's [defendant] going to do." The witness stated he had not testified to that effect. The prosecutor then asked: "But in the past, you've talked about a specific defendant doing well in prison? You predicted that, haven't you?" The defense successfully objected on relevance grounds.

According to defendant, the prosecutor's questions insinuated that the witness would not speak of defendant personally because the witness knew there was nothing good that could be said about him. According to defendant, the questions undermined important defense evidence in mitigation, and "[n]o admonition could have undone the harm caused by this misconduct." Defendant alleges this purported misconduct rendered the penalty trial fundamentally unfair and thereby constituted a denial of the right to due process of law under the United States Constitution. In addition, "once the prosecutor used improper leading questions to imply evidence that did not exist and would not have been relevant if it did exist, there was no realistic manner in which the defense could have 'confronted' the improper implication. This deprived [defendant] of his federal 6th and 14th Amendment rights to confront and cross-examine the witnesses against him . . . [and] effectively deprived [defendant] of his right to present witnesses in his own behalf." Defendant also claims denial of his constitutional right to a reliable penalty phase determination and his constitutional right to have the jury consider his evidence in mitigation.

The witness never answered the prosecutor's questions. Defendant did not seek an admonition to the jury to disregard the prosecutor's questions, a circumstance that ordinarily causes the forfeiture of a claim. Claims of prosecutorial misconduct ordinarily are forfeited for the purpose of appeal unless the defendant objects to the asserted misconduct at trial and requests an admonition to the jury, or an admonition would not have cured the harm. (*People v. Fierro* (1991) 1 Cal.4th 173, 211 [3 Cal.Rptr.2d 426, 821 P.2d 1302].)

Moreover, the jury was instructed that the attorneys' questions do not constitute evidence, and that it should not speculate concerning the answer that might have been given to a question or assume the truth of any insinuation suggested by a question as to which an objection was sustained. As a general matter, we may presume that the jury followed the instructions it was given (*People v. Cunningham* (2001) 25 Cal.4th 926, 1014 [108 Cal.Rptr.2d 291, 25 P.3d 519]), and defendant has failed to supply any persuasive reason to suppose the jury instead would have accepted as evidence the insinuation allegedly implicit in the prosecutor's questions.

Defendant also argues that in closing argument, the prosecutor improperly appealed to the passions of the jury and invited the jury to engage in a mechanical weighing process, in violation of various constitutional rights. Defendant points to the prosecutor's argument that the defense was inviting the jury to impose the same penalty—life in prison without possibility of parole—that would have been the minimum punishment had defendant committed only the offenses against Janene Weinhold. The prosecutor pointed to the additional aggravating factors of defendant's five other murders. He suggested that defense counsel essentially would be arguing that the other five murder victims did not count—that "these women are freebies. Let's throw these bodies in. And we are not going to exact one more day, one more ounce of punishment against [defendant] for killing six than we would the one."

Defendant did not object to the argument, nor did he seek an admonition to the jury. Under the circumstances, he forfeited any claim based on the principles stated above. In addition, contrary to defendant's claim, we do not believe that the prosecutor told the jury that all multiple murders automatically warrant the death penalty, nor do we believe his argument was an improper appeal to passion or invited the jury to engage in a mechanical weighing process. The circumstances of the charged capital crimes are appropriate factors in aggravation, and it is not improper to suggest that a defendant who murders six persons is more culpable and therefore should receive a more severe sentence than a defendant who murders only one victim.

Defendant cites a decision filed by a majority of the Illinois Supreme Court holding that a similar argument constituted reversible error at the penalty phase of a capital murder trial. (*People v. Kuntu* (2001) 196 Ill.2d 105 [256 Ill.Dec. 500, 752 N.E.2d 380, 403].) The decision held that the prosecutor's argument was a call to the jury to act on the basis of passion and prejudice and also amounted to an argument that all multiple murderers automatically must be punished by death. (*Ibid.*) The prosecutor's reference to "five free murders," the majority maintained, was "simply an inflammatory statement

with no basis in either law or fact; it is tantamount to the conclusion that, as a matter of law, a person who kills more than two persons should be sentenced to death." (*Ibid.*) The decision concluded that standard jury instructions informing the jury that the prosecutor's argument does not constitute evidence did not, under the particular facts of the case, cure the prosecutor's asserted misconduct. The court concluded that "[i]n light of the closely balanced evidence presented at the penalty phase of the death sentencing hearing, the risk is simply too great that the prosecutor's comments improperly influenced the jury's sentencing decision." (*Id.*, 752 N.E.2d at p. 404.)

We believe that the three dissenting justices in *Kuntu* took the better view. As the dissent pointed out, and as we believe is true in the present case as well, the prosecutor "at no time argued that the death penalty should always be imposed when more than two persons are killed. Instead, the State implied, through its comments, that the offense was particularly egregious and especially deserving of the death penalty. The State commented, as it has a right to do, that defendant's crime was an atrocious crime that resulted in the senseless death of seven victims . . . . Thus, the State's comments, although inartful, were not misstatements of the death penalty law and should not be construed in such a fashion." (*People v. Kuntu, supra*, 752 N.E.2d at p. 409 (dis. opn. of Fitzgerald, J.).)

### 6. *Failure to exclude evidence of defendant's possession of a weapon while he was in custody*

Defendant contends the trial court erred in determining that it lacked the discretion ordinarily afforded by Evidence Code section 352—which acknowledges the court's discretion to exclude evidence that is more prejudicial than probative—to exclude evidence of defendant's possession of a weapon in jail as a factor in aggravation under section 190.3, factor (b).

In *People v. Box* (2000) 23 Cal.4th 1153, 1201 [99 Cal.Rptr.2d 69, 5 P.3d 130], we declared that the trial court retains its "traditional discretion" to exclude " 'particular items of [section 190.3, factors (a) or (b)] evidence' " that are to be used in a " 'manner' that is misleading, cumulative, or unduly inflammatory." In addition, "factor (b) evidence, even if it fairly depicts the moral blameworthiness of the defendant, may nonetheless be excludable under Evidence Code section 352 insofar as it unfairly persuades jurors to find the defendant guilty of the crime's commission." (*Ibid.*) Even assuming error under *Box* in the present case, any error could not have been prejudicial. Defendant presents no reason for us to conclude that the evidence in question

was *unduly* inflammatory or prejudicial. He contends the evidence might demonstrate that defendant was likely to be dangerous in the future, but such an inference was proper.[31]

### 7. Challenges to the California death penalty scheme

Defendant raises various constitutional challenges to the California death penalty statute, but we reject them as we have done in prior cases.

a. Admitting evidence of prior unadjudicated crimes in aggravation does not violate the Fifth, Sixth, Eighth, or Fourteenth Amendment guarantees of fair trial, trial by an impartial jury, speedy trial, and reliability, or the prohibition on placing persons twice in jeopardy for the same offense. (*People v. Box, supra,* 23 Cal.4th at p. 1217.)

b. Failure to require that the jury unanimously find the aggravating circumstances true beyond a reasonable doubt, to find unanimously and beyond a reasonable doubt that aggravating circumstances outweigh mitigating circumstances, or to require a unanimous finding beyond a reasonable doubt that death is the appropriate penalty does not violate the Fifth, Eighth, or Fourteenth Amendment guarantees of due process and a reliable penalty determination. (*People v. Box, supra,* 23 Cal.4th at p. 1217.)

The California death penalty statute is not unconstitutional in failing to require the jury to make written findings concerning the aggravating circumstances it relied upon, nor does the failure to require written findings preclude meaningful appellate review. (*People v. Morrison* (2004) 34 Cal.4th 698, 730–731 [21 Cal.Rptr.3d 682, 101 P.3d 568].) Neither *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348], nor *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428], nor *Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531] "affects California's death penalty law or otherwise justifies reconsideration of the foregoing decisions." (*People v. Morrison, supra,* 34 Cal.4th at p. 731.) At oral argument in the present case, defense counsel filed a letter that added a citation to the high court's recent, related decision in *Cunningham v. California* (2007) 549 U.S. __ [166 L.Ed.2d 856, 127 S.Ct. 856]. The *Cunningham* decision involves merely an extension of the *Apprendi* and *Blakely* analyses to California's determinate sentencing law and has no apparent application to the state's capital sentencing scheme. In *Apprendi, supra,* 530 U.S. 466, the high court "found a constitutional requirement that

---

[31] For the same reason that we rejected defendant's state law claim, we reject his claim that he suffered an arbitrary deprivation of the benefit of state law (*Hicks v. Oklahoma, supra,* 447 U.S. 343) and that he was deprived of the right to a reliable penalty determination. (*Woodson v. North Carolina, supra,* 428 U.S. 280.)

any fact, other than a prior conviction, which increases the maximum penalty for a crime must be formally charged, submitted to the fact finder, treated as a criminal element, and proved beyond a reasonable doubt. [Citation.] But under the California death penalty scheme, once the defendant has been convicted of first degree murder and one or more special circumstances has been found true beyond a reasonable doubt, death *is* no more than the prescribed statutory maximum for the offense; the only alternative is life imprisonment without possibility of parole." (*People v. Anderson, supra*, 25 Cal.4th at pp. 589–590, fn. 14.) Defendant's failure to supply any discussion or analysis of the *Cunningham* decision leaves us with no basis to conclude that it should cause us to alter our views.

c. The California death penalty statute does not fail to narrow the class of persons eligible for the death penalty as required by the Eighth Amendment and article I, section 17 of the California Constitution. (*People v. Gray, supra*, 37 Cal.4th at p. 237; *People v. Smithey* (1999) 20 Cal.4th 936, 1017 [86 Cal.Rptr.2d 243, 978 P.2d 1171].)

d. Contrary to defendant's claim, comparative intercase proportionality review is not required by the United States Constitution. (*People v. Snow* (2003) 30 Cal.4th 43, 126, 127 [132 Cal.Rptr.2d 271, 65 P.3d 749]), but intracase proportionality review is available. (*People v. Hillhouse, supra*, 27 Cal.4th at p. 511.)

e. The use of the terms "extreme" or "substantial" does not improperly limit the jury's consideration of mitigating evidence in violation of the Fifth, Sixth, Eighth, or Fourteenth Amendments. (*People v. Smith* (2003) 30 Cal.4th 581, 642 [134 Cal.Rptr.2d 1, 68 P.3d 302].)

f. "Nor does the prosecutorial discretion to charge special circumstances or seek the death penalty under the [California death penalty] statute violate the federal Constitution." (*People v. Box, supra*, 23 Cal.4th at p. 1217.)

g. Delay in the appointment of counsel on appeal and in processing the appeal does not inflict cruel or unusual punishment within the meaning of the state or United States Constitution. (*People v. Lenart* (2004) 32 Cal.4th 1107, 1131 [12 Cal.Rptr.3d 592, 88 P.3d 498].)

h. Contrary to defendant's claim, the statutory sentencing factors are not so arbitrary, broad, or contradictory that they provide inadequate guidance to the jury. (*People v. Morrison, supra*, 34 Cal.4th at p. 729.)

i. There is no constitutional requirement of a presumption in favor of a sentence of life imprisonment without the possibility of parole. (*People v. Maury* (2003) 30 Cal.4th 342, 440 [133 Cal.Rptr.2d 561, 68 P.3d 1].)

j. Appellate review of death judgments is not impermissibly influenced by political considerations in violation of the Fifth, Sixth, Eighth, or Fourteenth Amendments to the United States Constitution. (*People v. Kipp, supra,* 26 Cal.4th at pp. 1140–1141.)

k. Defendant contends that the various violations of state and federal law he has asserted also constitute a violation of international law, but he "fail[s] to establish the premise that his trial involved violations of state and federal constitutional law." (*People v. Jenkins, supra,* 22 Cal.4th at p. 1055.) Further, "[t]o the extent defendant alleges violations of the International Covenant on Civil and Political Rights . . . his claim lacks merit, even assuming he has standing to invoke this covenant." (*People v. Cornwell* (2005) 37 Cal.4th 50, 106 [33 Cal.Rptr.3d 1, 117 P.3d 622]; see *People v. Brown* (2004) 33 Cal.4th 382, 404 [15 Cal.Rptr.3d 624, 93 P.3d 244].)

### 8. *Cumulative prejudice*

█ Defendant contends that guilt phase errors that may have been harmless at the guilt phase were prejudicial at the penalty phase. He cites (1) asserted error in admitting evidence of the knives discovered in his automobile at the time of his arrest; and (2) admission of "evidence of ambiguous statements made by [defendant] which were not sufficiently tied to the present crimes, but which nonetheless portrayed [defendant] as having a negative attitude toward females." Defendant contends this assertedly improperly admitted character evidence affected the penalty determination and also might have caused the jury to dismiss any lingering doubts they had concerning defendant's guilt. Defendant also contends the prejudicial impact of any guilt phase error on the penalty determination is subject to review under the *Chapman v. California, supra,* 386 U.S. 18, standard for review of federal constitutional error, rather than the *People v. Brown* (1988) 46 Cal.3d 432 [250 Cal.Rptr. 604, 758 P.2d 1135] test for state law error at the penalty phase. But "[w]e have explained that '*Brown*'s "reasonable possibility" standard and *Chapman*'s "reasonable doubt" test . . . are the same in substance and effect.' " (*People v. Gonzalez, supra,* 38 Cal.4th at p. 961, fn. omitted.) As we have concluded, the admission of the evidence of the knives was harmless under the most exacting standard of review (see *People v. Robinson, supra,* 37 Cal.4th at p. 655), and we have rejected defendant's claim concerning the admission of his statements.

## III. CONCLUSION

For the foregoing reasons, the judgment is affirmed in its entirety.

Kennard, J., Baxter, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied July 18, 2007.